**DROBNEKO & ASSOCIATES, P.C.**
*Proposed Counsel to the Debtor*
25-84 Steinway Street,
Astoria, N.Y. 11103
(718) 721-2000
Walter Drobenko (Wdrobenko@cs.com)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re:<br><br>CPJFK, LLC,<br><br>Debtor. | Chapter 11<br>Case No. 10-50566 (CEC) |

### DISCLOSURE STATEMENT APPURTENANT TO
### CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY CPJFK, LLC

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.

Dated:      March 7, 2011

CPJFK, LLC, the debtor (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case") pending in the United States Bankruptcy Court for the Eastern District of New York, submits this disclosure Statement (the "Disclosure Statement") pursuant to § 1125 of title 11 of the United States Code (the "Bankruptcy Code") in connection with the Debtor's proposed plan of reorganization, dated March 7, 2011 (the "Plan"). (A copy of the Plan is annexed to this Disclosure Statement as **Exhibit A**).

## IMPORTANT NOTICES

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST POSSIBLE RESULT FOR ALL HOLDERS OF CLAIMS AND INTERESTS AND THEREFORE BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR'S CREDITORS AND INTEREST HOLDERS. THE DEBTOR STRONGLY URGES ALL HOLDERS OF CLAIMS IN IMPAIRED CLASSES RECEIVING BALLOTS THAT ARE ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

THIS DISCLOSURE STATEMENT IS DESIGNED TO SOLICIT YOUR ACCEPTANCE OF THE PLAN AND CONTAINS INFORMATION RELEVANT TO YOUR DECISION. PLEASE READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE OTHER MATERIALS COMPLETELY AND CAREFULLY. THE SUMMARIES OF THE PLAN AND OTHER STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED HERETO, AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE BANKRUPTCY COURT BEFORE OR CONCURRENTLY WITH THE FILING OF THIS DISCLOSURE STATEMENT AND THE PLAN. FURTHERMORE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL CONTINUE TO BE MATERIALLY ACCURATE; OR (B) THE DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

CLASS 2(a) (SECURED CLAIM OF NESHGOLD, LP), CLASS 3 (PRIORITY NON-TAX CLAIMS), AND CLASS 4 (GENERAL UNSECURED CLAIMS) ARE IMPAIRED UNDER THE PLAN AND ENTITLED TO VOTE ON THE PLAN. CLASS 1(a) (SUPER-PRIORITY CLAIM OF SCS), CLASS 1(b) (SUPER-PRIORITY CLAIM OF NESHGOLD, LP), CLASS 2(b) (OTHER SECURED CLAIMS) AND CLASS 5 (EQUITY INTERESTS) ARE UNIMPAIRED AND HOLDERS OF SUCH CLAIMS OR INTERESTS ARE CONCLUSIVELY PRESUMED TO HAVE ACCEPTED THE PLAN PURSUANT TO § 1126(f) OF THE BANKRUPTCY CODE.

HOLDERS OF IMPAIRED CLAIMS ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT PRIOR TO SUBMITTING BALLOTS. IN MAKING A DECISION TO ACCEPT OR REJECT THE PLAN, EACH HOLDER OF CLAIM IN AN IMPAIRED CLASS MUST RELY ON ITS OWN EXAMINATION OF THE DEBTOR'S SCHEDULES AS

DESCRIBED IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. IN ADDITION, CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO CONDITIONS PRECEDENT THAT COULD LEAD TO DELAYS IN CONSUMMATION OF THE PLAN. THERE CAN BE NO ASSURANCE THAT EACH OF THESE CONDITIONS WILL BE SATISFIED OR WAIVED (AS PROVIDED IN THE PLAN) OR THAT THE PLAN WILL BE CONSUMMATED EVEN AFTER THE EFFECTIVE DATE. DISTRIBUTIONS UNDER THE PLAN MAY BE SUBJECT TO SUBSTANTIAL DELAYS FOR HOLDERS OF CLAIMS THAT ARE DISPUTED.

AN IMPAIRED CLASS OF CLAIMS WILL BE DEEMED TO HAVE ACCEPTED THE PLAN IF THE HOLDERS OF CLAIMS IN SUCH CLASS (OTHER THAN ANY HOLDER DESIGNATED UNDER § 1126(e) OF THE BANKRUPTCY CODE) WHO CAST VOTES IN FAVOR OF THE PLAN HOLD AT LEAST TWO-THIRDS IN DOLLAR AMOUNT AND MORE THAN ONE-HALF IN NUMBER OF THE ALLOWED CLAIMS THAT ARE HELD BY HOLDERS OF CLAIMS ACTUALLY VOTING IN SUCH CLASS.

WITH RESPECT TO ANY IMPAIRED CLASS THAT DOES NOT ACCEPT THE PLAN, THE DEBTOR WILL REQUEST THAT THE BANKRUPTCY COURT CONFIRM THE PLAN UNDER § 1129(b) OF THE BANKRUPTCY CODE. THAT SECTION PERMITS CONFIRMATION OF THE PLAN DESPITE REJECTION BY ONE OR MORE CLASSES IF THE BANKRUPTCY COURT FINDS THAT THE PLAN "DOES NOT DISCRIMINATE UNFAIRLY" AND IS "FAIR AND EQUITABLE" AS TO THE CLASS OR CLASSES THAT DO NOT ACCEPT THE PLAN. FOR A MORE DETAILED DESCRIPTION OF THE REQUIREMENTS FOR ACCEPTANCE OF THE PLAN AND OF THE CRITERIA FOR CONFIRMATION, SEE ARTICLE V OF THIS DISCLOSURE STATEMENT.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS WITH RESPECT TO THE PLAN OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS OR INFORMATION CONCERNING THE DEBTOR, OR THE VALUE OF THE DEBTOR'S PROPERTY HAVE BEEN AUTHORIZED OTHER THAN AS SET FORTH HEREIN. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH § 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH OTHER APPLICABLE NON-BANKRUPTCY LAWS. ENTITIES HOLDING, TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, OR INTERESTS IN THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

IF THE REQUISITE ACCEPTANCES OF THE PLAN ARE RECEIVED, THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE WHO DO NOT SUBMIT BALLOTS ACCEPTING OR TO REJECTING THE PLAN) WILL BE BOUND BY THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL OR REGULATORY AUTHORITY, AND NEITHER SUCH COMMISSION NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY DISTRIBUTION OF PROPERTY PURSUANT TO THE PLAN WILL UNDER ANY CIRCUMSTANCES CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF OR THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN OR IN THE AFFAIRS OF THE DEBTORS SINCE THE DATE HEREOF.

EACH CREDITOR AND INTEREST HOLDER OF THE DEBTOR SHOULD CONSULT WITH THEIR LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

## I.

## INTRODUCTION

This Disclosure Statement is being furnished by the Debtor pursuant to § 1125 of the Bankruptcy Code, in connection with the solicitation of Ballots to accept or reject the Plan from Holders of Claims in Classes 2(a), 3 and 4. All capitalized terms used in this Disclosure Statement have the meanings ascribed to such terms in the Plan, except as otherwise indicated. The following introduction and summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information, financial statements and notes appearing elsewhere in this Disclosure Statement.

On or about March 7, 2011, the Debtor filed the Plan with the Bankruptcy Court. Concurrently therewith, the Debtor filed this Disclosure Statement with the Bankruptcy Court pursuant to § 1125 of the Bankruptcy Code and in connection with the solicitation of Ballots to accept or reject the Plan (the "Solicitation").

On _____ ___, 2011, the Bankruptcy Court determined that this Disclosure Statement contains "adequate information" in accordance with § 1125 of the Bankruptcy Code. "Adequate information" is defined in the Bankruptcy Code as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan[.]" 11 U.S.C. § 1125(a)(1).

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for _____ ___, 2011 at ___:___ __.m. (prevailing Eastern Time), before the Honorable Carla E. Craig, Chief United States Bankruptcy Judge, at the United States Bankruptcy Court for the Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201. The hearing may be adjourned from time to time without further notice other than by announcement in the Bankruptcy Court on the scheduled date of such hearing or any adjourned hearings thereof. Any objections to confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on counsel for the Debtor listed below to ensure RECEIPT by them on or before _____ ___, 2011 at 5:00 p.m. (prevailing Eastern Time). Counsel on whom objections must be served are:

**DROBENKO & ASSOCIATES, PC**
25-84 Steinway Street
Astoria, New York 11103
(718) 721-2000
Walter Drobenko, Esq.

Generally speaking creditors holding Claims in Impaired Classes under the Plan are entitled to vote to accept or reject the Plan. Please carefully follow all of the instructions contained on the Ballot or Ballots provided to you with this Disclosure Statement if you are entitled to vote on the Plan. All Ballots must be completed and returned in accordance with the instructions provided. To be counted, your Ballot must be received by the Voting Deadline at the address set forth on the Ballot. It is of the utmost importance to the Debtor that you vote promptly to accept the Plan. A detailed discussion of voting rights and how voting affects confirmation of the Plan is set forth in § ____ hereof.

Attached hereto as Exhibits are copies of the following documents:

**Exhibit A:** The Plan;

**Exhibit B:** Order of the Bankruptcy Court, dated _____ ___, 2011 (the "Solicitation Procedures Order"), approving this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan;

**Exhibit C:** SCS Commitment Letter;

**Exhibit D:** Emergency Changes to Union Contract

**Exhibit E:** Letters of Interest from Hotel Franchisors

**Exhibit F:** Financial Projections with Union Concessions

**Exhibit G:** Liquidation Analysis

## II

## SUMMARY OF CLASSIFICATION AND
## TREATMENT OF CLAIMS AND INTERESTS

THE SUMMARY OF THE PLAN'S CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS SET FORTH BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS SET FORTH IN THE PLAN, THE TERMS OF WHICH CONTROL.

The estimated aggregate amount of claims in each class, and the estimated amount and nature of consideration to be distributed to each class, is summarized in the table below. In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified. The estimated amount of Claims shown in the table below are based upon: (i) the Debtor's preliminary review of its books and records; the Debtor's filed Schedules; and (iii) proofs of Claim filed with the Bankruptcy Court by parties purporting to hold claims against the Debtor. These estimated amounts may be revised substantially following further analysis. For purposes of computations of Claim amounts, Administrative Claims and other expenses and for similar computational purposes, the Effective Date is assumed to occur on or about two hundred and seventy (270) days following the Confirmation Date, _____ ___, 2011. The basis for this assumption stems from the Conditions to the Effective Date, set forth in § ____ below, which provides, among other things, that as a condition to the Plan becoming effective, not more than two hundred and seventy (270) days shall have lapsed following the Confirmation Date.

### SUMMARY OF CLASSIFICATION AND TREATMENT UNDER THE PLAN

| Class | Treatment | Status/Right to Vote | Aggregate Claims | Recovery under Plan |
|-------|-----------|----------------------|------------------|---------------------|
| Class 1(a) Super-Priority Secured Claim of SCS | Payment in Accordance with Terms of SCS Note | Unimpaired Not Entitled to Vote | $4,534,190.00 | 100% |
| Class 1(b) Super-Priority Secured Claim of Neshgold, LP | Full Payment as soon after Confirmation as practicable, but in no event later than Effective Date | Unimpaired Not Entitled to Vote | $300,000.00 | 100% |
| Class 2(a) Secured Claim of Neshgold, LP | Monthly payment of Interest at the Annual Rate of 2 % in year 1, 2.5% in year 2, 3% in year 3 | Impaired Entitled to Vote | $15,300,000.00 | 100% |

| | | | | |
|---|---|---|---|---|
| | and thereafter Libor plus 3 for the balance of the seven years, then a balloon payment equal to the principal, as may be adjusted through litigation | | | |
| Class 2(b) Other Secured Claims | Cash on Effective Date or the Surrender of Collateral (subject to prior liens) | Unimpaired Not Entitled to Vote | $250,000.00 | 100% |
| Class 3 Priority Non-Tax Claims | Monthly installment payments in Cash, together with interest, over a period of not more than two (2) years from the Effective Date, but Debtor reserve the right to pay Cash in full on the Effective Date | Impaired Entitled to Vote | $100,000.00 | 100% |
| Class 4 General Unsecured Claims | Twenty Five Percent of their Claims in annual installments over a period of four years from the Effective Date | Impaired Entitled to Vote | $3,500,000.00 | 25% |
| Class 5 Equity Interests | Retain their Interests in the Debtor | Unimpaired Not Entitled to Vote | Not Applicable | 100% |

# III.

# BACKGROUND

A.    The Debtor and Events Leading up to Chapter 11 Case

The Debtor is a limited liability company organized and existing pursuant to the laws of the State of Georgia, owned in its entirety by two individuals, Charles Morais (70%) and Sunil Mir (30%).

In or about March 30, 2006, the Debtor purchased a 183 room hotel (the "Hotel") located at 151-20 Baisley Boulevard, Jamaica, New York (the "Property") from Value Enhancement Fund II, LLC ("Value") and took an assignment of: (i) Value's lease (the "Ground Lease") with New Riviera Motel, LLC ("New Riviera") for the Property on which the Hotel is situated; and (ii) Value's lease (the "Parking Lot Lease") with 151 North Conduit Associates ("Conduit") for the parking lot (the "Parking Lot") adjacent to the Hotel for use by the Hotel's customers.

The Debtor financed its purchase of the Hotel with a loan (the "Senior Fortress Loan") in the amount of $9,000,000 from Fortress Credit Corp., on its own behalf and as agent for other participating lenders (collectively, "Fortress"), and granted to Fortress a collateral assignment of the Ground Lease and Parking Lot Lease, and a security interest in substantially all of its personal property to secure its obligation to repay the Senior Fortress Loan. In addition, in or about October 2006, the Debtor borrowed an additional $750,000 (the "Junior Fortress Loan")(together with the Senior Fortress Loan, the "Fortress Loans") from Fortress for operating capital, and granted to Fortress collateral assignments and security interests in the collateral mentioned above to secure its obligation to repay the Junior Fortress Loan, which are subordinate to the collateral assignments and security interests granted by the Debtor to secure its obligation to repay the Senior Fortress Loan.

The Debtor's loan agreements with Fortress provided all revenues from the Hotel were required to be deposited into a "Lockbox Account" and then periodically swept to a cash management account which Fortress alone controlled. Fortress was then required to disburse those funds in accordance with a prioritized distribution scheme set forth in the loan agreements, as follows: (i) to pay all taxes then due, (ii) to pay all insurance premiums then due, (iii) to pay interest on the Fortress Loans, (iv) to pay cash management servicing fees, (v) to fund a reserve for improvements to the Hotel, (vi) to pay operating expenses of the Hotel on accordance with an approved budget; and (vii) the remainder, if any, to the Debtor. Because Fortress controlled the Lockbox Account and the cash management account, Fortress (and not the Debtor) paid all of the items mentioned in clauses (i) through (v) above, and thereafter, Fortress would send the Debtor the excess to pay the operating expense.

The Debtor thereupon commenced operations as a Hotel as a "Crowne Plaza" hotel pursuant to a franchise agreement dated March 31, 2006 (the "Franchise Agreement") with

Six Continents Hotels, Inc. and Holiday Hospitality Franchising, Inc. (together, "HHFI"), which conferred upon the Debtor rights to use the "Crowne Plaza" name and reservation system.

Almost immediately, the Debtor began to experience financial stress due to its inability to meet various wage and benefit obligations to the New York Hotel and Motel Trades Council, New York Hotel Trades Council and Hotel Association of New York City, Inc. (the "Union") pursuant to a collective bargaining agreement (the "Union Contract") it had assumed from Value. This financial stress caused the Debtor to become delinquent with respect to its obligations to certain creditors, including its obligations to the Union under the Union Contract, its obligations to Fortress under the Fortress Loans, and to HHFI under the Franchise Agreement.

In or about July 2008, HHFI provided notice to the Debtor of its default under the Franchise Agreement for failure to pay certain franchise fees when due. The notice fixed September 4, 2008 as the deadline for cure of the Debtor's default under its obligation to pay past due franchise fees in the amount of $254,208.22. However, the Debtor negotiated a forbearance agreement with HHFI pursuant to which HHFI agreed to extend the deadline to 3:00 p.m. September 22, 2008.

The Debtor thereupon requested that approximately $500,000 then held by Fortress in the Debtor's cash management account (which as noted above, constituted the Debtor's property) be released in order to meet the deadline imposed by HHFI. Debtor advised Fortress of the forbearance agreement and Fortress knew the deadline. During the interim, Debtor paid $60,000.00. Fortress agreed to release the funds, but, due to negligence and mismanagement on its part, Fortress, on September 29, 2008, wired the amount of $194,208.22, the receipt of which was confirmed by HHFI on September 30, 2008. Despite the Debtor's partial payment prior to the deadline and HHFI receiving the entire $254,208.22 on September 30, 2010, HHFI terminated the Franchise License effective as of September 29, 2008, thereby causing the Debtor to lose access and rights to the "Crowne Plaza" name and reservation system, which in turn cause revenues to drop from $900,000.00 per month to less than $100,000.00.

On September 25, 2008, after having occasioned the default by the Debtor under the Franchise Agreement, Fortress delivered notice to the Debtor of its default under the Fortress Loans by virtue of the loss of its franchise rights. In November 2008, Fortress commenced an action (the "Fortress Action") against the Debtor in the Supreme Court of the State of New York in and for the County of Queens to foreclose its mortgages and security interests on its collateral, alleging defaults under the Fortress Loans by virtue of the Debtor's loss of its franchise, failure to pay certain debts to the Union and other alleged defaults. The Debtor promptly asserted a counterclaim against Fortress, alleging that Fortress itself, through negligence and nonfeasance, had caused the Debtor's loss of its franchise, and thereby caused the Debtor damages in excess of $10,000,000.

Despite the Debtor's vigorous defense of the action commenced by Fortress, the loss of the Debtor's franchise rights had an immediate deleterious effect on the Debtor's revenues. The Debtor was unable to meet its wage and benefit obligations to the Union, and employees therefore grew disgruntled and refused to perform services.

On January 27, 2009, however, Fortress has sold the Fortress Loans in the amount of $9,750,000.00, its collateral rights and it rights under the Fortress Action, to Neshgold LP ("Neshgold") for the sum of $5,000,000.00 (the assignment occurred on January 27, 2009).

In May 2009, HHFI commenced an action (the "HHFI Action") against the Debtor in the United States District Court for the Eastern District of New York asserting claims for breach of the Franchise Agreement and the Debtor's alleged unauthorized use of HHFI's intellectual property. HHFI alleged damages for unpaid franchise fees in the amount of $326,719.00 as well as liquidated damages under the Franchise Agreement, aggregating approximately $1,900,000. The Debtor asserted various affirmative defenses to the claims of HHFI, and further asserted counterclaims against HHFI for terminating the Debtor's franchise rights and license in bad faith, notwithstanding the fact that HHFI received a partial payment of $60,000.00 prior to the deadline and HHFI received the balance of all of the outstanding fee dues under the Forbearance Agreement by September 30, 2008, which was only 8 days after the September 22, 2008 deadline.

Despite the Debtor's continued defense of the Fortress action and the HHFI action, and the prosecution of its counterclaims in each of those proceedings, the loss of the Debtor's franchise rights caused too detrimental a blow to the Debtor's financial stability, and it was forced, in April 2009 to close down the Hotel temporarily. After the Hotel was closed, Neshgold placed the Hotel under its control and then hired a security company and maintenance company during to take care of the property while the Hotel is closed. During Neshgold's control over the Hotel there was a significant damage to the Hotel caused by vandalism, theft and a huge flood in the lower level of the Hotel. There was tremendous amount of water damage in the two banquet rooms, the restaurant, the offices, the boiler room and through out the entire lower level of the Hotel. The boilers were completely under water and were not operational, the floors and the portions of the walls in the entire lower level had to be replaced, the elevators were not working, the heating, plumbing and air conditioning systems all required extensive repairs.

In September 2009, in the foreclosure action, Neshgold and Debtor agreed that Debtor can collect outstanding receivables. The Debtor collected outstanding receivables in the amount of $407,500.00 and it was agreed that 50% of the said receivables was going to be turned over to the Debtor in order to obtain and or reinstate a franchise. Then, in January 2010, Neshgold turned over the Hotel back to the Debtor. Debtor advised Neshgold that they will be gearing up the Hotel to open. The Debtor principals, Charles Morais and Sunil Mir determined to recommence operations of the Hotel, and thus began to rehabilitate the business from the ground up. Over the ensuing months, the principals of the Debtor contributed in excess of $500,000 to the Debtor to renovate the physical property of the Hotel and to reinstate and upgrade computer and restaurant systems and equipment. The Debtor commenced negotiations with SCS to infuse additional capital in to the business, with other reputable hotel franchisors to attain a franchise to replace the lost "Crowne Plaza" franchise, and with the Union to reach an agreement on concessions which would enable the Debtor to operate profitably.

By April 2010, the Debtor's efforts had progressed sufficient far to reopen the business of the Hotel, albeit without Union labor and without a hotel franchise. Operating

simply as "JFK Plaza Hotel" the Debtor was nonetheless successful in achieving gross revenues in excess of $400,000 per month within a few months of reopening.

Notwithstanding, after the filing of the Chapter 11 Petition, Neshgold took a far different tack with respect to the Debtor. Because Neshgold's principals were involved, through other entities, in the business of owning and operating hotels, Neshgold pursued its rights not for the purposes of recovering under the Fortress Loans, but rather to displace the Debtor from the Hotel and operate it for its own account.

These efforts included the surreptitious usurpation of the Debtor's rights under the Parking Lot Lease. After Neshgold took an assignment of the Fortress Loans, on or about December 29, 2009, it created and caused its alter-ego, SF-JFK, LLC ("SF-JFK") to purchase the parking lot from North Conduit. In purchasing the parking lot, both North Conduit and SF-JFK breached the right of first refusal accorded to the Debtor under the Parking Lot Lease. Furthermore, after acquiring title to the parking lot, SF-JFK resorted to self-help and physically changed the locks to the parking lot, thereby effecting an illegal lock-out of the Debtor and completely disenfranchising the Debtor of its possessory and tenancy rights, without commencing or prosecuting any summary dispossess proceedings in landlord-tenant court, and without otherwise complying with applicable law or according the Debtor due process. After the illegal lockout, SF-JFK leased the parking lot to U-Save Car and Truck Rental. Thereafter, on March 9, 2010 SF-JFK commencing an action in the Civil Court of the City of New York, County of Queens, alleging that the Debtor owed SF-JFK the sum of $89,406.71 in rent arrears and requesting final judgment of possession from the court. The Debtor moved to dismiss the petition. On June 28, 2010, SF-JFK discontinued the action. As a result of the foregoing, the Debtor suffered an inability to properly operate the Hotel in accordance with local laws and ordinances, a loss of valuable operating income, and other damages.

Despite the Debtor ability to grow the revenues to $400,000 per month, without a franchise, there was insufficient cash flow to pay the ground lease and the Debtor fell into arrears on its rent to New Riviera for the months of April through August 2010 (in the amount of $55,000 per month), and real estate taxes for the 2010/2011 tax year in the amount of approximately $420,000. New Riviera served the Debtor with a default and then a termination notice, under which the Debtor's rights under the Ground Lease would terminate on September 22, 2010. On or about September 2, 2010, the Debtor and New Riviera executed a forbearance agreement under which the Debtor paid to New Riviera the sum of $110,000 (in payment of rent for the months of April and May 2010), and New Riviera extended the termination date to October 4, 2010, unless the Debtor could cure the defaults in the rent and real estate taxes. Despite the Debtor's efforts, New Riviera declined to issue an extension to the forbearance agreement.

To stay the termination of the Ground Lease and to afford the Debtor an opportunity to rehabilitate and restructure its finances, on October 4, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia. Up to and including October 4, 2010, Neshgold consented to Debtor's operations of the Hotel and permitted the Debtor to use all of the cash and income generated by the Hotel.

B.    Cash Collateral and Audit Orders

By motion dated October 25, 2010, the Debtor sought authority pursuant to §
363(c) of the Bankruptcy Code, to use the cash collateral of Neshgold in order to continue to
operate the business of the hotel. In that motion, the Debtor contended that Neshgold was
adequately protected by the value of the Property (approximately $24 million) and the Debtor's
proposal to grant to Neshgold replacement liens on post-petition accounts and property to the
extent of any diminution in the value of Neshgold's collateral. However, the Debtor contended
that since the Debtor would be utilizing Neshgold's cash collateral for the operation of the Hotel
and generation of additional revenues, Neshgold's collateral would not be depleted, but would
rather be enhanced.

Neshgold objected to the Debtor's motion to use cash collateral citing certain
questionable debts of the Debtor's principals, its failure to pay rent and real estate taxes and the
loss of its franchise, as grounds to questions the Debtor's ability to meet the projections provided
in its motion. However, Neshgold indicated that it would consent to the Debtor's use of its cash
collateral for a short duration provided that the Debtor utilized a lock-box under the control of
Neshgold to ensure the payment of rent and real estate taxes, and certain other conditions were
met.

On November 4, 2010 and November 5, 2010, the Bankruptcy Court in the
Northern District of Georgia conducted hearings on the Debtor's motion to use Neshgold's cash
collateral and Neshgold's objection thereto. Based on the presentations of the parties at that
hearing, the Court entered two orders designed to afford the Debtor access to Neshgold's cash
collateral and afford Neshgold adequate protection. First, the Court entered an Order dated
November 8, 2010 (the "Audit Order") which required the Debtor and its management company,
Soho Hotel Group, LLC to comply with and submit to a financial audit by Neshgold and its
auditors and to turn over to Neshgold various financial books and records in connection with
such audit.

Second, the Court entered an Order, dated November 9, 2010 (the "First Cash
Collateral Order") which permitted the Debtor to use Neshgold's cash collateral through
November 15, 2010 (unless extended on consent of Neshgold) and only for certain allotted
expenses, but required the Debtor to: (i) deposit monies in excess of those allotted expenses into
a debtor-in-possession bank account; (ii) cooperate with Neshgold's auditors pursuant to the
terms of the Court's Audit Order; (iii) file with the Court an abbreviated report of income, paid
expenses and unpaid expenses from October 1, 2010 through November 5, 2010. In addition,
under the First Cash Collateral Order, Neshgold was accorded post-petition replacement liens
and a super-administrative expense claims in an amount to be determined by the court to the
extent that the replacement liens were deemed insufficient to protect Neshgold from a diminution
in the value of its collateral.

C.    Transfer of Case to Eastern District of New York

On October 19, 2010 (shortly after the Debtor's bankruptcy filing), the Office of the United States Trustee filed a motion to transfer the Debtor's case to the Eastern District of New York on the basis that the Debtor's principal assets and a majority of its creditors were located in that district and the convenience of the parties warranted such transfer. Neshgold immediately joined in the motion.

The motion to transfer the case was heard and considered by the Court on November 5, 2010, in conjunction with the Court consideration of the Debtor's cash collateral motion and Neshgold's objection thereto. By order dated November 9, 2010, the Bankruptcy Court transferred the Debtor's case to the Eastern District of New York.

D.    Appointment of Chapter 11 Trustee

On November 12, 2010, a mere two (2) days after the case was transferred from the Northern District of Georgia, Neshgold applied for and obtained an Order of the Bankruptcy Court directing the Debtor to Show Cause why a chapter 11 trustee should not be appointed pursuant to § 1104 of the Bankruptcy Code, and scheduling a hearing on such relief for November 19, 2010 (the "Trustee Motion"). Neshgold's Trustee Motion contained assorted allegations of mismanagement by the Debtor during the pre-petition, and to a lesser degree, post-petition period, including, but not limited to: (i) the Debtor's alleged unauthorized use of Soho Hotel Group, LLC to manage the Debtor's income and expenses; (ii) the use of the Debtor's funds to pay the personal expenses of Charles Morais and/or Sunil Mir; (iii) the Debtor's alleged failure to comply with the Audit Order and the First Cash Collateral Order; (iv) the Debtor's failure to meet its on-going loan payment obligations to Neshgold under the Fortress Loans; and (vi) the failure of the Debtor to segregate the trust fund portion of sales and occupancy taxes.

When the Debtor's case was transferred to the Eastern District of New York on November 10, 2010, the Debtor found itself in a new district without the benefit of bankruptcy counsel. Although the Debtor had retained bankruptcy counsel in Georgia, pursuant to an Order of the Bankruptcy Court in the Northern District of Georgia, that retention was effective only while the case remained in that district. The timing of Neshgold's Trustee Motion (and the dates fixed by the Order to Show Cause for service and the hearing date) resulted in an allotment to the Debtor of less than four (4) days to retain New York counsel, educate him/her on the complex nuances and background of the case, subpoena witnesses, and appear for and defend an evidentiary hearing on the Trustee Motion.

The Debtor appeared for the hearing with Walter Drobenko, Esq., the attorney who had represented the Debtor in the Fortress Action, the HHFI action and its negotiations with the Union. In defense of the Trustee Motion, the Debtor elicited through testimony: (i) the Debtor's extraordinary efforts to rehabilitate the Debtor and increase revenues, without the benefit of a franchise, from $0 to $400,000 per month in a relatively short period of time; (ii) that any use of the Debtor's funds for the personal use of Charles Morais and Sunil Mir was, in the aggregate, less than the amount that would be charged and extracted by a professional management service for the Hotel; (iii) that it cooperated with Neshgold's auditors and gave

them access to any document they requested to the extent that such document existed; and (iv) that any payment of expenses in violation of the Bankruptcy Code derived from the failure of Debtor's prior bankruptcy counsel to advise the Debtor on the restrictions on such transfers post-petition. After a full day hearing on the Trustee Motion on November 19, 2010, the Court found cause to appoint a chapter 11 trustee on the basis of the Debtor's failure to comply with the disclosure requirements of the Audit Order and the First Cash Collateral Order[1], and the improper use of Debtor funds during the pre- and post-petition period. The Court granted the Trustee Motion by Order dated November 19, 2010. By Order dated November 24, 2010, the Bankruptcy Court approved the appointment of Alan Nisselson as chapter 11 Trustee.

On or about December 3, 2010, the Debtor filed a motion (the "Trustee Removal Motion") for an Order reconsidering the Order granting the Trustee Motion and appointing the chapter 11 Trustee, or alternatively, removing the Trustee pursuant to § 1105 of the Bankruptcy Code. The Debtor's Trustee Removal Motion was thereafter adjourned from time to time, to allow the Debtor to focus its efforts on consummating and confirming the Plan. To date, although the Trustee Removal Motion has been opposed by numerous parties to the case, including Neshgold, the chapter 11 Trustee, and the Office of the United States Trustee, the Trustee Removal Motion has not been heard or considered by the Court and is now scheduled for March 23, 2011.

E.    Removal of Foreclosure Action and Debtor's Counterclaims

On December 3, 2010, the Debtor filed a Notice of Removal of the Fortress Action to the Bankruptcy Court pursuant to 28 U.S.C. § 1452(a), Fed.R.Bankr.P. 9027. The effect of the Notice of Removal was to transfer the foreclosure action commenced by Fortress (and continued by Neshgold upon its receipt of the assignment of the Fortress Loans from Fortress) against the Debtor and the Debtor's counterclaims against Fortress/Neshgold therein, to the bankruptcy court where it could be adjudicated as an adversary proceeding related to the Debtor's case. Upon filing the Notice of Removal with the Bankruptcy Court (and the Supreme Court for the County of Queens), the clerk of the Bankruptcy Court assigned adversary proceeding number 10-01325 (CEC) to the action (the "Neshgold Adversary Proceeding").

The Debtor undertook the removal of the Fortress Action for the purpose of facilitating the implementation of the Plan, as more fully discussed in § 4(D)(6) below. However, prior to the removal there were two motion that were marked submitted and still

---

[1]    As noted above, the Audit Order required that the Debtor provide its books and records and the books and records of Soho Hotel Group, LLC (in accordance with a letter annexed to the Order) to Neshgold's auditors. The Debtor contends that it fully complied with the Audit Order and provided all items requested by Neshgold's auditors to the extent that such items existed. The First Cash Collateral Order required that the Debtor comply with the Audit Order, and also file with the Court a statement showing the Debtor's income, paid expenses and unpaid expenses for the period October 1, 2010 through November 5, 2010. In fact, the Debtor, through its counsel, Walter Drobenko, Esq., who does not have ECF filing access, delivered a full operating report for the month of October 2010 on disk to the United States Trustee and to the Court for filing. The operating report was apparently never uploaded to the docket. Nonetheless, the Debtor contends that it has fully complied with the disclosure requirements of the Audit Order and the Cash Collateral Order. To alleviate any concerns as to whether the Debtor has complied with such orders, the Debtor shall file a certification of Walter Drobenko, Esq. attesting to the Debtor's compliance, and annexing the full operating report that was previously delivered to the Court.

remain to be decided, to wit: Neshgold's motion to reargue the denial of Neshgold's motion for a default judgment and Debtor's cross motion to compel Neshgold to turn over the sum of $203,500.00, which represents 50% of the accounts receivables that was collected by Debtor during the foreclosure action.

F.    Second Cash Collateral Order

On January 4, 2011, the Trustee filed a motion (the "Second Cash Collateral Motion") with the Court for entry of a second Order, pursuant to § 363(c) of the Bankruptcy Code, authorizing use by the Trustee (on behalf of the Debtor) of Neshgold's cash collateral. In the Second Cash Collateral Motion, the Trustee presented to the Court the conditions fixed by Neshgold as consideration for Neshgold's authorization to use its cash collateral. As noted below, the Debtor viewed these conditions as an attempt by Neshgold to orchestrate the foreclosure of the Hotel for Neshgold's sole benefit. Specifically, as a condition to consenting to the Trustee's use of cash collateral, Neshgold required:

(a)    the Trustee to file a motion to approve procedures to sell the Hotel no later than January 18, 2011 with a hearing no later than February 11, 2011, and that an auction sale of the Hotel be conducted no later than March 15, 2011 with a closing to occur no later than March 31, 2011;

(b)    that Neshgold be permitted to credit bid the full amount (allegedly $15.3 million) of its claim at such sale; and

(c)    that Neshgold be granted full releases from the Debtor's estate (and any of its officers and directors) following a 60 days review period (which had already been deemed to have commenced on December 15, 2010).

In addition to the foregoing, as adequate protection for his use of cash collateral in an amount not to exceed $1,223,469, the Trustee proposed to grant to Neshgold the following:

(d)    super-priority perfected replacement liens on all of the Debtor's post-petition assets to the extent of any diminution of Neshgold's pre-petition collateral as a result of the Trustee's use of cash collateral;

(e)    allowed super-priority administrative expenses in the Debtor's Chapter 11 Case to the extent of any diminution in the Neshgold's pre-petition collateral as a result of the Trustee use of cash collateral;

(f)    such super-priority perfected replacement liens and super-priority administrative expenses would be subject to a carve-out for the fees of the United States Trustee and the allowed fees and expenses of Trustee's professionals in amount not exceeding $225,000 plus amounts payable to the Trustee's Hotel Manager and expenses related to the Trustee efforts to market and sell the Hotel; but

(g)    such super-priority perfected replacement liens and super-priority administrative expenses would not be subject to priming or even *pari passu* treatment with any other obligation of the Debtor's estate.

As noted, the Debtor perceived the Trustee's Second Cash Collateral Motion as a means of simply granting to Neshgold a deed in lieu of foreclosure in the context of a bankruptcy case, while precluding the Debtor from defending itself and from prosecuting any of its counterclaims against Fortress/Neshgold. The Debtor also viewed the Second Cash Collateral Motion as an unnecessary impingement upon the Debtor's ability to formulate and consummate a plan of reorganization. Specifically, the proposed release provisions of the order, if approved, would have completely rendered moot the Debtor's counterclaims in the Fortress Action (now the Neshgold Adversary Proceeding), upon which much of the Debtor's proposed plan was founded. Further, by prohibiting priming and *pari passu* liens with Neshgold's super-priority replacement liens, the Debtor would be precluded from obtaining a loan from a lender which desired such protections under § 364(d)(1) of the Bankruptcy Code, without even an opportunity to present the request for such financing to the Court for approval.

Based on the foregoing, the Debtor (and other interested parties) filed objections to the Trustee's Second Cash Collateral Motion. On January 12, 2011, after a hearing on the motion, the Court agreed to limit the releases accorded to Neshgold to only the Debtor and its estate (and not to directors and officers) following a ninety (90) day review period that commenced upon entry of a second cash collateral order. The Court also required Neshgold to file a request for the right to credit bid and afford parties-in-interest to review and object to the amount of Neshgold's claim for credit bidding purposes. The Court overruled, however, the Debtor's request the allow priming and *pari passu* liens, subject to the Debtor's right to seek reconsideration or relief from the order for the purposes of consummating a plan or otherwise pursuant to Fed.R.Civ.P. 59 and/or 60.[2]

On January 26, 2011, the Bankruptcy Court entered an Order (the "Second Cash Collateral Order") consistent with its decision at the hearing.

---

[2]    As noted in § 4(D)(6) below, the Order confirming the Debtor's Plan shall constitute a reconsideration or relief from the Second Cash Collateral order to the extent necessary.

G.    Trustee's Motion to Sell Hotel

In connection with the Second Cash Collateral Motion, on January 6, 2011, the Trustee filed a motion (the "Sale Procedures Motion") for approval of certain procedures in connection with his sale of the Hotel, as required by Neshgold. In the Sale Procedures Motion, the Trustee proposed to sell all of the Debtor's property, with the exception of cash, receivables and claims, free and clear of all liens, claims and encumbrances, which such liens, claims and encumbrances to attach to the proceeds of sale. The Trustee did not have a "stalking horse" bidder for the Debtor's property. Rather, the Trustee proposed to retain a broker to market the property between March 1, 2011 and March 15, 2011 and to attain the highest and best bidder for the property during that period. The proposed sale procedures order, consistent with the Second Cash Collateral Order, provided that Neshgold would be permitted to credit bid the full amount of its claim at the sale, and that the sale would be closed by March 31, 2011. In connection with the Sale Procedures Motion, also on January 6, 2011, the Trustee filed a motion for an order authorizing his retention of Optimum Hotel Brokerage, to serve as broker for the sale of the Debtor's Hotel and related property.

The Debtor's principal objection to the Sale Motion concerned Neshgold's unfettered right to credit bid without full consideration of the Debtor's claims against it deriving from its improper usurpation of the Parking Lot, and the malfeasance and nonfeasance of its predecessor-in-interest, Fortress, in orchestrating the Debtor's default under its Franchise Agreement with HHFI. Accordingly, the Debtor filed an objection to the Sales Procedure Motion raising those and other issues. At a hearing held on January 12, 2011, the Court granted the Sale Procedures Motion, subject to its direction regarding that Second Cash Collateral Motion, that Neshgold file a motion for the right to credit bid and parties be afforded an opportunity to object.

On January 21, 2011, the Bankruptcy Court entered an Order authorizing the Trustee to retain Optimum Hotel Brokerage to market the Debtor's Hotel and related property. On January 26, 2011, the Bankruptcy Court entered an Order (the "Sale Procedures Order") approving the procedures proposed by the Trustee to sell the Debtor's Hotel and related property and scheduling a hearing (the "Final Sale Hearing") to consider final approval of the sale for March 23, 2011 at 2:30 p.m.[3]

H.    Trustee's Proposed Settlement with Neshgold

On February 16, 2011, the Trustee filed a motion for entry of an Order approving a "settlement" the Trustee reached with Neshgold pursuant to Fed.R.Bankr.P. 9019. Under the proposed settlement, the Trustee will allow Neshgold to credit bid its claim at sale up to the amount of $14.5 million, extend to Neshgold full releases of any claims and causes of action the Debtor or the Debtor's estate may hold against Neshgold, and waive any rights the Trustee may have to surcharge Neshgold's collateral pursuant to § 506(c) of the Bankruptcy Code. In exchange for the foregoing, Neshgold proposes:

---

[3]    In order to facilitate the Bankruptcy Court's consideration of the Debtor's Plan, the Debtor intends to move the Bankruptcy Court for an adjournment of the Final Sale Hearing.

(a)     an increase in the carve out from its super-priority liens and claims to $510,000, including a $100,000 payment to be earmarked for distribution to unsecured creditors of the Debtor's estate;

(b)     to reinstate the Parking Lot Lease so that the successful bidder at sale will have access to the Parking Lot for use in connection with the Hotel;

(c)     to decrease its secured claim against the Debtor's Estate to $14.5 million (consistent with its proposed credit bid right).

The Trustee contends that based on his review and analysis, the claims held by the Debtor against Neshgold deriving from its improper usurpation of the Parking Lot and the negligence of its predecessor-in-interest, Fortress, in failing to release funds sufficient to cure the arrearage owed to HHFI, and thereby causing a default by the Debtor under the Franchise Agreement, "may have limited merit," and thus the settlement with Neshgold should be approved.

The Debtor does not believe that the Trustee's analysis of the Debtor's claims against Neshgold were balanced or fair or objective, and believes that the Debtor's claims against Neshgold have far greater value than the amount proposed to be received by the Estate in settlement thereof.   For instance, on page 14, in footnote 8, in the Trustee's Report dated February 16, 2011, although the Trustee indicates that there did appear to be funds available in Fortress's managed account to pay the arrearage owed to HHFI and that Fortress paid it late, the Trustee does not take into account the damages associated with Fortress's failure to release the funds – the loss of the Debtor's access to the "Crowne Plaza" name and reservation system, thereby causing an immediate loss of gross revenues and an immediate inability to meet ordinary operating expenses and commitments.  Further, the Debtor contends that the Trustee's analysis fails to take into consideration the propriety of Neshgold's improper lock-out of the Debtor from the Parking Lot, or the credit to which the Debtor is entitled for paying the utilities associated with the Parking Lot, in excess of $20,000 per month following the lock-out, or the $203,500.00 in receivables that Neshgold agreed to turn over to the Debtor Pre-Petition.   The Trustee in essence is granting Neshgold summary judgment on the Debtor's counterclaims, notwithstanding the fact that the Trustee himself acknowledges that there is an issue of fact and that there is merit to the claim.

Furthermore, the Debtor contends Neshgold's proposal to reduce its claim and credit bid is illusory since Neshgold knows at this point the results of the Trustee's marketing efforts with respect to the Hotel, and apparently realizes that not more than $14.5 million is even necessary to succeed at a sale thereof.  Finally, the $100,000 earmarked for unsecured creditors is insufficient to satisfy the Debtor's priority claims and thus general unsecured creditors shall receive nothing from the proposed allocation.

## I.    Commitment from SCS

On March ___, 2011, SCS issued a letter (the "Commitment Letter") memorializing its commitment to extend a loan to the Debtor in the amount of approximately $4.1 million, conditioned upon confirmation of a plan proposed by the Debtor's principals Charles Morias and Sunil Mir. (A copy of the Commitment Letter is annexed hereto as **Exhibit C**. The Commitment Letter commits SCS to provide funding essential to the implementation of the Debtor's Plan, as described in § 4(D)(2) below.

## IV.

## SUMMARY OF PLAN

The following is an overview of certain material provisions of the Plan. The following summaries of the material provisions of the Plan do not purport to be complete and are qualified in their entirety by reference to all the provisions of the Plan, all exhibits, all documents described therein, and the definitions therein of certain terms used below.

### A.    General Information Concerning Treatment of Claims and Interests

#### 1.    *Administrative Expense Claims and Priority Tax Claims*

Pursuant to the Plan, Holders of Allowed Administrative Expense Claims and Allowed Priority Tax Claims (set forth in Articles II and III of the Plan) have not been classified and are excluded from classification in accordance with § 1123(a)(1) of the Bankruptcy Code. As more fully discussed below, the Holders of Allowed Claims in each of these Classes will receive payment in full in Cash in accordance with the terms of the Plan.

#### 2.    *Classes of Claims and Interests*

Claims in Class 2(a), Class 3 and Class 4 are Impaired and entitled to vote on the Plan. The Debtor intends to solicit acceptances of the Plan from the Holders of Claims in these Classes. Under § 1126(f) of the Bankruptcy Code, Holders of Claims in Class 1(a), Class 1(b), Class 2(b), and Class 5 are Unimpaired under the Plan, are deemed to have accepted the Plan, and the votes of such Holders will not be solicited.

The Debtor intends to seek confirmation of the Plan and to take all steps necessary to cause the Effective Date to occur as soon as practicable. There can be no assurance, however, as to when the Effective Date will actually occur. Conditions to the Effectiveness of the Plan are discussed more fully in § 4(I)(2) below.

The Debtor believes that the Plan provides the best possible treatment for all Classes of Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court. The

"cramdown" provisions of § 1129(b) of the Bankruptcy Code, for example, permit confirmation of a chapter 11 plan in certain circumstances even if the plan is not accepted by all Impaired Classes of Claims and Interests. (See Article V below).

In the event that any of the Impaired Classes under the Plan votes to reject the Plan, the Debtor will request that the Bankruptcy Court confirm the Plan under § 1129(b) of the Bankruptcy Code. Section 1129(b) permits confirmation of the Plan despite rejection by one or more impaired classes if the Bankruptcy Court finds that the Plan "does not discriminate Unfairly" and is "fair and equitable" as to the rejecting class or classes. The Debtor will request that the Bankruptcy Court find that the Plan is fair and equitable and does not discriminate unfairly as to any Class that fails to accept the Plan.

For a more detailed description of the requirements for acceptance of the Plan and of the criteria for confirmation notwithstanding rejection by certain classes, see Section 5(E) below, entitled "Confirmation Requirements."

B.     Classification and Treatment of Claims and Interests

Section 101(5) of the Bankruptcy code defines a Claim as: (1) a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured or unsecured;" or (2) a "right to an equitable remedy for breach or performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured." 11 U.S.C. §101(5)

Section 1123 of the Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and interests in a debtor into separate classes based upon their legal nature. In accordance with § 1123 of the Bankruptcy Code, claims of a substantially similar legal nature are usually classified together, as are shareholder interests which give rise to the same legal rights; the "claims" and "interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan, the separate classes of claims and interests must be designated either as "impaired" or "unimpaired" by the plan. If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan (unless the plan provides for no distribution to the holders, in which case, the holder is deemed to reject the plan), and the right to receive under the chapter 11 plan property of a value that is not less than the value the holder would receive if the debtor were liquidated under chapter 7.

Under § 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (1) does not alter the legal, equitable, or contractual rights of the holders or (2) irrespective of the holders' acceleration rights, the plan cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case, or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon

any acceleration rights, and does not otherwise alter their legal, equitable, or contractual rights. Typically, this means the holder of an unimpaired claim will receive on the later of the effective date or the date on which amounts owing are due and payable, payment in full, in cash, with post-petition interest to the extent appropriate and provided under the governing agreement (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

As discussed above, § 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and interest holders. In compliance therewith, the Plan divides Claims and Interests into seven (7) Classes and sets forth the treatment for each Class. In accordance with § 1123(a) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

Section 1122 of the Bankruptcy Code further requires that each class of claims and interests contain only claims or interests that are "substantially similar" to each other. The Debtor believes that it has classified all Claims and Interests in compliance with the requirements of §§ 1122 and 1123. However, it is possible that a holder of a Claim or Interest may challenge such classification and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Debtor intends, to the extent permitted by the Bankruptcy Court, to modify the classifications in the Plan as required and use the acceptances received in this solicitation for the purpose of obtaining the approval of a Class or Classes of which the accepting holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class of which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of Claims or Interests could necessitate a re-solicitation of votes.

The following describes the classification of Claims and Interests under the Plan and the treatment that Holders of Allowed Claims and Allowed Interests are to receive if the Plan is confirmed and becomes effective. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in a different Class to the extent that any remainder of the Claim or Interest fits within the description of such different Class.

1.   *Unclassified Claims*

The Bankruptcy Code does not require classification of certain priority claims against a debtor. In this Chapter 11 Case, these unclassified claims include Administrative Expense Claims and Priority Tax Claims.

(a)   *Administrative Expense Claims.*   Administrative Expense Claims are the actual and necessary costs and expenses incurred in connection with the Chapter 11 Case that are allowed under § 503(b) of the Bankruptcy Code. These expenses typically include post-petition amounts owed to vendors providing goods and services to the Debtor during the Chapter 11

Case, and other obligations incurred after the Petition Date. Other Administrative Expense Claims include the actual, reasonable fees and expenses incurred during the Chapter 11 Case of the Debtor's Professionals and the Trustee's Professionals, as Allowed by the Bankruptcy Court.

In this case, the Debtor believes the Administrative Expense Claims consist primarily of: (i) vendors who provided goods and services to the Debtor following the Petition Date whose claims remain unpaid as of the Confirmation Date; (ii) unpaid real estate taxes that accrued following the Petition Date; (ii) the damages incurred by the Union on account of the Debtor's post-petition failure to honor the terms and conditions of the Union Contract; (iii) unpaid rent due under the Ground Lease for the period from the Petition Date through the Confirmation Date; (iv) the Allowed fees and expenses of the Professionals retained pursuant to Order of the Bankruptcy Court.

All amounts owed to retained Professionals for compensation and reimbursement of expenses will be determined in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Rules relating to the award and payment of interim and final compensation and expenses. The Bankruptcy Court will review and determine all such requests. Requests for such compensation must be approved by the Bankruptcy Court after notice and a hearing wherein all parties-in-interest may participate, and if appropriate, object to the allowance thereof. The Debtor believes that the Allowed fees and expenses of Professionals retained pursuant to Order of the Bankruptcy Court consist of: (i) Trustee's bankruptcy counsel, Windels Marx Lane & Mittendorf LLP, to the extent unpaid as of the Confirmation Date; (ii) the Allowed fees and expenses of the Trustee's Special Labor Counsel, Trivella, Forte & Smith, LLP, to the extent unpaid as of the Confirmation Date; (iii) the Allowed fees and expenses of the Trustee's Financial Advisors and Accountants, Eisner Amper, LLP, to the extent unpaid as if the Petition Date; and (iv) the Allowed fees and expenses of the Trustee's hotel manager, Choice Consultants, LLC, to the extent unpaid as of the Confirmation Date.

In addition to the foregoing, pursuant to the Second Cash Collateral Order, Neshgold holds a super-priority administrative expense, in the amount and to the extent of any diminution in the value of Neshgold's pre-Petition Date collateral as a result of the use by the Trustee of any of Neshgold's Cash Collateral on and after the Petition Date. Pursuant to the Second Cash Collateral Order, this super-priority administrative expense is also accorded super-priority secured status. Because of the dual characterization of the Claim as both an administrative expense and secured Claim, and to avoid double treatment of the Claim, it is treated only once under the Plan, in Class 1(b), as a Super-Priority Secured Claim in the Debtor's Chapter 11 Case. However, the treatment afforded Neshgold's Super-Priority Secured Claim is identical to the treatment afforded to administrative expenses of the Debtor's estate – cash equal to the Allowed Amount of such claim as soon after the Confirmation Date as is practicable, but in no event later than the Effective Date.

As stated above, the Debtor estimates that Allowed Administrative Expense Claims due and owing on the Effective Date (not including the Super-Priority Administrative Expense of Neshgold, which is classified and treated separately in Class 1(b) of the Plan), will aggregate approximately $1,100,000.00.

Under the Plan, each Allowed Administrative Expense Claim, to the extent unpaid as of the Effective Date, shall be paid in full in Cash on the later of (a) the Effective Date, or as soon thereafter as may be practicable; or (b) in the event such Administrative Expense Claim is not Allowed as of the Effective Date, the date on which the Bankruptcy Court enters an order allowing such Administrative Expense Claim, or (c) such later date as the Debtor and the Holder of such Allowed Administrative Expense Claim otherwise agree in writing, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Expense Claims incurred by the Debtor after the Confirmation Date, including, without limitation, claims for Professionals' Fees, shall not be subject to application and may be paid by the Debtor in the ordinary course of business and without further Bankruptcy Court approval.

Any Claimant seeking allowance of an Administrative Expense Claim for an Administrative Expense Claim the amount of which is not agreed to in writing by the Debtor and the Claimant, or otherwise Allowed by a Final Order, must file proof of its Administrative Expense Claim with the Bankruptcy Court and serve a copy thereof upon (a) the Debtor's counsel, Drobenko & Associates, P.C. 25-84 Steinway Street, Astoria, N.Y. 11103, Attn: Walter Drobenko, Esq., and (b) the United States Trustee, 271 Cadman Plaza East, Suite 4529, Brooklyn, New York 11201 Attn: William E. Curtin, Esq., no later than fifteen (15) days following the Confirmation Date; provided, however, that with respect to any such timely filed Administrative Expense Claim, such Claim shall be Allowed only if (i) the amount is agreed to in writing by the Debtor and such Claimant, (ii) no objection to the allowance thereof is interposed by the Debtor on or before ninety (90) days after the Effective Date, or such other date as may be established by the Bankruptcy Court, or (iii) if an objection is interposed, (x) such Administrative Expense Claim has been allowed by a Final Order, or (y) such objection is withdrawn. With respect to Claimants seeking allowance of Professional Fees as Administrative Expense Claims, all applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred for any period prior to the Confirmation Date must be filed no later than thirty (30) days following the Confirmation Date, and shall be deemed Allowed following entry by the Bankruptcy Court of any final order or orders allowing same.

Each Administrative Expense Claim Claimant who seeks allowance of an Administrative Expense Claim (a) that is not agreed to in writing by the Debtor and the Claimant, or otherwise allowed by a Final Order, and that fails to timely and duly file a proof of its Administrative Expense Claim, or (b) for Professional Fees that fails to timely and duly institute a request for a hearing thereon, as provided for in the Plan, shall have its Claim expunged and shall thereafter be forever barred from asserting any such Administrative Expense Claim. Except as otherwise specified in the Plan or a Final Order of the Bankruptcy Court, the Allowed Amount of an Allowed Administrative Expense Claim shall not include interest on such Claim from and after the Petition Date.

(b)     *Priority Tax Claims.* Priority Tax Claims typically consist of unsecured claims by federal, state and local governmental units for taxes specified in § 507(a)(8) of the Bankruptcy Code, such as certain income taxes, property taxes and excise taxes, if any. These unsecured claims are given a statutory priority in right of payment.

The Debtor believes that it owes Priority Tax Claims aggregating approximately $200,000.00.

Pursuant to the Plan, each Holder of an Allowed Priority Tax Claim that has not been paid prior to the Effective Date, will receive, in full and complete settlement, satisfaction and discharge of its respective Priority Tax Claims, regular installment payments in Cash, together with interest at the then current federal or state statutory rate (as the case may be), over a period of not more than five (5) years from the Petition Date, which payments have of a value, upon full payment equal to the Allowed Amount of such Priority Tax Claim, unless the holders of Allowed Priority Tax Claims agree otherwise. The Holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of interest, or on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim, except to the extent allowed as a part of an Allowed Priority Tax Claim pursuant to § 507(a)(8) of the Bankruptcy Code.

2.    *Classified Claims and Interests*

The following Claims are classified under the Plan.

(a)    *Class 1(a) – Super-Priority Secured Claim of SCS.*  Class 1(a) consists of the Super-Priority Secured Claim of SCS.  The Debtor intends to borrow the sum of approximately $4.1 million from SCS following confirmation of the Plan for the purposes of facilitating the implementation of the Plan and meeting the Conditions Precedent to the Effective Date of the Plan.  Accordingly, as of the date of the funding of the Loan, which shall occur as soon after the Confirmation Date as is practicable, the Debtor will owe SCS the sum of approximately $4.1 million which will be treated under the Plan.

Under the Plan, the Debtor will treat the Super-Priority Secured Claim of SCS in accordance with the terms and conditions of the SCS Note, which will provide generally for regular monthly payments of interest at 16.5% per annum for a term of thirty-six (36) months, followed by a balloon payment of principal.  In addition, the Debtor will grant to SCS, pursuant to § 364(d)(1) of the Bankruptcy Code, a security interest and lien on all of the Debtor's property to secure the Debtor's obligation to repay the SCS Loan, which is senior in priority to all other liens and security interests in the Debtor's property, with the exception of the security interest and liens held by Neshgold to secure its Super-Priority Secured Claim, with respect to which security interest, SCS shall hold equal priority.  In addition, the Debtor's obligation to repay the SCS Loan and to treat SCS's Super-Priority Secured Claim, will be personally guaranteed by the Holders of the Debtor's Interests, Charles Morais and Sunil Mir.

Because SCS does not hold a Claim against the Debtor arising prior to the Confirmation Date, it may not vote on the Plan.  Regardless, the Claim of SCS is not Impaired and is thus deemed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code.

(b)    *Class 1(b) - Super-Priority Secured Claim of Neshgold.*  Class 1(b) consists of the Super-Priority Secured Claim of Neshgold conferred to Neshgold pursuant to the Second Cash Collateral Order, in the amount of cash utilized by the Trustee during the period

commencing on the Petition Date through the Confirmation Date, limited however, to the extent of any diminution in the value of Neshgold's pre-Petition Date collateral as a result of the use by the Trustee of any of Neshgold's Cash Collateral on and after the Petition Date pursuant to the terms of the Second Cash Collateral Order.

As noted above, this Claim was also accorded super-administrative expense priority pursuant to the Second Cash Collateral Order. It is treated in the Plan as a secured claim as a matter of convenience. The treatment and consideration to be received by the Holder of the Allowed Class 1(b) Claim shall also be in satisfaction of any super-administrative expense claim held by Neshgold pursuant to the Second Cash Collateral Order.

The Debtor believes that the amount of such claim is approximately $300,000.00.

Under the Plan, the Holder of the Allowed Class 1(b) Claim will receive, in full and complete settlement, satisfaction and discharge of its Allowed Class 1(b) Claim Cash equal to the to the Allowed Amount of its Claim as soon after the Confirmation Date as may be practicable, but in no event later than the Effective Date.

Class 1(b) is not Impaired and is thus deemed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code.

(c)     *Class 2(a) - Secured Claim of Neshgold, LP*.  Class 2(a) consists of the Allowed Secured Claim of Neshgold, LP, reduced as applicable by any judgment or award in favor of the Debtor and against Neshgold arising by virtue of the counterclaims held by the Debtor against Neshgold in the Neshgold Adversary Proceeding or as a result of the Debtor's objection to Neshgold's Claim pursuant to § 502(a) of the Bankruptcy Code.

A discussion of the Debtor's claims and counterclaims against Neshgold is more fully set forth in § 4(D)(6) of this Disclosure Statement below.

Under the Plan, the Holder of the Class 2(a) Claim shall: (a) retain its Lien on the Property of the Debtor securing its Allowed Claim, and (b) receive on account of the Allowed Amount of its Claim (i) monthly payments Cash payments of interest, at the rate of LIBOR plus six percent (6%), commencing on the first day of the first full month  following the Effective Date; and (ii) a lump sum balloon payment equal to the Allowed Amount of its Claim on the date that is seven (7) years following the first day of the first full month following the Effective Date, which balloon payment may be pre-paid without penalty.  To the extent that a judgment or award is made in favor of the Debtor and against Neshgold in the Neshgold Adversary Proceeding following the Effective Date, which judgment or award serves to reduce the Allowed Amount of Neshgold's Claim, then, in that event, the monthly payment of interest provided above shall be immediately recalculated as interest at the applicable rate on the Allowed Amount of Neshgold's Claim as so reduced.  In the event of such recalculation, the principal amount of the Allowed Amount of Neshgold's Claim shall be reduced by:  (y) the award or judgment entered in favor of the Debtor and against Neshgold in the Adversary Proceeding; and (z) any excess payment of interest above the amount of the newly calculated interest payment for each month so paid by the Debtor following the Effective Date through the date on which such interest recalculation was

made. The treatment and consideration to be received by The Holder of Allowed Claims in Class 2(a) under the Plan shall be in full settlement and final satisfaction of its Claim.

Class 2(a) is Impaired under and may vote on the Plan.

(d)     *Class 2(b) - Other Secured Claims*.  Class 2(b) consists of any claimants (other than Neshgold) that purport hold liens and security interests in the Debtor's assets.  In this case, claims falling within this class are comprised of: (i) unpaid real estate taxes that accrued prior to the Petition Date, which constitute lines on the Hotel pursuant to statute; and (ii) any unpaid mechanics liens or judgment liens, to the extent not avoidable by the Debtor.

The Debtor believes that Allowed Claims in Class 2(b) aggregate approximately $250,000.00.

The Plan provides that each Holder of an Allowed Class 2(b) Claim that has not been paid prior to the Effective Date, will receive, in full and complete settlement, satisfaction and discharge of its Allowed Class 2(b)Claim, at the Debtor's option, either:  (a) Cash on the Effective Date in an amount equal to the value of the collateral securing such Claim evidenced by a valid, perfected and enforceable lien and security interest, in accordance with § 506(a) of the Bankruptcy Code; or (b) the collateral securing such claim, as surrendered by the Debtor, provided, however, that such treatment will be subject to the rights of any holder of a prior lien upon, and security in, said collateral.  To the extent the value of the collateral securing such Other Secured Claim is less than the Allowed Amount of the Other Secured Claim, any such deficiency will be treated as a Class 4 General Unsecured Claim under this Plan.  The treatment and consideration to be received by The Holders of Allowed Claims in Class 2(b) under the Plan shall be in full settlement and final satisfaction of its Claim.

Class 2(b) Claims are not Impaired under and are deemed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code.

(e)     *Class 3 - Priority Non-Tax Claims*.  Class 3 consists of all Allowed Priority Claims that are not Priority Tax Claims.  Under § 507 of the Bankruptcy Code, certain non-tax claims are accorded priority status.  These consist primarily of unpaid wages, salaries and commissions incurred within 180 days prior to Petition Date up to a statutory amount of $11,725 per claimant, unsecured claims for contributions to an employee benefit plan arising from services rendered in the 180 days prior to the Petition Date, subject to certain statutory caps per claimant, and deposit creditors.

The Debtor believes the aggregate amount of Claims in Class 3 that constitute Allowed Claims is approximately $100,000.00.

Under the Plan, each Holder of an Allowed Priority Non-Tax Claim that has not been paid prior to the Effective Date, will receive, in full and complete settlement, satisfaction and discharge of its respective Priority Non-Tax Claim, regular monthly installment payments in Cash, together with interest at the then current federal statutory rate, over a period of not more than two (2) years from the Effective Date, which payments have of a value, upon full payment

equal to the Allowed Amount of such Priority Non-Tax Claim, unless the holders of Allowed Priority Tax Claims agree otherwise. Notwithstanding the foregoing, the Debtor may, at its option, in the event of a confirmation pursuant to the provisions of § 1129(b) of the Bankruptcy Code, pay the Holders of Allowed Priority Non-Tax Claims (to the extent such Claims remain unpaid as of the Effective Date), Cash on the Effective Date equal to the to the Allowed Amount of their respective Claims.

Class 3 is Impaired under and may vote on the Plan.

(f)     *Class 4 - General Unsecured Claims.*  Class 3 consists of all Allowed General Unsecured Claims.

The Debtor believes that the aggregate amount of General Unsecured Claims that constitute Allowed Claims is approximately $3,500,000.00.

Under the Plan, each Holder of an Allowed Claim in Class 3 shall be entitled to receive a distribution in the total amount of twenty five percent (25%) of the Allowed Amount of its Claim over a period of three (3) years from the Effective Date, payable as follows:  ten percent (10%) of the Allowed Amount of its Claim as soon after the Confirmation Date as is practicable, but in no event later than the Effective Date; five percent (5%) of the Allowed Amount of Claim on the first anniversary of the Effective Date; five percent (5%) of the Allowed Amount of its Claim on the second anniversary of the Effective Date; and five percent (5%) of the Allowed Amount of its Claim on the third anniversary of the Effective Date.  The treatment and consideration to be received by Holders of Allowed Class 3 Claims shall be in full settlement and final satisfaction of their respective Claims.

Class 4 is Impaired under and may vote on the Plan.

(g)     *Class 5 - Interests.*  Class 5 consists of equity Interests in the Debtor. There are two Holders of such Interests, Charles Morais and Sunil Mir.  Under the Plan, the Holders of Class 5 Interests shall receive no Distributions under the Plan, but shall retain their respective equity interests in the Reorganized Debtor.  However, in order to retain their Interests as provided under the Plan, the Holders of the Debtor's Interests have agreed to execute personal guarantees of the Debtor's obligation to repay the SCS Loan in accordance with SCS Note and the Plan.

Class 5 is not Impaired under the Plan and is deemed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code.

C.     Unexpired Leases and Executory Contracts

1.     *Generally.*

Under § 365 of the Bankruptcy Code, the Debtor has the right, subject to Bankruptcy Court approval, to assume or reject executory contracts or unexpired leases. If an executory contract or unexpired lease entered into before the Petition Date is rejected by the

Debtor, it will be treated as if the Debtor breached such contract or lease on the date immediately preceding the Petition Date, and the other party to the agreement may assert a General Unsecured Claim for damages incurred as a result of the rejection. In the case of rejection of real property leases and employment agreements, damages are subject to certain limitations imposed by §§ 365 and 502 of the Bankruptcy Code.

Under § 502(b)(6) of the Bankruptcy Code, the claim of a lessor for damages resulting from the termination by the Debtor of a lease for real property pursuant to § 365 of the Bankruptcy Code may be allowed except to the extent that such claim exceeds (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of (i) the Petition Date; and (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates. Under § 502(b)(7) of the Bankruptcy Code, the claim of an employee of the Debtor for damages resulting from the termination by the Debtor of an employment contract pursuant to § 365 of the Bankruptcy Code may be allowed except to the extent that such claim exceeds (A) the compensation provided by such contract, without acceleration, for one year following the earlier of (i) the Petition Date; or (ii) the date on which the Debtor directed the employee to terminate, or such employee terminated, performance under such contract; plus (B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates.

2.    *Assumption and Rejection*.

The Plan provides that as of the Confirmation Date, any executory contract or unexpired lease that has not been expressly assumed or rejected with approval by order of the Bankruptcy Court, with the exception of the Union Contract and the Ground Lease, shall be deemed to have been rejected unless (a) there is then pending before the Bankruptcy Court a motion to assume such unexpired lease or executory contract, or (b) the Bankruptcy Court has entered an order extending the period during which a motion may be made to assume such unexpired lease or executory contract, and such a motion is filed with the Bankruptcy Court before the expiration of such period.

The Plan further provides that this Disclosure Statement and the Plan shall constitute due and sufficient notice of the intention of Debtor to reject all executory contracts and unexpired leases, with the exception of the Union Contract and the Ground Lease, that are not otherwise assumed. The Confirmation Order shall be deemed an order under § 365(a) of the Bankruptcy Code rejecting any such executory contracts and unexpired leases that are not otherwise assumed.

3.    *Deadline for Filing Rejection Damage Claims*.

The Plan establishes a deadline for filing Rejection Damage Claims. Pursuant to the Plan, unless otherwise provided for by an order of the Bankruptcy Court entered on or prior to the Confirmation Date, any Rejection Damage Claim for an executory contract or unexpired lease rejected by the Plan must be filed with the Bankruptcy Court within thirty (30) days following the Confirmation Date. Any Entity that fails to file its Rejection Damage Claim within

the period set forth above shall be forever barred from asserting a Claim against the Debtor, the Estate, or any Property or interests in Property of the Debtor or the Estate. All Allowed Rejection Damage Claims shall be classified as Class 4 General Unsecured Claims under the Plan.

D. Means For Effectuating The Plan

1. *Chief Restructuring Officer*.

On the Confirmation Date, the Debtor will retain Joseph Sarachek of Triax Capital Advisors to serve as a Manager of the Debtor's Board of Managers, and Chief Restructuring Officer ("CRO") of the Debtor, during the Effective Period, for the purposes of overseeing management of the Debtor's operations and satisfaction of the Conditions to the Effective Date of the Plan, as more fully described below. Joseph Sarachek does not hold or represent any interest adverse to the Debtor and is a disinterested person within the meaning of § 327(a) of the Bankruptcy Code. Accordingly, the Debtor believes that Joseph Sarachek is qualified to serve as CRO of the Debtor.[4]

The Confirmation Order shall provide that the retention of Joseph Sarachek is authorized and approved during the Effective Period.

During the Effective Period, the Chief Restructuring Officer shall be compensated in the amount of $6,250 per week plus reimbursement of all reasonable out-of-pocket expenses, plus a $50,000 exit bonus upon consummation of the Plan on the Effective Date of the Plan.

The Chief Restructuring Officer may continue to provide management services to the Reorganized Debtor in the sole discretion of the Board of Managers of the Reorganized Debtor. To the extent that the Reorganized Debtor determines to continue the engagement of the Chief Restructuring Officer he shall be compensated as agreed by the Reorganized Debtor and the Chief Restructuring Officer.

2. *Post-Confirmation Loan*. As noted above, prior to the filing of the Plan, the Debtor received a conditional commitment from SCS to loan the Debtor the approximate sum of $4.6 million for the purposes of (i) making the distributions due under the Plan on the Effective Dtae; (ii) facilitating the implementation of the Plan; and (iii) satisfying the Conditions Precedent to the Effective Date of the Plan. A copy of the letter (the "Commitment Letter") from SCS memorializing SCS's conditional commitment is annexed hereto as **Exhibit C**. As more fully set forth in the Commitment Letter, the commitment of SCS to make the SCS Loan is conditioned upon, *inter alia*, confirmation of the Plan. The Plan provides that on the Confirmation Date, or as soon thereafter as may be practicable, SCS will loan to the Debtor, and the Debtor will borrow from SCS, the sum of approximately $4.6 million for the purposes stated above and in the Commitment Letter.

---

[4] To the extent required by the Office of the United States Trustee, Joseph Sarachek will submit an affidavit or certification providing all appropriate disclosures under § 327 of the Bankruptcy Code.

The Debtor proposes to repay the SCS Loan pursuant to the terms set forth in § 5.1 of the Plan, as described in § 4(B)(2)(a) above, which shall be more fully documented in a series of loan documents, including a promissory note. As security for the Debtor's obligation to repay the SCS Loan pursuant to the terms of the Plan, the Debtor will grant to SCS, pursuant to § 364(d)(1) of the Bankruptcy Code, a security interest and lien against all of the Debtor's assets, senior in priority to all other liens and security interests in property of the Debtor and the Estate, with the exception of the security interest and liens held by Neshgold to secure its Super-Priority Secured Claim, with respect to which security interest, SCS shall hold equal priority. Additionally, the Holders of the Debtor's equity Interests shall execute and deliver to SCS personal guarantees of the Debtor's obligation to repay the SCS Loan, which execution and delivery shall constitute "new value" sufficient to satisfy the exception to the absolute priority rule contained in § 1129(b)(2)(B), to the extent necessary. The repayment will be through a refinance with a new lender, permitting the new lender to keep the Super-Priority Secured Claim for the repayment amount to SCS and for any new loan amount. Any amount over and above the repayment of the SCS amount will be used to paydown the principle due Neshgold and the remaining balance, if any, will be paid as provided in the Plan.

3.    *Assumption of Ground Lease*.  As noted above, the Debtor is party to a Ground Lease with New Riviera. Prior the Petition Date, the Debtor fell into arrears on the rent due to New Riviera, and on real estate taxes included in the rental obligation. The Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code on the Petition Date primarily to stay the termination of the Ground Lease pursuant to a certain forbearance agreement between the Debtor and New Riviera, which was slated to expire.

Under § 365(d)(4) of the Bankruptcy Code, a lease for non-residential real property will automatically be deemed rejected if the debtor or trustee does not move to assume it before the expiration of 120 days following the date on which the debtor filed its petition for relief under the Bankruptcy Code. Here, the 120 day period under § 365(d)(4) of the Bankruptcy Code ended on February 4, 2011. Prior to the expiration of that time period, the Trustee moved the Court for a ninety day extension of the 120 period.

Under the Debtor's Plan it is critical that the Debtor continue its possessory interest in the Hotel via the Ground Lease and thus the Debtor intends to assume the Ground Lease pursuant to the Plan. Accordingly, the Plan provides that on the Confirmation Date, the Debtor will assume the Ground Lease pursuant to § 365(a) of the Bankruptcy Code, and continue to make monthly payments and comply with all other obligations to New Riviera under the Ground Lease following the Confirmation Date. The Debtor will cure the monetary default in the Ground Lease pursuant to § 365(b)(1)(A) of the Bankruptcy Code as soon after the Confirmation Date as is practicable, but in no event later than the Effective Date. The Debtor estimates that the amount required to cure the Ground Lease is $330,000 (plus $880,000 in real estate tax obligations), which amount is reserved from the proceeds of the SCS Loan to pay the Ground

Lease Cure Amount.[5] However, under the Plan, the Debtor reserves the right to dispute and/or liquidate the Ground Lease Cure Amount after notice and a hearing during the Effective Period.

4. _Re-Employment of Union Labor Subject to Concessions._ As noted above, the Debtor is party to a Union Contract which requires the Debtor employ labor for the operation of its business represented by the Union and to compensate and pay benefits to such Union-represented employees in accordance with the terms of the Union Contract. As of the Petition Date, the Debtor was not employing Union-represented employees.

As part of its efforts to reorganize, the Debtor intends to re-employ limited Union-represented employees and pay to the Union as an administrative expense, damages arising from the Debtor's post-Petition Date failure to adhere to the Union Contract in the amount of $150,000, which sum has been reserved from the proceeds of the SCS Loan for such purpose. This re-employment and payment will place the Debtor back into compliance with the Union Contract and set a good faith playing field with the Union for the negotiation of concessions necessary for the Debtor's reorganization so that the Debtor may assume a modified Union Contract that ensures the continued survival of the Debtor's business operations and the continued employment of Union-represented labor.

Section 1113 of the Bankruptcy Code governs the assumption or rejection of collective bargaining agreements, such as the Union Contract. Unlike typical executor contracts -- which a debtor or a trustee may reject unilaterally, the rejection of collective bargaining agreements requires a debtor to first engage in a good faith negotiations with its union for the purposes of reaching an accord as to concessions or modifications to an existing collective bargaining agreement. A Bankruptcy Court will approve the rejection of a collective bargaining agreement only where a union refuses to accept, without good cause, a necessary proposal made by a debtor.

Section 1113(e) of the Bankruptcy Code also permits a debtor to seek and the Bankruptcy Court to direct, after notice and a hearing, interim changes to a collective bargaining agreement, including changes to terms, wages, benefits or work rules provided under such agreement, to avoid irreparable damage to the debtor's estate and where essential to the continuation of the debtor's business.

Here, as a condition to the re-employment of the Union-represented employees, the Debtor requires certain interim modifications to the Union Contract which are necessary to the continued operation of the Hotel, and without which the Debtor will suffer irreparable harm, namely the inability of the Debtor to operate in a positive cash flow circumstance, thus rendering the feasibility of the Debtor's Plan in question. These interim modifications are set forth in more detail on **Exhibit D** hereto. In summary, these modifications propose to release all of the operational departments of the Debtor's operations from the wage and benefit requirements of

---

[5] The $330,000 is scheduled as a Class 4 Claim. Approximately $220,000 of the real estate taxes are scheduled as a Class 2(b) Claim. Approximately $660,000 of the real estate taxes accrued post-petition and thus are classified as a Administrative Claim. To the extent the Debtor satisfies these amounts in full upon assumption of the Ground Lease, they will not receive the distributions as proposed to the Holders of such Claims under the Plan.

the Union Contract. However, the Debtor will adhere to the wage and benefit requirements of the Union Contract as they pertain the maintenance and laundry departments.

Once these modifications are effected, the Debtor will have the financial stability to negotiate with the Union in good faith for permanent modifications to the Union Contract with an eye toward assumption under § 1113 of the Bankruptcy Code.

Under the Plan, upon the Confirmation Date, or as soon thereafter as may be practicable, and subject to the conditions set forth in the Plan (and as described below), the Debtor will re-employ Union-represented employees to perform services necessary to the operation of the Debtor's business as set forth above. Under the Plan, the Union shall be required to cooperate with the Debtor in re-employing such employees, by providing the Debtor with the names and contact information of such employees, executing such documents as may be necessary to facilitate such re-employment, and otherwise communicating with the Debtor regarding such re-employment. Under the Plan, the Debtor's re-employment of Union-represented employees as described above shall be contingent upon Bankruptcy Court approval, pursuant to § 1113(e) of the Bankruptcy Code, of the emergency interim changes and conditions to the Union Contract and to the terms, conditions, wages, benefits and work rules provided therein, as set forth on the Interim Union Contract Term Sheet, annexed hereto as **Exhibit D**. The Interim Changes shall be effective during the Effective Period.

Further, pursuant to the Plan, commencing on the Confirmation Date, or as soon thereafter as may be practicable, the Debtor shall negotiate necessary changes to terms, conditions, wages, benefits and work rules provided in the Union Contract which are necessary to the reorganization of the Debtor's business. If an agreement is reached with the Union regarding such modifications to the Union Contract, the Debtor will assume the Union Contract pursuant to § 1113(a) of the Bankruptcy Code, on the Effective Date. Notwithstanding the foregoing, under the Plan, and if no agreement is reached, the Debtor reserves its right to seek the rejection of the Union Contract pursuant to § 1113(b), (c) and (d) of the Bankruptcy Code, on or prior to the Effective Date.

5. _Franchise Agreement_. Commencing on the Confirmation Date, and continuing thereafter as may be necessary, the Debtor will engage in negotiations and improvement to its property for the purposes of obtaining, pursuant to § 363(b) of the Bankruptcy Code, a franchise with a recognized and reputable hotel franchisor, so as to gain access to and participate in such franchisor's reservation system and increase its revenues. Prior to the filing of the Plan, the Debtor commenced such negotiations and has received expressions of interest from Starwood Hotels and Red Roof Inn. (Copies of letters of interest from the foregoing hotel franchisors are annexed hereto collectively as **Exhibit E**).

6. _Prosecution of Claims/Counter-claims Against Fortress/Neshgold_. As discussed above, Neshgold is the successor in interest to Fortress, which loaned the Debtor funds to acquire the Hotel in March 2006. Prior to the Petition Date, Fortress, old commenced an action to foreclose the Debtor's equity of redemption in the Hotel and to enforce its collateral assignment of the Ground Lease. The Debtor defended the action, and asserted various counterclaims

against Fortress / Neshgold. After the Debtor's Chapter 11 Case was transferred to the Eastern District of New York, on or about December 3, 2010, the Debtor removed the foreclosure action and its counterclaims to the Bankruptcy Court, where they currently exist as an adversary proceeding related to the Debtor's case, Adv. Proc. No. 10-01325 (CEC) (the "Neshgold Adversary Proceeding").

The Debtor's claims and counterclaims against Fortress / Neshgold derive from two separate circumstances, as discussed above. First, the Debtor asserts that the loss of its franchise with HHFI was occasioned due to the negligence and nonfeasance of Neshgold's predecessor in interest, Fortress, due to the failure of Fortress to timely release certain funds held by Fortress in a managed account pursuant to the terms of the Debtor's loan agreement with Fortress, which sums were earmarked for payment of a franchise fee to HHFI and which had been agreed to be released by Fortress in a timely fashion. Fortress failed to timely release the funds, causing the Debtor to default on the payment of franchise fees to HHFI and which in turn resulted in Debtor's rights under its Franchise License Agreement to be terminated. The resulting loss of the Crowne Plaza franchise and brand and reservation system caused an immediate reduction in the Debtor's gross revenues, ultimately causing the Debtor to fall into arrears with numerous vendors, and incur operational losses, compensatory and consequential damages estimated to exceed $10 million.

Second, the Debtor asserts that Neshgold improperly, through an alter-ego known as SF-JFK, usurped and foreclosed the Debtor's possessory and tenancy rights in and to a Parking Lot adjacent to the Hotel without due process. Specifically, the Debtor formerly leased the Parking Lot adjacent to the Hotel from North Conduit pursuant to a lease agreement dated October 30, 1998 (the "Parking Lot Lease"). The Parking Lot Lease provided the Debtor with a right of first refusal in any sale of the parking lot by North Conduit. The Parking Lot Lease also constituted part of the collateral pledged by the Debtor to Fortress as security for its obligation to repay its loans to Fortress. After Neshgold took an assignment of the loan documents from Fortress, on or about December 29, 2009 it created and caused its alter-ego, SF-JFK, to purchase the parking lot from North Conduit. In purchasing the parking lot, the Debtor asserts that both North Conduit and SF-JFK breached the right of first refusal accorded to the Debtor under the Parking Lot Lease. Furthermore, after acquiring title to the Parking Lot, the Debtor asserts that SF-JFK resorted to self-help and physically changed the locks to the parking lot, thereby effecting an illegal lock-out of the Debtor and completely disenfranchising the Debtor of its possessory and tenancy rights, without commencing or prosecuting any summary dispossess proceedings in landlord-tenant court, and without otherwise complying with applicable law or according the Debtor due process. After the illegal lockout, SF-JFK leased the parking lot to U-Save Car and Truck Rental. Thereafter, on March 9, 2010 SF-JFK commencing an action in the Civil Court of the City of New York, County of Queens, alleging that the Debtor owed SF-JFK the sum of $89,406.71 in rent arrears and requesting final judgment of possession from the court. The Debtor moved to dismiss the petition. On June 28, 2010, SF-JFK discontinued the action. To date, SF-JFK does not have a judgment of possession against the Debtor. As a result of the foregoing, the Debtor has suffered an inability to properly operate the Hotel in accordance with local laws and ordinances, a loss of valuable operating income and other damages. Further, the Debtor asserts that the improper usurpation by Neshgold (through its alter-ego) of the parking lot should properly result in credit against the amount of Neshgold's secured claim in the amount of

the value of the Parking Lot Lease, and the rental income lost by Debtor from the parking lot, inasmuch as Neshgold has effectively foreclosed that collateral through improper self-help remedies and without Due Process.

Neshgold has filed proof of its secure claim against the Debtor in the amount of approximately $15.7 million. Under the Plan, the Debtor intends to fully prosecute its claims against Neshgold as: (i) counterclaims in the context of the Neshgold Adversary proceeding; or (ii) an objection to Neshgold's claim pursuant to § 502(a) of the Bankruptcy Code, for the purpose of: (x) reducing the Allowed Amount of Neshgold's Claim under Class 2(a) of the Plan; (y) recovering damages and other relief from Neshgold; and (z) reacquiring rights to the parking lot for use in the operation of the Hotel.

As noted above, prior to the filing of the Plan, the Trustee entered into a proposed settlement with Neshgold concerning, in part, the Debtor's claims as discussed herein, under which the Trustee proposes to release Neshgold from such claims in consideration for its agreement to reduce its claim to $14.5 million, and to increase its carve out to $510,000, including the sum of $100,000 earmarked for unsecured creditors. The Trustee has filed a motion to approve the settlement that is slated to be heard by the Court on March 9, 2011. However, in order to facilitate the consummation of the Plan, the Debtor will request that the Trustee's settlement motion be adjourned to heard concurrently with confirmation of the Plan. To the extent that the Debtor's Plan is confirmed, the Trustee's motion will be rendered moot.

Following the Confirmation Date, the Debtor will prosecute its claims against Neshgold and its counterclaims against Neshgold in the context of the Neshgold Adversary Proceeding for the purposes of liquidating Neshgold's Allowed Class 2(a) Claim and making payments on account thereof as provided in § 5.3 of the Plan. The Confirmation Order shall constitute a reconsideration and rescission of any releases accorded by the Estate to Neshgold pursuant to the Second Cash Collateral Order or otherwise to the extent that any such releases encumber or impair the Debtor's rights under the Plan as described herein. In addition, the Confirmation Order shall constitute a reconsideration and rescission of any prohibition in the Second Cash Collateral Order that the super-priority replacement liens and super-priority administrative expenses conferred upon Neshgold pursuant to the Second Cash Collateral Order may not be primed or subject to *pari passu* treatment with any other obligation of the Debtor's Estate.

7. *Implementation*. Pursuant to the Confirmation Order and upon confirmation of the Plan, the Debtor shall be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and provisions of the Plan. On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate or further evidence the terms and provisions of the Plan and the other agreements referred to herein. The Debtor may be, is hereby authorized, and shall, execute such documents, and take such other actions as are necessary to effectuate the transactions provided for in the Plan, without the need for any additional approvals, authorizations or consents.

8. *Vesting of Property*. Except as otherwise provided in the Plan, on the Effective

Date, title to all Property of Debtor's Estate shall pass to and vest in the Reorganized Debtor, free and clear of all Claims, Interests, Liens, security interests, charges and other encumbrances, except as otherwise provided in the Plan.

9. *Preservation and Vesting of Claims, Rights, Demands and Causes of Action*. Pursuant to § 1123 of the Bankruptcy Code, the Debtor and the Reorganized Debtor, as the case may be, on behalf of and for the benefit of the Estate, shall be vested with, shall retain, and shall have the authority to prosecute and enforce any and all claims, controversies, agreements, promises, accounts, rights to legal remedies, rights to equitable remedies, rights, demands and Causes of Action of any kind or nature whatsoever held by, through, or on behalf of the Debtor and/or the Estate, including, without limitation, all Causes of Action of a trustee and a debtor-in-possession under the Bankruptcy Code, including, without limitation, under §§ 544, 545, 547, 548, and 549 of the Bankruptcy Code, against any other Entity arising before or after the Effective Date that have not been fully resolved or disposed of prior to the Effective Date, whether or not such Claims or Causes of Action are specifically identified in the Disclosure Statement accompanying the Plan and whether or not litigation with respect to same has been commenced prior to the Effective Date. The Debtor and the Reorganized Debtor will also be authorized to challenge, and/or object to disputed Claims, and will be authorized to settle disputed Claims with approval from the Bankruptcy Court prior to the Effective Date, and without approval from the Bankruptcy Court following the Effective Date. All Cash, proceeds and/or recoveries from the Causes of Action will be utilized by the Debtor in the operation of its business and may be used, at the Debtor's option for the implementation of the Plan.

10. *No Stamp or Similar Taxes*. Pursuant to § 1146(c) of the Bankruptcy Code: (a) the creation of any mortgage, deed of trust, lien, pledge, or other security interest; (b) the making or assignment of any lease or sublease; (c) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, any restructuring, disposition, liquidation, dissolution, deeds, bills of sale, transfers of tangible property or the transfers, sales, and assignments of the Debtor's leased real property, or (d) any transfers from or for the benefit of the Debtor pursuant to the Plan, will not be subject to any document recording tax, stamp tax, conveyance fee, personal property tax, real estate transfer tax, intangibles or similar governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

11. *Release of Liens*. Under the Plan, upon receipt of all of the Distributions required to be made to the holders of Allowed Secured Claims in accordance with the Plan (or upon the occurrence of any other event or condition which terminates a party's lien on or other interest in property of the Debtor or the Reorganized Debtor), such holder of the Allowed Secured Claim shall file such notice or other public statement as is necessary or appropriate to evidence the termination of the lien formerly held by such party. In addition, under the Plan, the Reorganized Debtor is appointed as attorney-in-fact for each party whose lien treated or created under the Plan is hereafter terminated, with full power and authority to execute on behalf of such holder

any notices or other public statements necessary or appropriate to evidence the termination of such party's lien.

12. *Effect of Confirmation*. The Confirmation Order (and any subsequent Final Orders) shall be a final determination as to the rights of all Claimants and Interest holders to participate in the Distributions under the Plan, whether or not (a) a proof of claim is filed or deemed filed under § 501 of the Bankruptcy Code, (b) such Claim is an Allowed Claim, or (c) the holder of such Claim has accepted the Plan.

E. Post-Confirmation Date Management and Procedures

1. *Post-Confirmation Management*. Following the Confirmation Date and continuing through the Effective Period, the Debtor's Board of Managers shall be reconstituted to provide for three (3) Managers as follows: (i) Joseph Sarachek; (ii) Charles Morias; and (iii) Sunil Mir. As discussed in § 4(D)(1) above, during the Effective Period, Joseph Sarachek shall serve as Chief Restructuring Officer of the Debtor. Following the Effective Date, the Chief Restructuring Officer may continue to provide management services to the Reorganized Debtor and may continue to serve on the Reorganized Debtor's Board of Managers in the sole discretion of the Board of Managers of the Reorganized Debtor. Charles Morais and Sunil Mir are the Holders of the Debtor's equity Interests, and shall retain those Interests under the Plan in consideration of the execution and delivery by them of personal guarantees of the Debtor's obligation to repay the $4.1 million SCS Loan.

2. *Post Confirmation Fees*. Under the Plan, the Debtor will pay all outstanding fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 31 U.S.C. § 3717, upon Confirmation and through the Effective Date. After the Effective Date, the Reorganized Debtor will be liable for and pay the fees of the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 31 U.S.C. § 3717 until the entry of a final decree in the Debtor's case, or until the case is converted or dismissed. United States Trustee Fees will be based on all plan payments and disbursements made in the ordinary course of the Debtor's business (or the Reorganized Debtor, as applicable), also through entry of a final decree in this case, or until the case is converted or dismissed.

3. *Post Confirmation Reports*. Under the Plan, the Reorganized Debtor shall file with the Court and serve on the United States Trustee monthly post-confirmation reports of disbursements until the entry of a final decree in the Debtor's case, or until the case is converted or dismissed.

4. *Post Confirmation Date Services by Professionals*. Under the Plan, the Professionals retained by the Debtor shall continue to be retained subsequent to the Confirmation Date for the purpose of rendering services as necessary to satisfy the Conditions for the Effective Date of the Plan set forth in § 13.2 of the Plan (and described in more detail below), objecting to Disputed Claims and effecting Distributions on Allowed Claims, and otherwise consummating the Plan. The reasonable fees and expenses of the Debtor's Professionals incurred after the Confirmation Date shall constitute Operating Expenses of the Debtor's Estate (or Reorganized

Debtor's Estate, as the case may be) and shall be payable upon presentment of a monthly statement for services rendered and for reimbursement of expenses incurred, to the Debtor or Reorganized Debtor, as the case may be, with a copy to the United States Trustee. Under the Plan, the Debtor (or the Reorganized Debtor) and the United States Trustee shall have ten (10) days from the receipt of any such fee and expense statements to dispute all or part of such statement. Upon the expiration of said ten (10) days, the Debtor (or Reorganized Debtor) shall pay the professionals the undisputed portion of such fees and expenses. Any disputes shall be submitted to the Bankruptcy Court for determination. Under the Plan, a law firm, accountant or other Professional shall not be disqualified from representing or otherwise serving the Reorganized Debtor solely because of its current or prior retention as counsel or professional to the parties in interest in the Chapter 11 Case, including, without limitation, counsel to the Debtor.

F.  Distributions; Disputed Claims Reserve; and Procedures for Resolving Disputed Claims

     1.  *Timing of Distributions Due Under Plan*.  All Distributions and payments required of the Debtor under the Plan to Holders of Allowed Claims will be paid from the Estate on the dates, and in the manner, indicated in the Plan.

     2.  *Manner of Distributions*.  At the option of the Debtor, Distributions from the Estate may be made by wire transfer, check, or such other method as the Debtor deems appropriate under the circumstances.  Under the Plan, no Distributions shall be required to be made to any Holder of an Allowed Claim in an amount less than fifty dollars ($50.00), unless request is made, in writing, to the Debtor.

     3.  Cash Payments. Cash payments made pursuant to the Plan will be in U.S. dollars. Cash payments made pursuant to the Plan in the form of checks issued by the Debtor shall be void if not cashed within one hundred twenty (120) days of the date of the issuance. Requests for reissuance of any check shall be made directly to Debtor as set forth in § 10.7 of the Plan, a described more fully below.

     4.  Disputed Claims Reserve.

     (a)  Under the Plan, prior to the Effective Date, the Debtor shall establish a Disputed Claims Reserve.  For purposes of establishing the Disputed Claims Reserve, the Debtor shall reserve for each Disputed Claim at the Maximum Amount. Under the Plan, "Maximum Amount is defined as: (a) the amount agreed to by the Debtor and the Holder of such Claim; (b) the amount, if any, estimated or determined by the Bankruptcy Court in accordance with §§ 502(c) or 503(b) of the Bankruptcy Code in the event such Disputed Claim is a Disputed Administrative/Priority Claim; or (c) absent any such agreement, estimation or determination, the liquidated amount set forth in the proof of claim filed by the Holder of such Claim, or if no amount is so set forth, the amount estimated by the Debtor. Under the Plan, on the date of any Distribution, the Debtor shall deposit into the Disputed Claims Reserve Cash equal to the amount that would be distributable to all Holders of Disputed Claims in respect of all Distributions made on that date, if such Disputed Claims were Allowed in the respective Maximum Amounts.

The Debtor shall maintain the Disputed Claims Reserve in a segregated, interest bearing account and shall keep records as to the applicable amounts reserved in respect of each Disputed Claim. The Debtor shall pay any taxes due and owing with respect to the Disputed Claims Reserve, and reserve all Distributions on account of the Disputed Claims, net of such taxes; provided, however, that the Debtor may contest in good faith any tax that any taxing authority determines is owed by the Estate.

(b)     In the event any Disputed Claim becomes an Allowed Claim, the amount of such Allowed Claim shall never exceed the Maximum Amount and the Debtor shall distribute to the Holder of such Allowed Claim from the Disputed Claims Reserve the aggregate amount of Cash that such Holder would have received through the date of such Distribution in respect of such Disputed Claim as if such Claim has been an Allowed Claim as of the Effective Date.

(c)     From time to time as Disputed Claims are Disallowed or become Allowed Claims in amounts less than its respective Maximum Amounts, the Cash deposited in the Disputed Claims Reserve that otherwise would have been distributed to the holders of such Disputed Claims if such Disputed Claims subsequently had become Allowed Claims in an amount equal to their respective Maximum Amounts (and which as a result is not distributable to such Holders pursuant to the Plan) shall be released under the Plan from and no longer held in the Disputed Claims Reserve and deposited in the Debtor's general operating account for use in operations.

5.     No Interest.  Under the Plan, except with respect to Holders of Unimpaired Claims entitled to interest under applicable non-bankruptcy law or as otherwise expressly provided herein, no Holder of an Allowed Claim, including, without limitation, Holders of Allowed General Unsecured Claims under Class 4 of the Plan shall receive interest on any Distribution to which such Holder is entitled hereunder, regardless of whether such Distribution is made on the Effective Date or thereafter.

6.     Withholding of Taxes.

(a)     Under the Plan, the Debtor may withhold from any Property to be distributed under the Plan any Property which must be withheld for taxes payable by the Entity entitled to such Distribution to the extent required by applicable law. As a condition to making any Distribution under the Plan, the Debtor may request that the Holder of any Allowed Claim provide such Holder's taxpayer identification number and such other certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

(b)     Notwithstanding any other provision of the Plan, each Entity receiving a Distribution of Cash pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of such Distribution, including income, withholding and other tax obligations.

7. Undeliverable or Unclaimed Distributions.

(a) All Distributions under the Plan to any Holder of an Allowed Claim shall be made at the address of such Holder as set forth on the Debtor's Schedules, unless Holder has filed a Proof of Claim or unless the Debtor has been notified in writing after the Confirmation Date of a change of address, in which case the Debtor shall utilize such changed address. Any Entity that is entitled to receive a Cash Distribution under the Plan but that fails to cash a check within one hundred twenty (120) days of its issuance shall be entitled to receive a reissued check from the Debtor for the amount of the original check, without any interest, if such Entity (i) requests, in writing, the Debtor to reissue such check, and (ii) provides the Debtor with such documentation as the Debtor requests to verify in its sole discretion that such Entity is entitled to such check. If an Entity fails to cash any check within one hundred twenty (120) days of its issuance or fails to request re-issuance of such check within one hundred twenty (120) days of its issuance, such Entity shall be deemed to have forfeited the amount of the Distribution provided for in such check. Any such forfeited Distributions shall revert to the Debtor and the Claim of any Holder or successor to such Holder with respect to such forfeited Distributions shall be discharged and forever barred, notwithstanding any other provisions in the Plan or any federal or state escheat laws to the contrary.

(b) In the event that any Distribution to any Holder of an Allowed Claim is returned to the Debtor as undeliverable, no further Distributions will be made to such Holder unless and until the Debtor is notified in writing of such Holder's then-current address. All claims for undeliverable Distributions must be made within one hundred twenty (120) days of the issuance of the original check. After such date, all unclaimed Distributions shall revert to the Debtor and the claim of any Holder or successor to such Holder with respect to such Distribution shall be forfeited, discharged and forever barred, notwithstanding any provisions in the Plan or any federal or state escheat laws to the contrary. Upon such forfeiture of Cash or other property, such Cash or property shall be the property of the Debtor.

G. Procedures for Resolving Disputed Claims

1. Objections to Claims. Under the Plan, the Debtor and Reorganized Debtor shall have the authority to file, settle, compromise, withdraw or litigate to judgment objections to Claims. Subject to an order of the Bankruptcy Court providing otherwise, the Debtor or Reorganized Debtor may object to a Claim by filing an objection with the Bankruptcy Court and serving such objection upon the Holder of such Claim not later than one hundred twenty (120) days after the Effective Date or one hundred twenty (120) days after the filing of the proof of such Claim, whichever is later, or such other date fixed by the Bankruptcy Court.

2. Procedure. Unless otherwise ordered by the Bankruptcy Court or agreed to by written stipulation of the Debtor or Reorganized Debtor, or until an objection thereto by the Debtor or Reorganized Debtor is withdrawn, the Debtor or Reorganized Debtor may litigate the merits of each Disputed Claim until a Final Order is entered with respect to such Claim; provided, however, that (a) prior to the Effective Date, the Debtor, subject to the approval of the

Bankruptcy Court, and (b) after the Effective Date, the Reorganized Debtor, may compromise and settle any objection to any Claim.

3.    Payments and Distributions With Respect to Disputed Claims. Under the Plan, no payments or Distributions shall be made in respect of any Disputed Claim until such Disputed Claim becomes an Allowed Claim.

4.    Claims Reserve - Estimation. For purposes of effectuating the reserve provisions of the Plan described above, and the allocations and Distributions to Holders of Allowed Claims, the Bankruptcy Court may, on or prior to the Effective Date, or such later date as may be established by the Bankruptcy Court and/or the Debtor or Reorganized Debtor, pursuant to § 502 of the Bankruptcy Code, fix or liquidate the amount of any contingent or unliquidated General Unsecured Claim, in which event the amount so fixed will be deemed the Allowed Amount of such Claim for purposes of the Plan or, in lieu thereof, the Bankruptcy Court will determine the maximum contingent or unliquidated amount for such Claim, which amount will be the Maximum Amount in which such Claim ultimately may be Allowed under the Plan, if such Claim is Allowed in whole or in part. The Bankruptcy Court's entry of the Confirmation Order or any such estimation order may limit the Distribution to be made on individual Disputed Claims, regardless of the amount finally Allowed on account of such Disputed Claims, and no Holder shall have recourse against the Debtor, the Estate, the Reorganized Debtor, or any of their respective Professionals, professional consultants, attorneys, advisors, officers, directors, employees, members or their successors or assigns, or any of their respective property, as such Holder's sole recovery shall be from the Distributions to be made to Holders of Allowed Claims.

5.    Distributions After Allowance of Disputed Claims. Distributions to each Holder of a Disputed Claim, to the extent that such Claim ultimately becomes an Allowed Claim, will be made in accordance with the provisions of the Plan.

6.    Setoffs and Recoupments. Except with respect to Causes of Action of any nature released or allowed pursuant to the Plan or Confirmation Order, the Debtor, the Reorganized Debtor or their designee as instructed by them may, pursuant to § 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off or recoup against any Allowed Claim, the Distributions to be made pursuant to the Plan on account of such Claim, any Causes of Action of any nature that the Debtor, the Estate, the Reorganized Debtor, or their successors may hold against the Holder of such Allowed Claim; provided that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtor, the Estate, or the Reorganized Debtor or their successors, of any Causes of Action that the Debtor, the Estate, or the Reorganized Debtor or their successors may possess against such Holder.

H.    Injunction, Release and Exculpation

1.    *Injunction.* **Except as otherwise provided in or to enforce the Plan or Confirmation Order, on or after the Effective Date all Entities that have held, currently hold, or may hold, a Claim, Lien, Interest or other liability against or in the Debtor that would be discharged or satisfied upon confirmation of the Plan and the Effective Date but for the provisions of § 1141(d)(3) of the Bankruptcy Code are permanently enjoined from**

taking any of the following actions on account of such Claim, Lien, Interest or right: (a) commencing or continuing in any manner any action or other proceeding on account of such Claim, Lien, Interest, or right against the Estate, the Reorganized Debtor, the Reorganized Debtor's assets, and any Property that is to be distributed under the Plan; or (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against the Estate, the Reorganized Debtor, the Reorganized Debtor's assets, and any Property to be distributed under the Plan. Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date all Creditors of, and Claimants against, the Estate are hereby permanently enjoined and stayed from pursuing or attempting to pursue any action, commencing or continuing any action, employing any process, or any act against the Estate, the Reorganized Debtor's assets, any Property that is to be distributed under the Plan, or the Reorganized Debtor on account of or based upon any right, claim or interest which any such Creditor, or Claimant or other Entity may have had prior to the entry of the Confirmation Order.

   2. <u>Release</u>. Except as otherwise specifically provided in the Plan, confirmation of the Plan (subject to the occurrence of the Effective Date) shall, as to all Holders of Claims who (a) vote in favor of the Plan, or (b) abstain from voting on the Plan, release the Debtor's officers, directors, employees, and other agents, financial advisors, consultants, attorneys and accountants (in such capacity), and their respective assets and properties from any debt, charge, Causes of Action, liability, encumbrance, Lien, security interest, Claim, Interest, or other cause of action of any kind, nature or description (including, but not limited to, any claim of successor liability), other than a right to pursue a claim based on any gross negligence or willful misconduct, including any breach of fiduciary duty constituting gross negligence or willful misconduct, that arose before the Confirmation Date, and any debt of the kind specified in §§ 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not a proof of Claim or Interest is or could have been filed or is deemed filed, and whether or not such Claim or Interest is or could have been Allowed.

   3. <u>Exculpation</u>. In consideration of the Distributions under the Plan, upon the Effective Date, each Holder of a Claim or Interest will be deemed to have released the Debtor, and its directors, partners, members, officers, agents, consultants, attorneys, independent accountants, advisors, Professionals, financial advisors, investment bankers and employees (in such capacity), employed by the Debtor from and after the Petition Date from any and all Causes of Action (other than the right to enforce the obligations under the Plan and the right to pursue a claim based on any gross negligence or willful misconduct, including any breach of fiduciary duty constituting gross negligence or willful misconduct) arising out of actions or omissions during the administration of the Chapter 11 Case, the administration of the Estate, or the Distribution of any Property pursuant to the Plan.

I. Conditions Precedent to the Confirmation Order and the Effective Date of the Plan

   1. *Condition Precedent to Entry of the Confirmation Order.* The following conditions must be satisfied on or before the Confirmation Date: (i) the Confirmation Order must be in form and substance reasonably acceptable to the Debtor; and (ii) the Confirmation Order must be entered by the Bankruptcy Court.

2.     *Conditions Precedent to the Effective Date.* The following conditions must be fully satisfied or waived, if subject to waiver, on or before the Effective Date for the Plan to become effective:

(a)     the Confirmation Order has become a Final Order;

(b)     the Debtor has closed on the SCS Loan and such loan has been fully funded to the Debtor;

(c)     the Chief Restructuring Officer has accepted, in writing, the terms of her/his service and compensation, and such terms shall have been approved by the Bankruptcy Court in the Confirmation Order;

(d)     the Debtor has assumed the Ground Lease in accordance with the provisions of § 365(a) of the Bankruptcy Code and has paid or has segregated funds sufficient to satisfy the Ground Lease Cure Amount;

(e)     the Debtor has entered into franchise agreement with a reputable hotel franchisor pursuant to § 363(b) of the Bankruptcy Code;

(f)     the Debtor has assumed or rejected the Union Contract in accordance with the provisions of § 1113 of the Bankruptcy Code;

(g)     the Debtor has paid or has segregated sufficient funds to satisfy the Class 1(b) Super-Priority Administrative Expense of Neshgold (to the extent such expenses remain unpaid as of the Effective Date) in accordance with § 5.2 of the Plan;

(h)     the Debtor has paid or has segregated sufficient funds to satisfy all Allowed Administrative Expenses (to the extent such expenses remain unpaid as of the Effective Date) in accordance with the provisions of Article II of the Plan;

(i)     in the event that the Debtor has confirmed the Plan pursuant to the provisions of § 1129(b) of the Bankruptcy Code, the Debtor has paid or has segregated sufficient funds to satisfy all Allowed Priority Non-Tax Claims (to the extent such Claims remain unpaid as of the Effective Date) in accordance with the provisions of § 5.5 of the Plan;

(j)     the Debtor has paid or has segregated sufficient funds to make the First Distribution to Class 4 General Unsecured Creditors in accordance with § 5.6 of the Plan;

(k)     the Disputed Claim Reserve has been established in accordance with § 10.4 of the Plan;

(l)     not more than two hundred seventy (270) days have lapsed since the Confirmation Date;

3.    *Debtor's Right to Waive Conditions Precedent*. Under the Plan, certain of the foregoing conditions to the Effective Date may be waived. Under the Plan, the Debtor, in its sole discretion, may waive the condition set forth in subsection 2(e) above at any time from and after the Confirmation Date. In addition, the Debtor, in its sole discretion may waive the condition set forth in subsection 2(a) above. In the event of as waiver of the condition set forth in subsection 2(a) above, the Debtor will be entitled to render any or all of its performances under the Plan prior to what otherwise would be the Effective Date if such condition was not waived, including, but not limited to, the right to perform under any circumstances which would moot any appeal, review or other challenge of any kind to the Confirmation Order if the Confirmation Order is not stayed pending such appeal, review or other challenge.

J.    Miscellaneous Provisions

1.    Bankruptcy Court to Retain Jurisdiction. Under the Plan, notwithstanding entry of the Confirmation Order, or the occurrence of the Effective Date or Substantial Consummation of the Plan, the Chapter 11 Case having been closed, or a Final Decree having been entered, the Bankruptcy Court (or the District Court, as the case may be) shall have and retain jurisdiction of matters arising out of, and related to the Chapter 11 Case and the Plan under §§ 105(a), 1127, 1142 and 1144 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    to consider any modification of the Plan under § 1127 of the Bankruptcy Code and/or modification of the Plan before "substantial consummation" as defined in § 1101(2) of the Bankruptcy Code and § 14.13 of the Plan, and to consider any modification of the Plan to cure any defect or omission, or reconcile any inconsistency in the Plan, the Disclosure Statement or in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(b)    to hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, if any, including but not limited to the Ground Lease and the Union Contract, and the allowance of Claims resulting therefrom;

(c)    to (i) hear and determine any Claim or Cause of Action arising in or related to the Chapter 11 Case; and (ii) to adjudicate any Causes of Action or other proceedings currently pending or which may be commenced by the Debtor after the Confirmation Date or otherwise referenced herein or elsewhere in the Plan, including, but not limited to, the adjudication of any Causes of Action and any and all "core proceedings" under 28 U.S.C. § 157(b), which are or may be pertinent to the Chapter 11 Case and which the Debtor or Reorganized Debtor may deem appropriate to commence and prosecute in support of implementation of the Plan;

(d)    to determine any and all adversary proceedings, applications, and contested matters filed or commenced by the Debtor or Reorganized Debtor after the Confirmation Date, including, without limitation, any Causes of Action;

(e)    to ensure that Distributions are accomplished as provided in the Plan;

(f)     to hear and determine any objections to Administrative Expenses, to Proofs of Claim, or to Claims and Interests filed and/or asserted both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow or disallow any disputed Administrative Expense, Claim or Interest, in whole or in part, and any request for estimation of Claims;

(g)     to protect the Reorganized Debtor's Estate from adverse Claims or interference inconsistent with the Plan, including to hear actions to quiet or otherwise clear title to such property of the Reorganized Debtor's Estate based upon the terms and provisions of the Plan;

(h)     to (i) enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated; (ii) to issue such orders in aid of execution of the Plan as may be necessary and appropriate, to the extent authorized by § 1142 of the Bankruptcy Code; and (iii) to interpret and enforce any Orders previously entered in the Chapter 11 Case to the extent such Orders are not superseded or inconsistent with the Plan;

(i)     to hear and determine all applications for compensation and reimbursement of expenses of Professionals under §§ 330, 331, and 503(b) for services rendered and expenses incurred prior to the Confirmation Date;

(j)     to hear and determine all litigation, Causes of Action and all controversies, suits and disputes that may arise in connection with the interpretation, implementation or enforcement of the Plan, including but not limited to, any and all litigation and/or Causes of Action brought by the Debtor or Reorganized Debtor, whether such litigation and/or Causes of Action is/are commenced either prior to or after the Effective Date;

(k)     to hear and determine matters concerning state, local, and federal taxes in accordance with §§ 345, 505, and 1146 of the Bankruptcy Code;

(l)     to enter a Final Decree closing the Chapter 11 Case;

(m)     to consider and act on the compromise and settlement of any litigation, Claim against or Cause of Action asserted in connection with the Chapter 11 Case, the Estate or the Reorganized Debtor's Estate; and

(n)     without limiting the generality of the foregoing and notwithstanding the Effective Date and to the fullest extent permitted by law, the Bankruptcy Court shall retain exclusive jurisdiction over the Reorganized Debtor's Estate after the Effective Date, including, without limitation, jurisdiction to resolve any and all controversies, suits and issues that may arise in connection herewith or therewith, including, without limitation, any Entities' obligations incurred in connection herewith or therewith, including without limitation, any action against the Debtor, the Reorganized Debtor, the Estate or the Reorganized Debtor's Estate, or any or all of the Debtor's or Reorganized

Debtor's professionals, and any action seeking turnover or recovery of assets included in the Estate or Reorganized Debtor's Estate.

2.    Binding Effect of the Plan. Nothing contained in the Plan or this Disclosure Statement will limit the effect of confirmation as set forth in § 1141 of the Bankruptcy Code. The provisions of the Plan shall be binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, any Holder of a Claim or Interest, or their respective predecessors, successors, assigns, agents, officers, managers, members and directors and any other Entity affected by the Plan.

3.    Fractional Cents. Under the Plan, whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

4.    Successors and Assigns. The rights and obligations of any Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Entity.

5.    Blank Ballots. Under the Plan, any Ballot which is executed by the Holder of an Allowed Claim but which does not indicate an acceptance or rejection of the Plan, shall be deemed to be an acceptance of the Plan. Any Ballot not filed in accordance with the filing instructions on the Ballot pertaining to the Plan shall not be counted for voting purposes.

6.    Authorization of Corporate Action. Upon the entry of the Confirmation Order, all actions contemplated by the Plan will be deemed authorized and approved in all respects (subject to the provisions of the Plan), including, without limitation, the transfer and/or contribution of the Debtor's Assets to the Reorganized Debtor.    Under the Plan, on the Confirmation Date, appropriate officers of the Debtor and the Reorganized Debtor are authorized and directed to execute and to deliver any and all agreements, documents and instruments contemplated by the Plan, or as necessary for the consummation of the Plan, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without the need for any additional authorizations, approvals or consents.

7.    Withdrawal of the Plan. The Debtor reserves the right, at any time prior to the entry of the Confirmation Order, to revoke or withdraw the Plan. If the Debtor revokes or withdraws the Plan, or if the Confirmation Date does not occur, or if the Effective Date does not Occur, then (a) the Plan will be deemed null and void and (b) the Plan shall be of no effect and shall be deemed vacated, and the Chapter 11 Case shall continue as if the Plan had never been filed and, in such event, the rights of any Holder of a Claim or Interest shall not be affected nor shall such Holder be bound by, for purposes of illustration only, and without limitation, (i) the Plan, (ii) any statement, admission, commitment, valuation or representation contained in the Plan, the Disclosure Statement, or the Related Documents or (iii) the classification and proposed treatment (including any allowance) of any Claim in the Plan.

8.    Captions. Article and Section captions used in the Plan and this Dislcosure Statement are for convenience only and will not affect the construction of the Plan.

9.     Method of Notice. Any notice or other communication under the Plan shall be in writing (including by facsimile transmission or by e-mail) and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the person for whom such notice is intended (or, in the case of notice by facsimile transmission or e-mail, when received and telephonically or electronically confirmed), addressed as follows (provided, however, that only one notice or other communication hereunder need be sent to Holders sharing the same address):

If to the Debtor, to:

CPJFK, LLC
151-20 Baisley  Boulevard
Jamaica, New York 11434
Attn:  Sunil Mir

With a copy to:

Joseph Sarachek
Triax Capital Advisors
10 Rockefeller Plaza, Suite 601
New York, New York 10020

and

Walter Drobenko, Esq.
Drobenko & Associates, P.C.
25-84 Steinway Street
Astoria, N.Y. 11103

If to the United States Trustee:

United States Department of Justice
Office of the United States Trustee
271 Cadman Plaza East, Suite 4529
Brooklyn, New York 11201
Attn:  William E. Curtin, Trial Attorney

Any of the above may, from time to time, change its address for future notices and other communications hereunder by filing a notice of the change of address with the Bankruptcy Court.

10.     Amendments and Modifications to Plan. The Plan may be altered, amended or modified by the Debtor, before or after the Confirmation Date, as provided in § 1127 of the Bankruptcy Code. The Debtor may also seek to modify the Plan at any time after confirmation so long as (a) the Plan has not been substantially consummated and (b) the Bankruptcy Court

authorizes the proposed modification after notice and a hearing. The Debtor further reserves the right to modify the treatment of any Allowed Claims at any time after the Effective Date upon the consent of the Creditor whose Allowed Claim treatment is being modified, so long as no other Creditors are materially adversely affected.

11.    Section 1125(e) of the Bankruptcy Code. Confirmation of the Plan will constitute a finding that the Debtor (and each of its Affiliates, agents, directors, officers, employees, advisors, Professionals, and attorneys) have proposed and solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

12.    Entire Agreement. The Plan, as described herein, and this Disclosure Statement and the exhibits hereto, set forth the entire agreement and understanding of the parties hereto relating to the subject matter hereof and supersede all prior discussions and documents. No party hereto shall be bound by any terms, conditions, definitions, warrants, understandings or representations with respect to the subject matter hereof, other than as is expressly provided for herein or as may hereafter be agreed to by the parties in writing.

13.    Substantial Consummation. The Plan will be deemed substantially consummated, as such term is used in § 1101(2) of the Bankruptcy Code, upon the commencement of Distributions to the holders of a Class of Claims under this Plan. Following such substantial consummation, any appeal, rehearing or other post-confirmation motion of any nature with respect to the Plan or the Confirmation Order except as specifically provided herein or therein shall be rendered moot and no longer justiciable.

## V.

## VOTING ON AND CONFIRMATION OF PLAN

A.    General

Confirmation and consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the treatment of claims against, and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any person or entity acquiring property under the plan and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

In general, a plan divides the claims against, and interests in a debtor into separate classes and allocates plan distributions among those classes. If the legal, equitable and contractual rights of a class are unaffected by the plan, such class is considered "unimpaired." Pursuant to § 1126(f) of the Bankruptcy Code, all unimpaired classes are deemed to have accepted the plan and, therefore, are not entitled to vote on the Plan. Section 1126(g) of the Bankruptcy Code, on the other hand, provides that all classes of claims and interests that do not receive or retain any property under the plan on account of such claims or interests are deemed not to have accepted, or to have rejected the plan and are, likewise, not entitled to vote. All other

classes of claims and interests are considered "impaired" and are entitled to vote to accept or reject the plan. Under the Bankruptcy Code, acceptance of the plan is determined by class; therefore, it is not required that each holder of a claim or interest in an impaired class vote in favor of the plan in order for the bankruptcy court to confirm the plan. Generally, each impaired class must vote to accept the plan; however, the bankruptcy court may confirm the plan in certain circumstances without the acceptance of all impaired classes if at least one (1) impaired class votes to accept the plan and certain other statutory tests are satisfied. A further explanation of the requirements of confirmation if an impaired class rejects the plan is set forth below in this Disclosure Statement. Many of these tests are designed to protect the interests of creditors and interest holders who either do not vote or vote to reject the plan, but who nonetheless would be bound by the plan if it is confirmed by the bankruptcy court.

B.    Acceptance of Plan

As a condition to confirmation, § 1129(a) of the Bankruptcy Code requires that: (a) each impaired class of claims or interests votes to accept the plan; and (b) the plan meets the other requirements of § 1129(a) of the Bankruptcy Code. As explained above, classes that are unimpaired are deemed to have accepted a plan and, therefore, are not entitled to vote and classes that do not receive or retain any property under a plan are deemed to have rejected a plan and are likewise not entitled to vote. Accordingly, acceptances of the Plan are being solicited only from those parties who hold Claims in Impaired Classes that are to receive distributions under the Plan. An Impaired Class of Claims will be deemed to have accepted the Plan if Holders of at least two-thirds in dollar amount and more than one-half in number of Claims in such Class that cast timely ballots vote to accept the Plan. Holders of Claims or Interests who do not timely vote on the Plan are not counted for purposes of determining acceptance or rejection of the Plan by any Impaired Class of Claims or Interests.

C.    Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only classes of claims against or equity interests in a debtor that are "impaired" under the terms of a plan of reorganization, and who receive distributions under such plan, are entitled to vote to accept or reject the plan. Generally, a class is "impaired" under a plan unless such plan leaves unaltered the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest. Classes of claims and interests that are not impaired are not entitled to vote on the plan and are conclusively presumed to have accepted the plan.

As set forth above, holders of Claims in Classes 2(a), 3 and 4 are entitled to vote on the Plan. If any of those classes vote to reject the Plan, (a) the Debtor may seek to satisfy the requirements for Confirmation of the Plan under the "cramdown" provisions of § 1129(b) of the Bankruptcy Code (discussed below) and, if required, may amend the Plan to conform to the standards of such section, or (b) the Plan may be modified or withdrawn.

Please carefully follow all of the instructions contained on the Ballot or Ballots provided to you with this Disclosure Statement if you are entitled to vote on the Plan. All Ballots must be completed and returned in accordance with the instructions provided. To be

counted, your Ballot must be received by the Voting Deadline at the address set forth on the Ballot. It is of the utmost importance to the Debtor that you vote promptly to accept the Plan.

If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call the Debtor's attorneys, Seidman & Pincus, LLC, at (201) 473-0047.

Votes cannot be transmitted orally, by facsimile, or by email. Accordingly, you are urged to return your signed and completed Ballot, by hand delivery, overnight service or regular U.S. mail, promptly, so that it is received by the Debtor's counsel on or before the Voting Deadline.

## D.    Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after proper notice to parties in interest, to hold a hearing on whether the Debtor has fulfilled the confirmation requirements of § 1129 of the Bankruptcy Code. The Confirmation Hearing with respect to the Plan will be/has been scheduled for _____ ___, 2011 at __:___ _.m. (Eastern time) before the Honorable Carla E. Craig, Chief United States Bankruptcy Judge of the United States Bankruptcy Court for the Eastern District of New York in her Courtroom at 271 Cadman Plaza East, Brooklyn, New York 11201. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to confirmation must be made in writing and must specify in detail the name and address of the objecting party, all grounds for the objection and the amount of the Claim or Interest held by the objecting party. Any such objections must be filed and served upon the persons designated in the notice of the Confirmation Hearing and in the manner and by the deadline described therein.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the following requirements of § 1129(a) of the Bankruptcy Code are met:

1.    The Plan complies with the applicable provisions of the Bankruptcy Code.

2.    The Debtor has complied with the applicable provisions of the Bankruptcy Code.

3.    The Plan has been proposed in good faith and not by any means forbidden by law.

4.    Any payment made or to be made by the Debtor, or by an entity issuing securities, or acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the Chapter 11 Case or in connection with the Plan and incident to the Chapter 11 Case has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

5.    The Plan discloses the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a general partner, or a successor to the Debtor under the Plan, and the appointment to or continuance in such office by such individual must be consistent with the interests of Creditors and Interest Holders and with public policy.

6.    With respect to each Impaired Class of Claims or Interests, each Holder of a Claim or Interest in such Class has either accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code.

7.    With respect to each Class of Claims or Interests, such Class has either accepted the Plan or is Unimpaired by the Plan. If this requirement is not met, the Plan may still be confirmed pursuant to § 1129(b) of the Bankruptcy Code.

8.    Except to the extent that the Holder of a particular Claim or Interest has agreed to a different treatment of its Claim, the Plan provides that (a) Allowed Administrative Expense Claims will be paid in full in Cash on the later of (i) the Effective Date, or (ii) in the event such Administrative Expense Claim is not Allowed as of the Effective Date, the date on which the Bankruptcy Court enters an order allowing such Administrative Expense Claim, or (iii) such later date as the Debtor and the Holder of such Allowed Administrative Expense Claim otherwise agree in writing, or as soon thereafter as is practicable; and (b) Allowed Priority Tax Claims will be paid in full in Cash on the later of (i) the Effective Date, or (ii) in the event such Priority Tax Claim is not Allowed as of the Effective Date, the date on which the Bankruptcy Court enters an order allowing such Priority Tax Claim, or as soon thereafter as is practicable.

9.    If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired by the Plan has accepted the Plan, determined without including any acceptance of the Plan by any "insider."

10.   Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor of the Debtor under the Plan. All fees payable under 28 U.S.C. § 1930 as determined by the Bankruptcy Court at the Confirmation Hearing have been paid or the Plan provides for the payment of all such fees on the Effective Date.

11.   The Plan provides for the continuation after the Effective Date of payment of all Retiree Benefits (as defined in § 1114 of the Bankruptcy Code), at the level established pursuant to § 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtor is obligated to provide such benefits.

The Debtors believe that the Plan satisfies, to the extent applicable, all of the statutory requirements of chapter 11 of the Bankruptcy Code. Certain of these requirements are discussed in more detail below.

E.    Confirmation Requirements

    1.    *Feasibility*

In connection with confirmation of the Plan, § 1129(a)(11) requires that the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. This is the so-called "feasibility" test. Here, in order for the Plan to become effective, the Debtor will have achieved certain revenue-increasing conditions and realized certain cost-savings measures which will enable it to meet the projections annexed to this Disclosure Statement as **Exhibit F** (the "Projections"). These conditions are set forth in more detail below, but include the following:

    (a)    The Debtor will have obtained a Loan from SCS in the amount of approximately $4.6 million which will enable it to: (i) cure all defaults under, and assume the Debtor's Ground Lease; (ii) pay all Allowed Administrative Claims and Allowed Priority Tax Claims in full, and make an initial distribution on account of Allowed General Unsecured Claims; (iii) fund necessary repairs and improvements to the Hotel to obtain a franchise agreement from a reputable hotel franchisor;

    (b)    The Debtor will have reached an agreement for concessions with the Union and will have assumed the Union Contract, or will have rejected the Union Contract; and

    (c)    The Debtor will have entered into a franchise agreement with a reputable hotel franchisor, thereby attaining access to such franchisor's name and reservation system.

If the Debtor meets the Conditions to Effectiveness under the Plan (which include the foregoing), it will readily meet or exceed the revenue streams, and it will readily meet or fall below the expense line items, projected in its Projections. The Projections provide for the payment of all distributions proposed under the Plan. Accordingly, the Debtor believes that confirmation of the Plan will not be followed by a liquidation or the need for further reorganization, and thus that the Plan complies with the standard of § 1129(a)(11) of the Bankruptcy Code.

    2.    *"Best Interests"; Liquidation Analysis*

In order to confirm the Plan, the Bankruptcy Court also must determine that the Plan is in the best interests of each Holder of a Claim or Interest in any such Impaired Class who has not voted to accept the Plan. Accordingly, if an Impaired Class does not accept the Plan as required under the Bankruptcy Code, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of such Impaired Class a recovery on account of the member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value

of the distribution that each such member would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

To estimate what members of each Impaired Class of Claims or Interests would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if the Chapter 11 Case was converted to a chapter 7 case under the Bankruptcy Code and the Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of the Debtor would consist of the net proceeds received from the disposition by a chapter 7 trustee (as opposed to the Debtor) of the Debtor's remaining assets plus any cash held by the Debtor.

The Liquidation Value available to Holders of Claims or Interests that are not Secured Claims would be reduced by, among other things: (a) the Claims of secured creditors to the extent of the value of their collateral; (b) the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtor's hypothetical chapter 7 case; (c) unpaid Administrative Expense Claims of the Chapter 11 Case; and (d) Priority Tax Claims and Priority Non-Tax Claims. The Debtor's costs of liquidation in a chapter 7 case would include the compensation of a trustee, as well as of counsel and of other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, Claims arising from the administration of the Debtor during the pendency of the chapter 7 case and all unpaid Administrative Claims incurred by the Debtor during the Chapter 11 Case that are allowed in the hypothetical chapter 7 case.

The information contained in **Exhibit G** hereto provides a summary of the Liquidation Value of the Debtor's interests in property, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the Debtor's properties and interests. In summary, the Debtor believes that a chapter 7 liquidation would result in far lower value to be realized by Holders of Allowed Claims, as compared to the proposed distributions under the Plan. Consequently, the Debtor believes that the Plan will provide a greater ultimate return to Holders of Allowed Claims than would a chapter 7 liquidation of the Debtor and the Plan accordingly satisfies the requirements of § 1129(a)(7) of the Bankruptcy Code.

3.    *Cramdown*

In the event that any Impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan if all other requirements under § 1129(a) of the Bankruptcy Code are satisfied, and if, with respect to each Impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to such Class. Confirmation under § 1129(b) of the Bankruptcy Code requires that at least one Impaired Class of Claims accepts the Plan, excluding any acceptance of the Plan by an "insider" (as that term is defined in § 101 of the Bankruptcy Code). The Debtor intends to seek confirmation of the Plan notwithstanding the non-acceptance of one or more Impaired Classes.

(a)    No Unfair Discrimination.    A plan of reorganization does not "discriminate unfairly" with respect to a non-accepting Class if the value of the cash

and/or securities to be distributed to the non-accepting Class is equal or otherwise fair when compared to the value of distributions to other Classes whose legal rights are the same as those of the non-accepting Class. The Debtor believes that the Plan would not discriminate unfairly against any non-accepting Class of Claims or Interests.

(b)　　Fair and Equitable Test. The "fair and equitable" test of § 1129(b) of the Bankruptcy Code is different for secured claims, unsecured claims and interests, and includes the following treatment:

(i)　　*Secured Claims.* A plan is fair and equitable with respect to a non-accepting class of secured claims if (x) the holder of each claim in such class will retain its lien or liens and receive deferred cash payments totaling the allowed amount of its claim, of a value, as of the effective date of the plan, equal to the value of such holder's interest in the collateral, (y) the holder of each claim in such class will receive the proceeds from the sale of such collateral or (z) the holder of each claim in such class will realize the indubitable equivalent of its allowed secured claim.

(ii)　　*Unsecured Claims.* A plan is fair and equitable with respect to a nonaccepting class of unsecured claims if (x) the holder of each claim in such class will receive or retain under the plan property of a value, as of the effective date of the plan, equal to the allowed amount of its claim, or (y) holders of claims or interests that are junior to the claims of such creditors will not receive or retain any property under the plan on account of such junior claim or interest, provided, however, that the holders of claims or interests that are junior to the claims of such creditors prove to the Debtor "new value" in consideration for their treatment under the Plan.

(iii)　　*Interests.* A plan is fair and equitable with respect to a non-accepting class of interests if the plan provides that (x) each member of such class receives or retains on account of its interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (y) holders of interests that are junior to the interests of such class will not receive or retain any property under the plan on account of such junior interests.

Based upon the classification made and distributions provided for under the Plan, the Debtor believes the Plan is fair and equitable. The treatment afforded to Class 2(a) under the Plan is fair and equitable because the Holder of such Claims (Neshgold, LP) retains its liens and receives deferred cash payments totaling the allowed amount of its claim, of a value, as of the Effective Date of the Plan, equal to the value of such Holder's interest in its collateral. The treatment afforded to Class 3 under the Plan is fair and equitable, and also complies with the requirements of § 1129(a)(9)(B) of the Bankruptcy Code (governing the treatment required to claims holding priority under § 507(a)(1), (a)(4), (a)(5), (a)(6) and (a)(7) of the Bankruptcy Code), because the Holders of such Claims (Holders of Priority Non-Tax Claims) receive cash deferred payments of

a value, as of the Effective Date of the Plan equal to the Allowed amount such Holders' respective Claims. In the event that Class 3 votes to reject the Plan, the Debtor reserves the right to treat the Holders of Class 3 Claims by paying such Holders cash on the Effective Date equal to the Allowed amount of such Holders' respective Claims. Finally, the treatment afforded to Class 4 under the Plan is fair and equitable because the Holders of Interests retain their interests only upon providing new value to the Debtor's estate. As discussed more fully below, the Holders of Interests in the Debtor have personally guaranteed the Debtor's repayment of the SCS Loan in the amount of approximately $4.1 million, which Loan serves to facilitate the payment of all Administrative Expenses, all distributions on account of Priority Tax Claims, the cure and assumption of the Debtor's Ground Lease, the retention and payment of the CRO, the renovation and repairs necessary to obtain an agreement with a reputable hotel franchisor, and all distributions provided under the Plan. SCS would not have provided the SCS Loan in the absence of the personal guarantees of the Debtor's equity Interests. Accordingly, the Debtor believes that the personal guarantees provided by the Holders of Interests in the Debtor constitutes the contribution of "new value" to the Debtor's estate sufficient to entitle the Interest Holders to retain their Interests in the Debtor pursuant to the Plan, and sufficient to determine that the treatment afforded to the Holders of Class 4 Claims is fair and equitable under the Plan.

F.    Alternatives to Confirmation and Consummation of the Plan

If the Plan is not confirmed, Alan Nisselson, as chapter 11 Trustee of the Debtor, would most likely continue to administer the Debtor's Chapter 11 Case. As discussed at length above, prior to the filing by the Debtor of the Plan and this Disclosure Statement, the Trustee marketed the Hotel for sale, and negotiated a proposed settlement of the Debtor's claims against Neshgold, LP, under which settlement: (i) Neshgold, LP will hold an allowed secured claim against the Debtor in the amount of $14.5 million; (ii) Neshgold will hold the right to credit bid at a sale of the Hotel up to the amount of $14.5 million; (iii) if Neshgold is the successful bidder, Neshgold will designate and pay to the Debtor's estate the sum of $410,000 from the value of its collateral to pay the administrative expenses of the Debtor's estate, and $100,000 from the value of its collateral to pay unsecured claims of the Debtor's estate; and (iv) Neshgold will receive form the Debtor's estate a release of all claims against it. Thus, in the event that the Plan is not confirmed, the Trustee will likely move forward with his pending motion to sell the Hotel, and the Hotel will be sold to Neshgold or such other higher and better bidder and the proceeds from such sale will be used to fund a plan of liquidation proposed by the Trustee, or the Trustee will move to convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code following such sale, and a chapter 7 trustee will liquidate the remaining assets of the Debtor's estate and make distributions to creditors in accordance with the priorities set forth in the Bankruptcy Code.

Alternatively, the Debtor's case may be immediately converted to a case under chapter 7 of the Bankruptcy Code. In a chapter 7 case, a chapter 7 trustee would be appointed to promptly liquidate the assets of the Debtor and make distributions to creditors in accordance with the priorities set forth in the Bankruptcy Code.

The Debtor believes that in either scenario (a sale by the Trustee of the Hotel followed by a liquidation; or an immediate conversion of the case to a case under chapter 7 of the Bankruptcy Code), creditors will receive far less than they shall receive under the Plan proposed

by the Debtor. The Liquidation Analysis annexed hereto as **Exhibit G** sets forth the likely distribution to general unsecured creditors in the vent of a liquidation under chapter 7 of the Bankruptcy Code. As that analysis makes clear, there will likely be no funds available to pay unsecured creditors in such chapter, and very little, if any, available even to pay priority creditors. Similarly, under the Trustee's proposal, in accordance with the proposed settlement with Neshgold, the $100,000 allocated for unsecured claims will be fully utilized to pay only a portion of the amount sowed to priority creditors, leaving nothing available for general unsecured creditors.

Because the Debtor's Plan proposes to pay general unsecured creditors twenty five percent (25%) of their claims, and all other creditors one hundred percent (100%) of their claims, plus continue to employ labor represented by the Union, the Debtor believes that the confirmation of the Plan is far superior to any other alternative available to the Holders of Claims against the Debtor's Estate.

## VI.

## TAX CONSEQUENCES

A.  General Statement

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtor and to Creditors. The federal income tax consequences of the Plan may be complex for certain Creditors and are subject to uncertainties. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, and it does not purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations and investors in pass-through entities).

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR GENERAL INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN AND NOT TO RELY EXCLUSIVELY ON THIS SUMMARY. THE DEBTOR IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CLAIM OR INTEREST HOLDER, NOR IS THE DEBTOR RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

B.    Tax Consequences to Debtor

Under the general tax provisions, the Debtor would realize cancellation of debt ("COD") income to the extent that the Debtor paid a Creditor pursuant to the Plan an amount of consideration with respect to a Claim that is worth less than the amount of such Claim. For this purpose, the amount of consideration paid to a Creditor generally would equal the amount of Cash and the fair market value on the Effective Date of any other property paid to such Creditor. Because the Debtor will be in a bankruptcy case at the time the COD income is realized, the Debtor will not be required to include COD income in its gross income, but rather must reduce certain of its tax attributes by the amount of COD income that would have otherwise been required to be recognized.

THE FOREGOING FEDERAL INCOME TAX SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.    HOWEVER, THE APPLICATION OF THE RULES DESCRIBED ABOVE TO THE SITUATION OF ANY PARTICULAR HOLDER OF A CLAIM IS COMPLEX. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN TO THEM.

C.    Tax Consequences to Creditors

Both secured and unsecured creditors may be either (i) required to recognize income or (ii) allowed a deduction as a result of implementation of the Plan. The exact tax treatment depends upon each creditor's method of accounting, the nature of each creditor's Claim, the property being received and exchanged for such Claim, if any, and whether and to what extent such creditor has taken a bad debt deduction in prior taxable years with respect to a particular debt owed to it by the Debtor.

Each holder of a Claim, whether secured or unsecured, is urged to consult with its tax advisor regarding the particular tax consequences of the treatment of its Claim under this Plan.

# VII.

## CONCLUSION AND RECOMMENDATION

BASED ON ALL OF THE FACTS AND CIRCUMSTANCES, THE DEBTOR CURRENTLY BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR, ITS CREDITORS, AND ITS ESTATE. THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST AVAILABLE ALTERNATIVE FOR MAXIMIZING THE RECOVERIES THAT CREDITORS MAY RECEIVE FROM THE DEBTOR'S ESTATE. THEREFORE, THE DEBTOR RECOMMENDS THAT ALL CREDITORS THAT ARE ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

Dated:     March 7, 2011

**CPJFK, LLC**
*Debtor*

By: _____
Charles Morais, Managing Member

**DROBENKO & ASSOCIATES, P.C.**
*Counsel to the Debtor*

By: _____
Walter Drobenko, Esq. (WD3552)
Wdrobenko@cs.com
25-84 Steinway Street
Astoria, N.Y. 11103
Tel. (718) 721-2000
Fax. (718) 721-8812