**EXHIBIT "A"**

**DROBNEKO & ASSOCIATES, P.C.**
*Proposed Counsel to the Debtor*
25-84 Steinway Street,
Astoria, N.Y. 11103
(718) 721-2000
Walter Drobenko (Wdrobenko@cs.com)

<div align="center">

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

</div>

| | |
|---|---|
| In re:<br><br>CPJFK, LLC,<br><br>                    Debtor. | Chapter 11<br>Case No. 10-50566 (CEC) |

<div align="center">

### CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY CPJFK, LLC

</div>

CPJFK, LLC, the above-captioned debtor (the "Debtor") , hereby proposes this plan (the "Plan") of reorganization pursuant to § 1121(a) and (c) of title 11 of the United States Code (the "Bankruptcy Code"). This Plan should be read in conjunction with the disclosure statement (the "Disclosure Statement") submitted by the Debtor, dated March 7, 2011.

<div align="center">

### ARTICLE I
Definitions, Rules of Interpretation,
Computation of Time and Governing Law

</div>

A.     Scope of Definitions; Rules of Construction

For purposes of the Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in the Introduction, Article I or elsewhere in the Plan. Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules. Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

B.     Definitions

1.1.    "Administrative Expense Claim" means an Allowed Claim against the Debtor entitled to priority in accordance with § 503(b), 507(a)(1) or 1114(e)(2) of the Bankruptcy Code, including without limitation: (a) every cost or expense of administration of the Debtor's Chapter 11 case, including any actual and necessary costs and expenses incurred after the Petition Date of

preserving the Estate and operating the business of the Debtor (such as wages, salaries or commissions for services); and (b) compensation for legal, financial, advisory, accounting and other services and reimbursement of expenses awarded or allowed under §§ 330(a) or 331 of the Bankruptcy Code.

1.2.    "Allowed Amount" shall mean the amount of an Allowed Claim.

1.3.    "Allowed Claim" or "Allowed Interest" means:

(a)    With respect to pre-Petition Claims and Interests, (i) any Claim or Interest, proof of which is timely filed, or (ii) any Claim or Interest that has been or is hereafter listed in the Schedules as neither disputed, contingent or unliquidated; provided, however, that with respect to any Claim or Interest described in clauses (i) or (ii) above, such Claim or Interest shall be allowed only if (x) no objection to the allowance thereof is interposed by the Debtor, or any other party-in-interest within any applicable time period fixed under the Plan, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure or by the Bankruptcy Court, or (y) such an objection is interposed but the Claim or Interest has been allowed (or to the extent it has been allowed) by a Final Order (but only if such allowance was not solely for the purpose of voting to accept or reject the Plan); and

(b)    With respect to Administrative Expense Claims, "Allowed" means any holder of an Administrative Expense Claim that is determined to hold a claim entitled to treatment as an Allowed Administrative Expense Claim; provided, however, that with respect to any Claimant seeking allowance of an Administrative Expense Claim the amount of which is not agreed to in writing by the Debtor , or otherwise allowed by a Final Order, such Claimant will hold an "Allowed" Administrative Expense Claim only if such Claimant complies with the procedure for Allowance set forth in Article II of the Plan.

1.4.    "Ballot" means the voting form distributed to Holders of Claims or Interests in Classes that are Impaired and entitled to vote on the Plan for the purpose of indicating acceptance or rejection of the Plan.

1.5.    "Ballot Date" means the date set by the Bankruptcy Court for receipt of Ballots indicating acceptance or rejection of the Plan.

1.6.    "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, and all amendments thereto.

1.7.    "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of New York, located at 271 Cadman Plaza East, Brooklyn, New York 11201, having jurisdiction over the Chapter 11 Case, or any such other court as may hereafter exercise primary jurisdiction over the Chapter 11 Case.

1.8.    "Bankruptcy Rules" means, collectively (a) the Federal Rules of Bankruptcy Procedure recommended by the Judicial Conference of the United States and prescribed by the

Supreme Court of the United States, effective August 1, 1983, in accordance with the provisions of section 2075 of title 28 of the United States Code, and all amendments thereto, and (b) the local Bankruptcy Rules for the Eastern District of New York, as now in effect or hereafter amended.

1.9.    "Bar Date" means February 8, 2011, the final date established by the Bankruptcy Court pursuant to Bankruptcy Rule 3003(c), for filing timely proofs of Claim or Interests arising prior to the Petition Date, subject to such other and further order of the Court fixing the Bar Date.

1.10.    "Business Day" means any day other than a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

1.11.    "Cash" means cash and cash equivalents, including but not limited to bank deposits, checks, and other similar items in each case denominated in United States dollars.

1.12.    "Causes of Action" means any and all actions, causes of action, suits, debts, rights to payment and claims under any insurance policies, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise.

1.13.    "Chapter 11 Case" means the Debtor's case under chapter 11 of the Bankruptcy Code, currently pending before the United States Bankruptcy Court for the Eastern District of New York under case caption styled In re CPJFK, LLC, Case No. 10-50566 (CEC).

1.14.    "Claim" means a claim against a Debtor, whether or not asserted, known or unknown, as such term is defined in § 101(5) of the Bankruptcy Code.

1.15.    "Claimant" means the holder of a Claim or Interest.

1.16.    "Class" means a group of Claims or Interests which are substantially similar in nature and are grouped together for similar treatment pursuant to the Plan.

1.17.    "Conditions Precedent to the Effective Date" means all of the conditions set forth in § 13.2 of the Plan which must be satisfied by the Debtor prior to the Effective Date.

1.18.    "Confirmation Date" means the date upon which the Confirmation Order is entered on the docket maintained by the Clerk of the Bankruptcy Court with respect to the Chapter 11 Case.

1.19.    "Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan under § 1129 of the Bankruptcy Code.

1.20.    "Creditor" means any Entity that is the Holder of a Claim arising on or before the Petition Date or under §§ 502(g), 502(h) or 502(i) of the Bankruptcy Code.

1.21. "CRO" means the Chief Restructuring officer to be employed by the Debtor during the Effective Period in accordance with § 8.1 of the Plan.

1.22. "Debtor" means CPJFK, LLC, a limited liability company organized and existing pursuant to the laws of the State of New York.

1.23. "Disclosure Statement" means the document filed with the Bankruptcy Court by the Debtor in connection with the Plan and the Chapter 11 Case pursuant to § 1125 of the Bankruptcy Code and approved by order of the Bankruptcy Court as containing "adequate information" as that term is defined at § 1125(a)(1) of the Bankruptcy Code, and any exhibits annexed thereto and any documents delivered or filed in connection therewith, as the same may be amended or modified from time to time by any duly authorized or allowed amendment or modification.

1.24. "Disputed Claim" or "Disputed Interest" means any Claim or Interest designated as disputed, contingent or unliquidated on the Schedules and/or any Claim or Interest against which an objection to the allowance thereof has been interposed, which objection has not been determined by a Final Order.

1.25. "Disputed Claims Reserve" means the reserve to be established by the Debtor prior to the Effective Date for Disputed Claims in accordance with § 10.4 of the Plan.

1.26. "Distribution" means a distribution of Cash pursuant to the Plan.

1.27. "Distribution Date" shall mean the date occurring as soon as reasonably practicable after the Effective Date when distributions under the Plan shall commence, without further Bankruptcy Court Order, and, thereafter, shall mean such other dates on which distributions are made to Holders of Allowed Claims in accordance with the terms hereof.

1.28. "Effective Date" means the date that is ten (10) days after the date on which all such Conditions Precedent to the Effective Date, as set forth in § 13.2 hereof, have been satisfied or waived, if subject to waiver.

1.29. "Effective Period" means the period following the Confirmation Date through the Effective Date.

1.30. "Entity" means any Person, individual, corporation, limited or general partnership, limited liability company, joint venture, association, joint stock company, estate, trust, trustee, United States trustee, unincorporated organization, government, governmental unit (as defined in § 101(27) of the Bankruptcy Code), agency or political subdivision thereof.

1.31. "Estate" means the estate created in the Debtor's Chapter 11 Case pursuant to § 541 of the Bankruptcy Code.

1.32. "Final Decree" means the order to be entered by the Bankruptcy Court closing the

Chapter 11 Case in accordance with § 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022.

1.33. "Final Order" means an order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction (a) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no order, ruling or judgment no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, or (b) as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing satisfactory to the Debtor, or (c) as to which, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof there shall have been a determination denying any relief by the highest court to which such order was appealed, or certiorari, reargument or rehearing granted, and the time to further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order shall not render such order a non-Final Order.

1.34. "First Distribution" means the Distribution due and payable under the Plan on the Effective Date, or as soon thereafter as may be practicable.

1.35. "Fortress Action" means the action entitled Fortress Credit Corp., Drawbridge Special Opportunities Fund, LP, Fortress Credit Opportunities I, LP, Fortress Credit Funding III, LP, Fortress Credit Funding IV, LP, and Neshgold, LP, as successor v. CPJFK, LLC, Sunil Mir, Charles Morais, Commissioner of Labor of the State of New York, The People of the State of New York, NY State Dept. of Taxation & Finance, New York Hotel & Motel Trades Council and New York Hotel Trades Council and Hotel Association of New York City, Inc., The City Of New York, Lodgment Entertainment Group and John Does 1-10, pending in the Supreme Court of the State of New York in and for the County of Queens, under docket no. 27921/08 prior to its removal to the Bankruptcy Court.

1.36. "General Unsecured Claim" means any unsecured Claim which does not qualify as an Administrative Expense Claim, Priority Tax Claim or Priority Non-Tax Claim and which is not an Interest.

1.37. "Ground Lease" means the first restatement of lease between New Riviera Motel, LLC, as landlord, and the Debtor (as assignee from the Boulevard Hotel Associates LLC), as tenant, for the non-residential real property located at 141-20 Baisley Boulevard, Jamaica, New York 11434 dated April 10, 1997, and all appendices, schedules and exhibits thereto, as amended from time to time.

1.38. "Ground Lease Cure Amount" means the amount necessary to cure the monetary defaults by the Debtor under the Ground Lease as of the Effective Date pursuant to § 365(b)(1)(A).

1.39. "Holder" means any Entity that holds a Claim or Interest.

1.40.   "Impaired", when used with respect to any Claim, Interest or Class, has the same meaning as that contained in § 1124 of the Bankruptcy Code.

1.41.   "Insider" shall have the meaning given to such term in § 101(31) of the Bankruptcy Code.

1.42.   "Interest" means any equity interest in the Debtor.

1.43.   "Lien" means with respect to an asset or interest of the Debtor, any mortgage, lien, pledge, charge, encumbrance or other security interest of any kind affecting such asset.

1.44.   "Maximum Amount" means, with respect to any Disputed Claim: (a) the amount agreed to by the Debtor and the Holder of such Claim; (b) the amount, if any, estimated or determined by the Bankruptcy Court in accordance with §§ 502(c) or 503(b) of the Bankruptcy Code in the event such Disputed Claim is a Disputed Administrative/Priority Claim; or (c) absent any such agreement, estimation or determination, the liquidated amount set forth in the proof of claim filed by the Holder of such Claim, or if no amount is so set forth, the amount estimated by the Debtor.

1.45.   "Neshgold" means Neshgold, LP.

1.46.   "Neshgold Adversary Proceeding" means the adversary proceeding pending before the Bankruptcy Court entitled Fortress Credit Corp., Drawbridge Special Opportunities Fund, LP, Fortress Credit Opportunities I, LP, Fortress Credit Funding III, LP, Fortress Credit Funding IV, LP, and Neshgold, LP, as successor v. CPJFK, LLC, Sunil Mir, Charles Morais, Commissioner of Labor of the State of New York, The People of the State of New York, NY State Dept. of Taxation & Finance, New York Hotel & Motel Trades Council and New York Hotel Trades Council and Hotel Association of New York City, Inc., The City Of New York, Lodgment Entertainment Group and John Does 1-10, bearing docket number Adv.Proc.No. 10-01325 (CEC).

1.47.   "Neshgold Guarantors" means Charles Morais and Sunil Mir.

1.48.   "Neshgold Secured Claim" means the Claim against the Debtor asserted by Neshgold arising prior to the Petition Date pursuant to the Leasehold Mortgage, Assignment of Rents, Security Agreement, Lockbox Agreement and related loan documents (the "Loan Documents") entered by Fortress Credit Funding III LP, Fortress Credit Funding IV LP and Fortress Credit Opportunities I LP, as lenders (and predecessors-in-interest to Neshgold), and the Debtor, as borrower, dated March 31, 2006, to the extent of the value of any collateral constituting property of the Debtor securing such Claim, plus interest, penalties, late fees, attorneys' fees and expenses, and other charges, to the extent permissible under such Loan Documents and allowable under § 506(b) of the Bankruptcy Code.

1.49.   "Neshgold Super-Priority Secured Claim" means the first priority replacement liens on and security interests in all currently owned and hereafter acquired assets or properties (whether pre-petition or post-petition and including, without limitation, all of the Pre-Petition

Collateral) of the Debtor and its Estate but excluding claims and causes of action arising under Chapter 5 of the Bankruptcy Code (but including claims or causes of action under § 549 of the Bankruptcy Code), limited, however, to the extent of any diminution in the value of Neshgold's pre-Petition Date collateral as a result of the use by the Trustee of any of Neshgold's Cash Collateral on and after the Petition Date, as conferred to Neshgold pursuant to the terms of the Second Cash Collateral Order.

1.50. "Operating Expenses" shall mean all costs and expenses related to the administration of the Estate pursuant to the Plan.

1.51. "Parking Lot Lease" means the lease between SF-JFK Holdings, LLC (as assignee of 151 North Conduit Associates) and the Debtor (as assignee of Value Enhancement Fund II, LLC, as assignee of Boulevard Hotel Associates, LLC), originally dated October 30, 1998 for certain real estate contiguous to the Hotel Property and historically utilized as a parking lot in connection with the operation of the Hotel, and all appendices, schedules and exhibits thereto, as amended from time to time.

1.52. "Person" shall have the meaning set forth in § 101(41) of the Bankruptcy Code.

1.53. "Petition Date" means October 4, 2010, the date on which the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia.

1.54. "Plan" means this plan of reorganization, and any exhibits annexed hereto and any documents delivered in connection herewith, as the same may be amended or modified from time to time as and to the extent permitted herein or by the Bankruptcy Court and/or the Bankruptcy Code.

1.55. "Priority Non-Tax Claim" means any Claim, other than a Priority Tax Claim or an Administrative Expense Claim, which is entitled to priority treatment under § 507(a) of the Bankruptcy Code.

1.56. "Priority Tax Claim" means any Claim which is entitled to priority treatment under § 507(a)(8) of the Bankruptcy Code.

1.57. "Professional Fees" means any claim for compensation and/or reimbursement of expenses under §§ 330, 331 or 503(b) of the Bankruptcy Code by any Professionals which must be applied for in accordance with the Bankruptcy Code and the Plan and must be allowed by the Bankruptcy Court before payment thereof may be made.

1.58. "Professionals" means any attorneys, accountants, appraisers, consultants, and other professionals retained or to be compensated pursuant to an order of the Bankruptcy Court pursuant to, *inter alia*, §§ 327, 328, 330, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Case.

1.59.    "Property" means all of Debtor's assets, including without limitation, any and all of the Debtor's accounts receivable, inventory, machinery and equipment, vehicles, contracts, tax refunds, interests, Cash, Causes of Action, products, general intangibles, real property, books and records, and other assets and personal property of any kind or description, including, but not limited to, any direct or indirect ownership or other interests the Debtor may have or be entitled to assert.

1.60.    "Pro Rata" means proportionally, so that the ratio of the amount of consideration distributed on account of a particular Allowed Claim to the Allowed Amount of the Claim is the same as the ratio of the amount of consideration distributed on account of all Allowed Claims of the Class in which the particular Claim is included to the aggregate amount of the Allowed Claims of the Class.

1.61.    "Rejection Damage Claim" means any Claim arising from the rejection of any executory contract or unexpired lease in accordance with Article VII of the Plan.

1.62.    "Rejection Damages Bar Date" means the date established for filing timely proofs of Claim for any Rejection Damage Claim, which is the date that is the later of either (a) the Bar Date; (b) the first business day that is at least thirty (30) calendar days after entry of the order authorizing the rejection of the respective executory contract or unexpired lease; or (c) such date as the Court may fix in the applicable order authorizing such rejection.

1.63.    "Related Documents" means the Plan and any documents necessary to consummate the transactions contemplated by the Plan.

1.64.    "Reorganized Debtor" shall mean the Debtor as of the Effective Date.

1.65.    "Schedules" means the schedules of assets and liabilities in accordance with Bankruptcy Rule 1007(b), filed by the Debtor with the Bankruptcy Court (as same may have been or may be amended from time to time in accordance with Bankruptcy Rule 1009).

1.66.    "SCS" means SCS-Strategic Capital Solutions, LLC, the proposed post-confirmation lender to the Debtor.

1.67.    "SCS Commitment Letter" means the letter, dated March 7, 2011 from SCS memorializing its commitment to extend a loan to the Debtor in the amount of approximately $4,663,330 million, conditioned upon confirmation of a plan proposed by the Debtor's principals Charles Morais and Sunil Mir and setting forth the terms and conditions of such loan and the terms and conditions of repayment thereof.

1.68.    "SCS Loan" means the loan proposed to be made by SCS to the Debtor in accordance with the terms and conditions set forth in § 8.2 herein and to be repaid by the Debtor pursuant to the terms of §§ 5.1 and 8.2(a) herein and the SCS Note.

1.69.   "SCS Note" means the proposed promissory note to be executed by the Debtor on or shortly after confirmation, setting forth the terms and conditions of the Debtor's obligation to repay the SCS Loan.

1.70.   "Second Cash Collateral Order" means the Second Interim Cash Collateral Order of the Bankruptcy Court, dated January 26, 2011.

1.71.   "Secured Claim" means a claim that is either secured by a lien on property in which the Debtor has an interest pursuant to § 506 or § 1111(b) of the Bankruptcy Code or subject to setoff under § 553 of the Bankruptcy Code.

1.72.   "Substantial Consummation" means the result of the conditions set forth in § 14.13 of the Plan.

1.73.   "Trustee" means Alan Nisselson, the chapter 11 trustee of the Debtor's estate, appointed pursuant to Order of the Bankruptcy Court date November 24, 2011.

1.74.   "Unimpaired" means any Class of Claims or Interests that is not Impaired.

1.75.   "Union" means The New York Hotel & Motel Trade Council, AFL/CIO.

1.76.   "Union Contract" means the Collective Bargaining Agreement between the Union and the Sheraton Airport JFK Hotel (as predecessor in interest to the Debtor), effective May 1, 2001, and all appendices, schedules and exhibits thereto, as amended from time to time.

1.77.   "United States Trustee" means any and all representatives of the Office of the United States Trustee for the Eastern District of New York, the entity empowered to administer the Chapter 11 Case.

C.    Rules of Interpretation

For purposes of the Plan (1) any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (2) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified or supplemented, (3) unless otherwise specified, all references in the Plan to Sections, Articles, Schedules and Exhibits are references to Sections, Articles, Schedules and Exhibits of or to the Plan, (4) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan, (5) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, and (6) the rules of construction set forth in § 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

D.    Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

E.    Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the laws of, the State of New York, without giving effect to its conflicts of law provisions or choice of law rules.

## ARTICLE II
### Treatment of Administrative Expense Claims

Administrative Expense Claims are not classified under the Plan in accordance with § 1123(a)(1) of the Bankruptcy Code. Each Allowed Administrative Expense Claim, to the extent unpaid as of the Effective Date, shall be paid in full in Cash on the later of (a) the Effective Date, or as soon thereafter as may be practicable; or (b) in the event such Administrative Expense Claim is not Allowed as of the Effective Date, the date on which the Bankruptcy Court enters an order allowing such Administrative Expense Claim, or (c) such later date as the Debtor and the Holder of such Allowed Administrative Expense Claim otherwise agree in writing, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Expense Claims incurred by the Debtor after the Confirmation Date, including, without limitation, claims for Professionals' Fees, shall not be subject to application and may be paid by the Debtor in the ordinary course of business and without further Bankruptcy Court approval.

Any Claimant seeking allowance of an Administrative Expense Claim for an Administrative Expense Claim the amount of which is not agreed to in writing by the Debtor and the Claimant, or otherwise Allowed by a Final Order, must file proof of its Administrative Expense Claim with the Bankruptcy Court and serve a copy thereof upon (a) the Debtor's counsel, and (b) the United States Trustee, Attention William E. Curtin, Esq., no later than fifteen (15) days following the Confirmation Date; provided, however, that with respect to any such timely filed Administrative Expense Claim, such Claim shall be Allowed only if (i) the amount is agreed to in writing by the Debtor and such Claimant, (ii) no objection to the allowance thereof is interposed by the Debtor on or before ninety (90) days after the Effective Date, or such other date as may be established by the Bankruptcy Court, or (iii) if an objection is interposed, (x) such Administrative Expense Claim has been allowed by a Final Order, or (y) such objection is withdrawn. With respect to Claimants seeking allowance of Professional Fees as Administrative Expense Claims, all applications for final compensation of Professionals for services rendered and for reimbursement of expenses incurred for any period prior to the Confirmation Date must be filed no later than thirty (30) days following the Confirmation Date, and shall be deemed Allowed following entry by the Bankruptcy Court of any final order or orders allowing same.

Each Administrative Expense Claim Claimant who seeks allowance of an Administrative

Expense Claim (a) that is not agreed to in writing by the Debtor and the Claimant, or otherwise allowed by a Final Order, and that fails to timely and duly file a proof of its Administrative Expense Claim, or (b) for Professional Fees that fails to timely and duly institute a request for a hearing thereon, as provided for in the Plan, shall have its Claim expunged and shall thereafter be forever barred from asserting any such Administrative Expense Claim. Except as otherwise specified in the Plan or a Final Order of the Bankruptcy Court, the Allowed Amount of an Allowed Administrative Expense Claim shall not include interest on such Claim from and after the Petition Date.

## ARTICLE III
### Treatment of Priority Tax Claims

Priority Tax Claims are not classified under the Plan in accordance with § 1123(a)(1) of the Bankruptcy Code. Each Holder of an Allowed Priority Tax Claim that has not been paid prior to the Effective Date, will receive, in full and complete settlement, satisfaction and discharge of its respective Priority Tax Claims, regular installment payments in Cash, together with interest at the then current federal or state statutory rate (as the case may be), over a period of not more than five (5) years from the Petition Date, which payments have of a value, upon full payment equal to the Allowed Amount of such Priority Tax Claim, unless the holders of Allowed Priority Tax Claims agree otherwise. The Holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of interest, or on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim, except to the extent allowed as a part of an Allowed Priority Tax Claim pursuant to § 507(a)(8) of the Bankruptcy Code.

## ARTICLE IV
### Classification of Claims and Interests

4.1.    Designation of Classes. Section 4.3 below sets forth the designation of Classes and Claims and Interests for this Plan pursuant to §§ 1122 and 1123(a)(1) of the Bankruptcy Code. Administrative Expense Claims and Priority Tax Claims of the kinds specified in §§ 507(a)(1) and 507(a)(8) of the Bankruptcy Code (set forth in Articles II and III above) have not been classified and are excluded from classification in accordance with § 1123(a)(1) of the Bankruptcy Code.

4.2.    Allowed Amount in a Particular Class. An Allowed Claim or Allowed Interest is part of a particular Class only to the extent of the amount that the Allowed Claim or Allowed Interest qualifies for treatment within that Class and is in a different Class to the extent that the remaining amount of the Allowed Claim or Allowed Interest qualifies for treatment within that different Class.

4.3.    Classes. All Allowed Claims and Allowed Interests shall be divided into the following Classes, which Classes shall be mutually exclusive:

(a)    Class 1(a). Class 1(a) consists of the Super-Priority Secured Claim of SCS.

(b)    Class 1(b). Class 1(b) consists of the Super-Priority Secured Claim of Neshgold conferred to Neshgold pursuant to the Second Cash Collateral Order, in the amount of cash utilized by the Trustee during the period commencing on the Petition Date through the Confirmation Date, limited however, to the extent of any diminution in the value of Neshgold's pre-Petition Date collateral as a result of the use by the Trustee of any of Neshgold's Cash Collateral on and after the Petition Date pursuant to the terms of the Second Cash Collateral Order.

(c)    Class 2(a). Class 2(a) consists of the Secured Claim of Neshgold that does not hold super-priority status pursuant to the Second Cash Collateral Oder, notwithstanding the value of any collateral securing such claim and without regard to § 506(a) of the Bankruptcy Code.

(d)    Class 2(b). Class 2(b) consists of any claimants (other than Neshgold) that purport hold liens and security interests in the Debtor's assets. The Debtor does not believe there are any such valid Claims.

(e)    Class 2. Class 2 consists of all Priority Non-Tax Claims.

(f)    Class 3. Class 3 consists of all General Unsecured Claims.

(g)    Class 4. Class 4 consists of all Interests.

## ARTICLE V
### Treatment of Claims and Interests

5.1.    Class 1(a) – Super-Priority Secured Claim of SCS. Class 1(a) consists of the Super-Priority Secured Claim of SCS. The Debtor intends to borrow the sum of $4,663,330 million from SCS following confirmation of the Plan for the purposes of facilitating the implementation of the Plan and meeting the Conditions Precedent to the Effective Date of the Plan.

(a)    *Treatment.* The Debtor proposes to repay the SCS Loan pursuant to the terms and conditions of the SCS Note which shall be conform substantially to the terms of the SCS Commitment Letter. In addition, the Debtor will grant to SCS, pursuant to § 364(d)(1) of the Bankruptcy Code, a security interest and lien on all of the Debtor's property to secure the Debtor's obligation to repay the SCS Loan, which is senior in priority to all other liens and security interests in the Debtor's property, with the exception of the security interest and liens held by Neshgold to secure its Super-Priority Secured Claim, with respect to which security interest, SCS shall hold equal priority. In addition, the Debtor's obligation to repay the SCS Loan and to provide the treatment to

SCS provided hereunder will be personally guaranteed by the Holders of the Debtor's Equity Interests, Charles Morais and Sunil Mir.

(b)     *Full Settlement.* The treatment and consideration to be received by the Holder of the Allowed Claim in Class 1(a) shall be in full settlement and final satisfaction of its Claim.

(c)     *Unimpaired.* Because SCS does not hold a Claim against the Debtor arising prior to the Confirmation Date, it may not vote on the Plan. Regardless, the Claim of SCS is not Impaired and is thus deemed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code.

5.2     Class 1(b) - Super-Priority Secured Claim of Neshgold. Class 1(b) consists of the super-priority secured claim of Neshgold conferred to Neshgold pursuant to the Second Cash Collateral Order, in the amount of cash utilized by the Trustee during the period commencing on the Petition Date through the Confirmation Date, limited however, to the extent of any diminution in the value of Neshgold's pre-Petition Date collateral as a result of the use by the Trustee of any of Neshgold's Cash Collateral on and after the Petition Date pursuant to the terms of the Second Cash Collateral Order.

(a)     *Treatment.* The Holder of the Allowed Class 1(b) Claim will receive, in full and complete settlement, satisfaction and discharge of its Allowed Class 1(b) Claim Cash equal to the to the Allowed Amount of its Claim as soon after the Confirmation Date as may be practicable, but in no event later than the Effective Date.

(b)     *Full Settlement.* The treatment and consideration to be received by the Holder of the Allowed Claim in Class 1(b) shall be in full settlement and final satisfaction of its Claim. This Claim was also accorded super-administrative expense priority pursuant to the Second Cash Collateral Order. It is treated herein as a secured claim as a matter of convenience. The treatment and consideration to be received by the Holder of the Allowed Class 1(b) Claim shall also be in satisfaction of any super-administrative expense claim held by Neshgold pursuant to the Second Cash Collateral Order.

(c)     *Unimpaired.* Class 1(b) is not Impaired and is thus deemed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code.

5.3.     Class 2(a) - Secured Claim of Neshgold, LP. Class 2(a) consists of the Allowed Secured Claim of Neshgold, LP, reduced as applicable by any judgment or award in favor of the Debtor and against Neshgold arising by virtue of the counterclaims held by the Debtor against Neshgold in the Neshgold Adversary Proceeding or as a result of the Debtor's objection to Neshgold's Claim pursuant to § 502(a) of the Bankruptcy Code.

(a)     *Treatment.* The Holder of the Class 2(a) Claim shall: (a) retain its Lien on the Property of the Debtor securing its Allowed Claim, and (b) receive on account of the Allowed Amount of its Claim (i) monthly payments Cash payments of interest, at the rate

of 2 % for year one, 2.5 % for year 2, 3% for year 3, and for the years thereafter LIBOR plus three (3%) percent, commencing on the first day of the first full month  following the Effective Date; and (ii) a lump sum balloon payment equal to the Allowed Amount of its Claim on the date that is seven (7) years following the first day of the first month following the Effective Date, which balloon payment may be pre-paid without penalty. To the extent that a judgment or award is made in favor of the Debtor and against Neshgold in the Neshgold Adversary Proceeding following the Effective Date, which judgment or award serves to reduce the Allowed Amount of Neshgold's Claim as provided herein, then, in that event, the monthly payment of interest provided above shall be immediately recalculated as interest at the applicable rate on the Allowed Amount of Neshgolds' Claim as so reduced.  In the event of such recalculation, the principal amount of the Allowed Amount of Neshgold's Claim shall be reduced by:  (y) the award or judgment entered in favor of the Debtor and against Neshgold in the Adversary Proceeding; and (z) any excess payment of interest above the amount of the newly calculated interest payment for each month so paid by the Debtor following the Effective Date through the date on which such interest recalculation was made.

(b)    *Full Settlement.*  The treatment and consideration to be received by The Holder of Allowed Claims in Class 2(a) shall be in full settlement and final satisfaction of its Claim.

(c)    *Impaired.*  Class 2(a) is Impaired under and may vote on the Plan.

5.4.    Class 2(b) - Other Secured Claims.  Class 2(b) consists of any claimants (other than Neshgold) that purport hold liens and security interests in the Debtor's assets.  The Debtor does not believe there are any such valid Claims.

(a)    *Treatment.*  The Holder of the Allowed Class 2(b) Claim that has not been paid prior to the Effective Date, will receive, in full and complete settlement, satisfaction and discharge of its Allowed Class 2(b)Claim, at the Debtor's option, either: (a) Cash on the Effective Date in an amount equal to the value of the collateral securing such Claim evidenced by a valid, perfected and enforceable lien and security interest, in accordance with § 506(a) of the Bankruptcy Code; or (b) the collateral securing such claim, as surrendered by the Debtor, provided, however, that such treatment will be subject to the rights of any holder of a prior lien upon, and security in, said collateral.  To the extent the value of the collateral securing such Other Secured Claim is less than the Allowed Amount of the Other Secured Claim, any such deficiency will be treated as a Class 4 General Unsecured Claim under this Plan.

(b)    *Full Settlement.*  The treatment and consideration to be received by The Holders of Allowed Claims in Class 2(b) shall be in full settlement and final satisfaction of its Claim.

(c)    *Unimpaired.*  Class 2(b) Claims are not Impaired under and are deemed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code.

5.5.    Class 3 - Priority Non-Tax Claims.  Class 3 consists of all Allowed Priority Claims that are not Priority Tax Claims.

(a)    *Treatment.*  Class 3 consists of all Allowed Priority Claims that are not Priority Tax Claims.  Each Holder of an Allowed Priority Non-Tax Claim that has not been paid prior to the Effective Date, will receive, in full and complete settlement, satisfaction and discharge of its respective Priority Non-Tax Claims, regular monthly installment payments in Cash, together with interest at the then current federal statutory rate, over a period of not more than two (2) years from the Effective Date, which payments have of a value, upon full payment equal to the Allowed Amount of such Priority Non-Tax Claim, unless the holders of Allowed Priority Tax Claims agree otherwise.  Notwithstanding the foregoing, the Debtor may, at its option, in the event of a confirmation pursuant to the provisions of § 1129(b) of the Bankruptcy Code, pay the Holders of Allowed Priority Non-Tax Claims (to the extent such Claims remain unpaid as of the Effective Date), Cash on the Effective Date equal to the to the Allowed Amount of their respective Claims.

(b)    *Full Settlement.*  The treatment and consideration to be received by Holders of Allowed Claims in Class 3 shall be in full and final satisfaction of their respective Claims.

(c)    *Impaired.*  Class 3 is Impaired under and may vote on the Plan.

5.6.    Class 4 - General Unsecured Claims.  Class 3 consists of all Allowed General Unsecured Claims.

(a)    *Treatment.*  Each Holder of an Allowed Claim in Class 3 shall be entitled to receive a distribution in the total amount of twenty five percent (25%) of the Allowed Amount of its Claim over a period of three (3) years from the Effective Date, payable as follows:  ten percent (10%) of the Allowed Amount of its Claim as soon after the Confirmation Date as is practicable, but in no event later than the Effective Date; five percent (5%) of the Allowed Amount of Claim on the first anniversary of the Effective Date; five percent (5%) of the Allowed Amount of its Claim on the second anniversary of the Effective Date; and five percent (5%) of the Allowed Amount of its Claim on the third anniversary of the Effective Date.

(b)    *Full Settlement.*  The treatment and consideration to be received by Holders of Allowed Class 3 Claims shall be in full settlement and final satisfaction of their respective Claims.

(c)    *Impaired.*  Class 4 is Impaired under and may vote on the Plan.

5.7.    Class 5 - Interests.  Class 5 consists of equity Interests in the Debtor.

(a)    *Treatment.* Class 5 consists of equity Interests in the Debtors. Holders of Class 5 Interests shall receive no Distributions under the Plan, but shall retain their respective equity interests in the Reorganized Debtor.

(b)    *Full Settlement.* The treatment and consideration to be received by Holders of Allowed Class 5 Interests shall be in full settlement and final satisfaction of their respective Interests.

(c)    *Unimpaired.* Class 5 is not Impaired under the Plan and is deemed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code.

## ARTICLE VI
### Identification of Classes of Claims and Interests Impaired and Unimpaired Under the Plan

6.1.    Class of Claims Impaired by the Plan and Entitled to Vote.    Holders of Allowed Claims in Class 2(a) (Secured Claim of Neshgold, LP), Class 3 (Priority Non-Tax Claims), and Class 4 (General Unsecured Claims) are Impaired and the Holders of Allowed Claims in such Classes are entitled to vote to accept or reject the Plan.

6.2.    Acceptance by an Impaired Class of Claims.    Consistent with § 1126(c) of the Bankruptcy Code, and except as provided in § 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.

6.3.    Classes of Claims Unimpaired by this Plan and Conclusively Presumed to Accept the Plan.    Holders of Claims in Class 1(a) (Super-Priority Secured Claim of SCS), Class 1(b) (Super-Priority Secured Claim of Neshgold), and Class 2(b) (Other Secured Claims) are Unimpaired. Under § 1126(f) of the Bankruptcy Code, the Holders of Allowed Claims in such Classes are conclusively presumed to accept the Plan, and the acceptances of Holders of such Allowed Claims will not be solicited.

6.4    Class of Interests Deemed to Have Accepted the Plan. Allowed Interests in Class 5 are Unimpaired. Under § 1126(f) of the Bankruptcy Code, the Holders of Allowed Interests in such Class are conclusively presumed to accept the Plan, and the acceptances of Holders of such Allowed Interests will not be solicited.

6.5    Controversy With Respect to Impairment.    In the event of a controversy as to whether a Class of Claims or Interests is Impaired, the Court shall, after notice and a hearing, determine such controversy.

6.6    Confirmation Pursuant to § 1129(b) of the Bankruptcy Code ("Cram Down"). With respect to any Impaired Class that does not accept the Plan, the Debtor intends to request

that the Bankruptcy Court "cram down" such Class(es) and confirm the Plan in accordance with § 1129(b) of the Bankruptcy Code.

## ARTICLE VII
### Unexpired Leases and Executory Contracts

7.1.    Assumption and Rejection of Executory Contracts and Unexpired Leases. As of the Confirmation Date, any executory contract or unexpired lease that has not been expressly assumed or rejected with approval by order of the Bankruptcy Court, with the exception of the Union Contract and the Ground Lease, shall be deemed to have been rejected unless (a) there is then pending before the Bankruptcy Court a motion to assume such unexpired lease or executory contract, or (b) the Bankruptcy Court has entered an order extending the period during which a motion may be made to assume such unexpired lease or executory contract, and such a motion is filed with the Bankruptcy Court before the expiration of such period. The Disclosure Statement and the Plan shall constitute due and sufficient notice of the intention of Debtor to reject all executory contracts and unexpired leases, with the exception of the Union Contract and the Ground Lease, that are not otherwise assumed.  The Confirmation Order shall be deemed an order under § 365(a) of the Bankruptcy Code rejecting any such executory contracts and unexpired leases that are not otherwise assumed.

7.2    Bar Date for Rejection Damage Claims.  Unless otherwise provided for by an order of the Bankruptcy Court entered on or prior to the Confirmation Date, any Rejection Damage Claim for an executory contract or unexpired lease rejected by the Plan must be filed with the Bankruptcy Court within thirty (30) days following the Confirmation Date.  Any Entity that fails to file its Rejection Damage Claim within the period set forth above shall be forever barred from asserting a Claim against the Debtor, the Estate, or any Property or interests in Property of the Debtor or the Estate.  All Allowed Rejection Damage Claims shall be classified as Class 4 General Unsecured Claims under the Plan.

## ARTICLE VIII
### Means for Effectuating the Plan

8.1    Chief Restructuring Officer.

(a)    *Retention.*  On the Confirmation Date, the Debtor will retain Joseph Sarachek of Triax Capital Advisors to serve as a Manager of the Debtor's Board of Managers. and CRO of the Debtor, during the Effective Period, for the purposes of overseeing management of the Debtor's operations and satisfaction of the Conditions to the Effective Date of the Plan as set forth in § 13.2 hereof.  Joseph Sarachek does not hold or represent any interest adverse to the Debtor and is a disinterested person within the meaning of § 327(a) of the Bankruptcy Code. Accordingly, Joseph Sarachek is qualified to serve as Chief Restructuring Office of the Debtor. The Confirmation Order shall provide that the retention of Joseph Sarachek is authorized and approved during the Effective Period.

(b)    *Compensation*.  During the Effective Period, the Chief Restructuring Officer shall be compensated in the amount of $6,250 per week plus reimbursement of all reasonable out-of-pocket expenses, plus a $50,000 exit bonus upon consummation of the Plan on the Effective Date of the Plan.

(c)    *Post-Effective Date Services*.    The Chief Restructuring Officer may continue to provide management services to the Reorganized Debtor in the sole discretion of the Board of Managers of the Reorganized Debtor.  To the extent that the Reorganized Debtor determines to continue the engagement of the Chief Restructuring Officer he shall be compensated as agreed by the Reorganized Debtor and the Chief Restructuring Officer.

8.2    Post-Confirmation Loan.  On the Confirmation Date, or as soon thereafter as may be practicable, SCS will loan to the Debtor, and the Debtor will borrow from SCS, the sum of $4,663,330.00 million for the purposes of: (i) making the distributions due under the Plan on the Effective Date; (ii) facilitating the implementation of the Plan; and (iii) satisfying the Conditions Precedent to the Effective Date of the Plan.

(a)    *Repayment*.  The Debtor proposes to repay the SCS Loan pursuant to the terms set forth in § 5.1 hereof and the SCS Note, as proposed in the SCS Commitment Letter, a copy of which is annexed to the Disclosure Statement as **Exhibit A**.  The repayment will be through a refinance with a new lender, permitting the new lender to keep the Super-Priority Secured Claim for the repayment amount to SCS and for any new loan amount.  Any amount over and above the repayment of the SCS amount will be used to paydown the principle due Neshgold and the remaining balance, if any, will be paid as provided in the Plan.

(b)    *Security*.  As security for the Debtor's obligation to repay the SCS Loan pursuant to the terms of the SCS Note, the Debtor will grant to SCS, pursuant to § 364(d)(1) of the Bankruptcy Code, a security interest and lien against all of the Debtor's assets, senior in priority to all other liens and security interests in property of the Debtor and the Estate, with the exception of the security interest and liens held by Neshgold to secure its Super-Priority Secured Claim, with respect to which security interest, SCS shall hold equal priority.  The Debtor shall execute and deliver to SCS on or as soon thereafter as may be practicable, a Security Agreement  providing for the terms and conditions of SCS's liens and security interests as provided hereunder.

8.3    Assumption of Ground Lease.  On the Confirmation Date, the Debtor will assume the Ground Lease pursuant to § 365(a) of the Bankruptcy Code, and continue to make monthly payments and comply with all other obligations to New Riviera Motel, LLC under the Ground Lease following the Confirmation Date. The Debtor will cure the monetary default in the Ground Lease pursuant to § 365(b)(1)(A) of the Bankruptcy Code  as soon after the Confirmation Date as is practicable, but in no event later that the Effective Date.  The Debtor reserves the right to dispute and/or liquidate the Ground Lease Cure Amount after notice and a hearing during the Effective Period.

8.4    Re-Employment of Union Labor Subject to Concessions.  The Debtor is party to a Union Contract which requires the Debtor employ labor for the operation of its business

represented by the Union and to compensate and pay benefits to such Union represented employees in accordance with the terms of the Union Contract. As of the Petition Date, the Debtor was not employing Union represented employees.

(a)     *Re-Employment.*  Upon the Confirmation Date, or as soon thereafter as may be practicable, and subject to the conditions set forth in sub-paragraph (b) below, the Debtor will re-employ limited Union represented employees to perform services necessary to the operation of the Debtor's business. The Union shall cooperate with the Debtor in re-employing such employees, by providing the Debtor with the names and contact information of such employees, executing such documents as may be necessary to facilitate such re-employment, and otherwise communicating with the Debtor regarding such re-employment.

(b)     *Emergency Interim Changes.*  The re-employment of Union represented employees as provided in sub-paragraph (a) above shall be contingent upon Bankruptcy Court approval, pursuant to § 1113(e) of the Bankruptcy Code, of the emergency interim changes and conditions to the Union Contract and to the terms, conditions, wages, benefits and work rules provided therein, as set forth on the Interim Union Contract Term Sheet, a copy of which is annexed to the Disclosure Statement as **Exhibit D**. The Interim Changes shall be effective during the Effective Period.

(c)     *Renegotiation and Assumption of Collective Bargaining Agreement.*  Commencing on the Confirmation Date, or as soon thereafter as may be practicable, the Debtor shall negotiate necessary changes to terms, conditions, wages, benefits and work rules provided in the Union Contract which are necessary to the reorganization of the Debtor's business.     Upon reaching an agreement with the Union regarding such modifications to the Union Contract, the Debtor will assume the Union Contract pursuant to § 1113(a) of the Bankruptcy Code, on the Effective Date.

(d)     *Reservation of Right to Reject Collective Bargaining Agreement.*  Notwithstanding the provisions of sub-paragraph (c) above, the Debtor reserves its right to seek the rejection of the Union Contract pursuant to § 1113(b), (c) and (d) of the Bankruptcy Code, on or prior to the Effective Date.

8.5     Franchise Agreement.  Commencing on the Confirmation Date, and continuing thereafter as may be necessary, the Debtor will engage in negotiations and improvement to its property for the purposes of obtaining, pursuant to § 363(b) of the Bankruptcy Code, a franchise with a recognized and reputable hotel franchisor, so as to gain access to and participate in such franchisor's reservation system and increase its revenues.

8.6     Prosecution of Claims/Counter-claims Against Neshgold.     Following the Confirmation Date, the Debtor will prosecute its claims against Neshgold and its counterclaims against Neshgold in the context of the Neshgold Adversary Proceeding for the purposes of liquidating Neshgold's Allowed Class 2(a) Claim and making payments on account thereof as provided in § 5.3 hereof. The Confirmation Order shall constitute a reconsideration and rescission of any releases accorded by the Estate to Neshgold pursuant to the Second Cash

-19-

Collateral Order to the extent that any such releases encumber or impair the Debtor's rights under this § 8.6 of the Plan.

8.7    Implementation. Pursuant to the Confirmation Order and upon confirmation of the Plan, the Debtor shall be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and provisions of the Plan. On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate or further evidence the terms and provisions of the Plan and the other agreements referred to herein. The Debtor may be, is hereby authorized, and shall, execute such documents, and take such other actions as are necessary to effectuate the transactions provided for in the Plan, without the need for any additional approvals, authorizations or consents.

8.8    Vesting of Property. Except as otherwise provided in the Plan, on the Effective Date, title to all Property of Debtor's Estate shall pass to and vest in the Reorganized Debtor, free and clear of all Claims, Interests, Liens, security interests, charges and other encumbrances, except as otherwise provided in the Plan.

8.9    Preservation and Vesting of Claims, Rights, Demands and Causes of Action. Pursuant to § 1123 of the Bankruptcy Code, the Debtor and the Reorganized Debtor, as the case may be, on behalf of and for the benefit of the Estate, shall be vested with, shall retain, and shall have the authority to prosecute and enforce any and all claims, controversies, agreements, promises, accounts, rights to legal remedies, rights to equitable remedies, rights, demands and Causes of Action of any kind or nature whatsoever held by, through, or on behalf of the Debtor and/or the Estate, including, without limitation, all Causes of Action of a trustee and a debtor-in-possession under the Bankruptcy Code, including, without limitation, under §§ 544, 545, 547, 548, and 549 of the Bankruptcy Code, against any other Entity arising before or after the Effective Date that have not been fully resolved or disposed of prior to the Effective Date, whether or not such Claims or Causes of Action are specifically identified in the Disclosure Statement accompanying the Plan and whether or not litigation with respect to same has been commenced prior to the Effective Date. The Debtor and the Reorganized Debtor will also be authorized to challenge, and/or object to disputed Claims, and will be authorized to settle disputed Claims with approval from the Bankruptcy Court prior to the Effective Date, and without approval from the Bankruptcy Court following the Effective Date. All Cash, proceeds and/or recoveries from the Causes of Action will be utilized by the Debtor in the operation of its business and may be used, at the Debtor's option for the implementation of the Plan.

8.10    No Stamp or Similar Taxes. Pursuant to § 1146(c) of the Bankruptcy Code: (a) the creation of any mortgage, deed of trust, lien, pledge, or other security interest; (b) the making or assignment of any lease or sublease; (c) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, any restructuring, disposition, liquidation, dissolution, deeds, bills of sale, transfers of tangible property or the transfers, sales, and assignments of the Debtor's leased real property, or (d) any transfers from or for the benefit of the Debtor pursuant to the Plan, will not be subject to any document recording tax, stamp tax, conveyance fee, personal property tax, real estate transfer tax, intangibles or similar governmental assessment, and the Confirmation Order shall

direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

    8.11   Release of Liens. Upon receipt of all of the Distributions required to be made to the holders of Allowed Secured Claims in accordance with the Plan (or upon the occurrence of any other event or condition which terminates a party's lien on or other interest in property of the Debtor or the Reorganized Debtor), such holder of the Allowed Secured Claim shall file such notice or other public statement as is necessary or appropriate to evidence the termination of the lien formerly held by such party. In addition, the Reorganized Debtor is hereby appointed as attorney-in-fact for each party whose lien treated or created under the Plan is hereafter terminated, with full power and authority to execute on behalf of such holder any notices or other public statements necessary or appropriate to evidence the termination of such party's lien.

    8.12   Effect of Confirmation. The Confirmation Order (and any subsequent Final Orders) shall be a final determination as to the rights of all Claimants and Interest holders to participate in the Distributions under the Plan, whether or not (a) a proof of claim is filed or deemed filed under § 501 of the Bankruptcy Code, (b) such Claim is an Allowed Claim, or (c) the holder of such Claim has accepted the Plan.

## ARTICLE IX
### Post-Confirmation Date Management and Procedures

    9.1.   Post-Confirmation Management. Following the Confirmation Date and continuing through the Effective Period, the Debtor's Board of Managers shall be reconstituted to provide for three (3) Managers as follows: (i) Joseph Sarachek; (ii) Charles Morias; and (iii) Sunil Mir. During the Effective Period, Joseph Sarachek shall serve as Chief Restructuring Officer of the Debtor pursuant to the provisions of § 8.1 of the Plan. Following the Effective Date, the Chief Restructuring Officer may continue to provide management services to the Reorganized Debtor and may continue to serve on the Reorganized Debtor's Board of Managers in the sole discretion of the Board of Managers of the Reorganized Debtor.

    9.2.   Post Confirmation Fees. The Debtor will pay all outstanding fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 31 U.S.C. § 3717, upon Confirmation and through the Effective Date. After the Effective Date, the Reorganized Debtor will be liable for and pay the fees of the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 31 U.S.C. § 3717 until the entry of a final decree in this case, or until the case is converted or dismissed. United States Trustee Fees will be based on all plan payments and disbursements made in the ordinary course of the Debtor's business (or the Reorganized Debtor, as applicable), also through entry of a final decree in this case, or until the case is converted or dismissed.

    9.3   Post Confirmation Reports. The Reorganized Debtor shall file with the Court and serve on the United States Trustee monthly post-confirmation reports of disbursements until the entry of a final decree in this case, or until the case is converted or dismissed.

9.4.    Post Confirmation Date Services by Professionals. The Professionals retained by the Debtor shall continue to be retained subsequent to the Confirmation Date for the purpose of rendering services as necessary to satisfy the Conditions for the Effective Date of the Plan set forth in § 13.2of the Plan, objecting to Disputed Claims and effecting Distributions on Allowed Claims, and otherwise consummating the Plan.    The reasonable fees and expenses of the Debtor's Professionals incurred after the Confirmation Date shall constitute Operating Expenses of the Debtor's Estate (or Reorganized Debtor's Estate, as the case may be) and shall be payable upon presentment of a monthly statement for services rendered and for reimbursement of expenses incurred, to the Debtor or Reorganized Debtor, as the case may be, with a copy to the United States Trustee. The Debtor (or the Reorganized Debtor) and the United States Trustee shall have ten (10) days from the receipt of any such fee and expense statements to dispute all or part of such statement. Upon the expiration of said ten (10) days, the Debtor (or Reorganized Debtor) shall pay the professionals the undisputed portion of such fees and expenses. Any disputes shall be submitted to the Bankruptcy Court for determination. A law firm, accountant or other Professional shall not be disqualified from representing or otherwise serving the Reorganized Debtor solely because of its current or prior retention as counsel or professional to the parties in interest in the Chapter 11 Case, including, without limitation, counsel to the Debtor.

## ARTICLE X
### Distributions; Disputed Claims Reserve

10.1.    Timing of Distributions Due Under Plan. All Distributions and payments required of the Debtor under the Plan to Holders of Allowed Claims will be paid from the Estate on the dates, and in the manner, indicated in the Plan.

10.2.    Manner of Distributions.    At the option of the Debtor, Distributions from the Estate may be made by wire transfer, check, or such other method as the Debtor deems appropriate under the circumstances.    No Distributions shall be required to be made to any Holder of an Allowed Claim in an amount less than fifty dollars ($50.00), unless request is made, in writing, to the Debtor.

10.3.    Cash Payments.    Cash payments made pursuant to the Plan will be in U.S. dollars. Cash payments made pursuant to the Plan in the form of checks issued by the Debtor shall be void if not cashed within one hundred twenty (120) days of the date of the issuance. Requests for reissuance of any check shall be made directly to Debtor as set forth in § 10.7 below.

10.4.    Disputed Claims Reserve.

(a)    Prior to the Effective Date, the Debtor shall establish a Disputed Claims Reserve.  For purposes of establishing the Disputed Claims Reserve, the Debtor shall reserve for each Disputed Claim at the Maximum Amount. On the date of any Distribution, the Debtor shall deposit into the Disputed Claims Reserve Cash equal to the

amount that would be distributable to all Holders of Disputed Claims in respect of all Distributions made on that date, if such Disputed Claims were Allowed in the respective Maximum Amounts. The Debtor shall maintain the Disputed Claims Reserve in a segregated, interest bearing account and shall keep records as to the applicable amounts reserved in respect of each Disputed Claim. The Debtor shall pay any taxes due and owing with respect to the Disputed Claims Reserve, and reserve all Distributions on account of the Disputed Claims, net of such taxes; provided, however, that the Debtor may contest in good faith any tax that any taxing authority determines is owed by the Estate.

(b)    In the event any Disputed Claim becomes an Allowed Claim, the amount of such Allowed Claim shall never exceed the Maximum Amount and the Debtor shall distribute to the Holder of such Allowed Claim from the Disputed Claims Reserve the aggregate amount of Cash that such Holder would have received through the date of such Distribution in respect of such Disputed Claim as if such Claim has been an Allowed Claim as of the Effective Date.

(c)    From time to time as Disputed Claims are Disallowed or become Allowed Claims in amounts less than its respective Maximum Amounts, the Cash deposited in the Disputed Claims Reserve that otherwise would have been distributed to the holders of such Disputed Claims if such Disputed Claims subsequently had become Allowed Claims in an amount equal to their respective Maximum Amounts (and which as a result is not distributable to such Holders pursuant to this § 10.4) shall be released from and no longer held in the Disputed Claims Reserve and deposited in the Debtor's general operating account for use in operations.

10.5.    No Interest. Except with respect to Holders of Unimpaired Claims entitled to interest under applicable non-bankruptcy law or as otherwise expressly provided herein, no Holder of an Allowed Claim, including, without limitation, Holders of Allowed General Unsecured Claims under Class 4 of the Plan shall receive interest on any Distribution to which such Holder is entitled hereunder, regardless of whether such Distribution is made on the Effective Date or thereafter.

10.6.    Withholding of Taxes.

(a)    The Debtor may withhold from any Property to be distributed under the Plan any Property which must be withheld for taxes payable by the Entity entitled to such Distribution to the extent required by applicable law. As a condition to making any Distribution under the Plan, the Debtor may request that the Holder of any Allowed Claim provide such Holder's taxpayer identification number and such other certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

(b)    Notwithstanding any other provision of the Plan, each Entity receiving a Distribution of Cash pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental

-23-

unit on account of such Distribution, including income, withholding and other tax obligations.

10.7.   Undeliverable or Unclaimed Distributions.

(a)    All Distributions under the Plan to any Holder of an Allowed Claim shall be made at the address of such Holder as set forth on the Debtor's Schedules. unless Holder has filed a Proof of Claim or unless the Debtor has been notified in writing after the Confirmation Date of a change of address, in which case the Debtor shall utilize such changed address. Any Entity that is entitled to receive a Cash Distribution under the Plan but that fails to cash a check within one hundred twenty (120) days of its issuance shall be entitled to receive a reissued check from the Debtor for the amount of the original check, without any interest, if such Entity (i) requests, in writing, the Debtor to reissue such check, and (ii) provides the Debtor with such documentation as the Debtor requests to verify in its sole discretion that such Entity is entitled to such check. If an Entity fails to cash any check within one hundred twenty (120) days of its issuance or fails to request re-issuance of such check within one hundred twenty (120) days of its issuance, such Entity shall be deemed to have forfeited the amount of the Distribution provided for in such check. Any such forfeited Distributions shall revert to the Debtor and the Claim of any Holder or successor to such Holder with respect to such forfeited Distributions shall be discharged and forever barred, notwithstanding any other provisions in the Plan or any federal or state escheat laws to the contrary.

(b)    In the event that any Distribution to any Holder of an Allowed Claim is returned to the Debtor as undeliverable, no further Distributions will be made to such Holder unless and until the Debtor is notified in writing of such Holder's then-current address. All claims for undeliverable Distributions must be made within one hundred twenty (120) days of the issuance of the original check. After such date, all unclaimed Distributions shall revert to the Debtor and the claim of any Holder or successor to such Holder with respect to such Distribution shall be forfeited, discharged and forever barred, notwithstanding any provisions in the Plan or any federal or state escheat laws to the contrary. Upon such forfeiture of Cash or other property, such Cash or property shall be the property of the Debtor.

## ARTICLE XI
### Procedures for Resolving Disputed Claims

11.1.   Objections to Claims.   The Debtor and Reorganized Debtor shall have the authority to file, settle, compromise, withdraw or litigate to judgment objections to Claims. Subject to an order of the Bankruptcy Court providing otherwise, the Debtor or Reorganized Debtor may object to a Claim by filing an objection with the Bankruptcy Court and serving such objection upon the Holder of such Claim not later than one hundred twenty (120) days after the Effective Date or one hundred twenty (120) days after the filing of the proof of such Claim, whichever is later, or such other date fixed by the Bankruptcy Court.

11.2.  Procedure. Unless otherwise ordered by the Bankruptcy Court or agreed to by written stipulation of the Debtor or Reorganized Debtor, or until an objection thereto by the Debtor or Reorganized Debtor is withdrawn, the Debtor or Reorganized Debtor may litigate the merits of each Disputed Claim until a Final Order is entered with respect to such Claim; provided, however, that (a) prior to the Effective Date, the Debtor, subject to the approval of the Bankruptcy Court, and (b) after the Effective Date, the Reorganized Debtor, may compromise and settle any objection to any Claim.

11.3.  Payments and Distributions With Respect to Disputed Claims. No payments or Distributions shall be made in respect of any Disputed Claim until such Disputed Claim becomes an Allowed Claim.

11.4.  Claims Reserve - Estimation. For purposes of effectuating the reserve provisions of the Plan, and the allocations and Distributions to Holders of Allowed Claims, the Bankruptcy Court may, on or prior to the Effective Date, or such later date as may be established by the Bankruptcy Court and/or the Debtor or Reorganized Debtor, pursuant to § 502 of the Bankruptcy Code, fix or liquidate the amount of any contingent or unliquidated General Unsecured Claim, in which event the amount so fixed will be deemed the Allowed Amount of such Claim for purposes of the Plan or, in lieu thereof, the Bankruptcy Court will determine the maximum contingent or unliquidated amount for such Claim, which amount will be the Maximum Amount in which such Claim ultimately may be Allowed under the Plan, if such Claim is Allowed in whole or in part. The Bankruptcy Court's entry of the Confirmation Order or any such estimation order may limit the Distribution to be made on individual Disputed Claims, regardless of the amount finally Allowed on account of such Disputed Claims, and no Holder shall have recourse against the Debtor, the Estate, the Reorganized Debtor, or any of their respective Professionals, professional consultants, attorneys, advisors, officers, directors, employees, members or their successors or assigns, or any of their respective property, as such Holder's sole recovery shall be from the Distributions to be made to Holders of Allowed Claims.

11.5.  Distributions After Allowance of Disputed Claims. Distributions to each Holder of a Disputed Claim, to the extent that such Claim ultimately becomes an Allowed Claim, will be made in accordance with the provisions of the Plan.

11.6.  Setoffs and Recoupments. Except with respect to Causes of Action of any nature released or allowed pursuant to the Plan or Confirmation Order, the Debtor, the Reorganized Debtor or their designee as instructed by them may, pursuant to § 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off or recoup against any Allowed Claim, the Distributions to be made pursuant to the Plan on account of such Claim, any Causes of Action of any nature that the Debtor, the Estate, the Reorganized Debtor, or their successors may hold against the Holder of such Allowed Claim; provided that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtor, the Estate, or the Reorganized Debtor or their successors, of any Causes of Action that the Debtor, the Estate, or the Reorganized Debtor or their successors may possess against such Holder.

## ARTICLE XII

Injunction, Release and Exculpation

12.1. <u>Injunction</u>. Except as otherwise provided in or to enforce the Plan or Confirmation Order, on or after the Effective Date all Entities that have held, currently hold, or may hold, a Claim, Lien, Interest or other liability against or in the Debtor that would be discharged or satisfied upon confirmation of the Plan and the Effective Date but for the provisions of § 1141(d)(3) of the Bankruptcy Code are permanently enjoined from taking any of the following actions on account of such Claim, Lien, Interest or right: (a) commencing or continuing in any manner any action or other proceeding on account of such Claim, Lien, Interest, or right against the Estate, the Reorganized Debtor, the Reorganized Debtor's assets, and any Property that is to be distributed under the Plan; or (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against the Estate, the Reorganized Debtor, the Reorganized Debtor's assets, and any Property to be distributed under the Plan. Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date all Creditors of, and Claimants against, the Estate are hereby permanently enjoined and stayed from pursuing or attempting to pursue any action, commencing or continuing any action, employing any process, or any act against the Estate, the Reorganized Debtor's assets, any Property that is to be distributed under the Plan, or the Reorganized Debtor on account of or based upon any right, claim or interest which any such Creditor, or Claimant or other Entity may have had prior to the entry of the Confirmation Order.

12.2. <u>Release</u>. Except as otherwise specifically provided herein, confirmation of the Plan (subject to the occurrence of the Effective Date) shall, as to all Holders of Claims who (a) vote in favor of the Plan, or (b) abstain from voting on the Plan, release the Debtor's officers, directors, employees, and other agents, financial advisors, consultants, attorneys and accountants (in such capacity), and their respective assets and properties from any debt, charge, Causes of Action, liability, encumbrance, Lien, security interest, Claim, Interest, or other cause of action of any kind, nature or description (including, but not limited to, any claim of successor liability), other than a right to pursue a claim based on any gross negligence or willful misconduct, including any breach of fiduciary duty constituting gross negligence or willful misconduct, that arose before the Confirmation Date, and any debt of the kind specified in §§ 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not a proof of Claim or Interest is or could have been filed or is deemed filed, and whether or not such Claim or Interest is or could have been Allowed.

12.3. <u>Exculpation</u>. In consideration of the Distributions under the Plan, upon the Effective Date, each Holder of a Claim or Interest will be deemed to have released the Debtor, and its directors, partners, members, officers, agents, consultants, attorneys, independent accountants, advisors, Professionals, financial advisors, investment bankers and employees (in such capacity), employed by the Debtor from and after the Petition Date from any and all Causes of Action (other than the right to enforce the obligations under the Plan and the right to pursue a claim based on any gross negligence or willful misconduct, including any breach of fiduciary duty constituting gross negligence or willful misconduct) arising out of actions or omissions during the administration of the Chapter 11 Case, the administration of the Estate, or the Distribution of any Property pursuant to the Plan.

**ARTICLE XIII**
Conditions Precedent to the Confirmation
Order and the Effective Date of the Plan

13.1. <u>Condition Precedent to Entry of the Confirmation Order</u>. The following conditions must be satisfied on or before the Confirmation Date: (i) the Confirmation Order must be in form and substance reasonably acceptable to the Debtor; and (ii) the Confirmation Order must be entered by the Bankruptcy Court.

13.2. <u>Conditions Precedent to the Effective Date</u>. The following conditions must be fully satisfied or waived, if subject to waiver, on or before the Effective Date for the Plan to become effective:

(a) the Confirmation Order has become a Final Order;

(b) the Debtor has closed on the SCS Loan and such loan has been fully funded to the Debtor;

(c) the Chief Restructuring Officer has accepted, in writing, the terms of her/his service and compensation, and such terms shall have been approved by the Bankruptcy Court in the Confirmation Order;

(d) the Debtor has assumed the Ground Lease in accordance with the provisions of § 365(a) of the Bankruptcy Code and has paid or has segregated funds sufficient to satisfy the Ground Lease Cure Amount;

(e) the Debtor has entered into franchise agreement with a reputable hotel franchisor pursuant to § 363(b) of the Bankruptcy Code;

(f) the Debtor has assumed or rejected the Union Contract in accordance with the provisions of § 1113 of the Bankruptcy Code;

(g) the Debtor has paid or has segregated sufficient funds to satisfy the Class 1(b) Super-Priority Administrative Expense of Neshgold (to the extent such expenses remain unpaid as of the Effective Date) in accordance with § 5.2 of the Plan;

(h) the Debtor has paid or has segregated sufficient funds to satisfy all Allowed Administrative Expenses (to the extent such expenses remain unpaid as of the Effective Date) in accordance with the provisions of Article II of the Plan;

(i) in the event that the Debtor has confirmed the Plan pursuant to the provisions of § 1129(b) of the Bankruptcy Code, the Debtor has paid or has segregated sufficient funds to satisfy all Allowed Priority Non-Tax Claims (to the extent such Claims remain unpaid as of the Effective Date) in accordance with the provisions of § 5.5 of the Plan;

(j)    the Debtor has paid or has segregated sufficient funds to make the First Distribution to Class 4 General Unsecured Creditors in accordance with § 5.6 of the Plan;

(k)    the Disputed Claim Reserve has been established in accordance with § 10.4 of the Plan;

(l)    not more than two hundred seventy (270) days have lapsed since the Confirmation Date;

13.3.    Debtor's Right to Waive Conditions Precedent. The Debtor, in its sole discretion, may waive the condition set forth in the foregoing § 13.2(e) of the Plan at any time from and after the Confirmation Date.   In addition, the Debtor, in its sole discretion may waive the condition set forth in § 13.2(a) of the Plan.  In the event of as waiver of the condition set forth in § 13.2(a) of the Plan, the Debtor will be entitled to render any or all of its performances under the Plan prior to what otherwise would be the Effective Date if such condition was not waived, including, but not limited to, the right to perform under any circumstances which would moot any appeal, review or other challenge of any kind to the Confirmation Order if the Confirmation Order is not stayed pending such appeal, review or other challenge.

## ARTICLE XIV
### Miscellaneous Provisions

14.1.    Bankruptcy Court to Retain Jurisdiction. Notwithstanding entry of the Confirmation Order, or the occurrence of the Effective Date or Substantial Consummation of the Plan, the Chapter 11 Case having been closed, or a Final Decree having been entered, the Bankruptcy Court (or the District Court, as the case may be) shall have and retain jurisdiction of matters arising out of, and related to the Chapter 11 Case and the Plan under §§ 105(a), 1127, 1142 and 1144 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    to consider any modification of the Plan under § 1127 of the Bankruptcy Code and/or modification of the Plan before "substantial consummation" as defined in § 1101(2) of the Bankruptcy Code and § 14.13 of the Plan, and to consider any modification of the Plan to cure any defect or omission, or reconcile any inconsistency in the Plan, the Disclosure Statement or in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(b)    to hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, if any, including but not limited to the Ground Lease and the Union Contract, and the allowance of Claims resulting therefrom;

(c)    to (i) hear and determine any Claim or Cause of Action arising in or related to the Chapter 11 Case; and (ii) to adjudicate any Causes of Action or other proceedings currently pending or which may be commenced by the Debtor after the Confirmation Date or otherwise referenced herein or elsewhere in the Plan, including, but

not limited to, the adjudication of any Causes of Action and any and all "core proceedings" under 28 U.S.C. § 157(b), which are or may be pertinent to the Chapter 11 Case and which the Debtor or Reorganized Debtor may deem appropriate to commence and prosecute in support of implementation of the Plan;

        (d)    to determine any and all adversary proceedings, applications, and contested matters filed or commenced by the Debtor or Reorganized Debtor after the Confirmation Date, including, without limitation, any Causes of Action;

        (e)    to ensure that Distributions are accomplished as provided in the Plan;

        (f)    to hear and determine any objections to Administrative Expenses, to Proofs of Claim, or to Claims and Interests filed and/or asserted both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow or disallow any disputed Administrative Expense, Claim or Interest, in whole or in part, and any request for estimation of Claims;

        (g)    to protect the Reorganized Debtor's Estate from adverse Claims or interference inconsistent with the Plan, including to hear actions to quiet or otherwise clear title to such property of the Reorganized Debtor's Estate based upon the terms and provisions of the Plan;

        (h)    to (i) enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated; (ii) to issue such orders in aid of execution of the Plan as may be necessary and appropriate, to the extent authorized by § 1142 of the Bankruptcy Code; and (iii) to interpret and enforce any Orders previously entered in the Chapter 11 Case to the extent such Orders are not superseded or inconsistent with the Plan;

        (i)    to hear and determine all applications for compensation and reimbursement of expenses of Professionals under §§ 330, 331, and 503(b) for services rendered and expenses incurred prior to the Confirmation Date;

        (j)    to hear and determine all litigation, Causes of Action and all controversies, suits and disputes that may arise in connection with the interpretation, implementation or enforcement of the Plan, including but not limited to, any and all litigation and/or Causes of Action brought by the Debtor or Reorganized Debtor, whether such litigation and/or Causes of Action is/are commenced either prior to or after the Effective Date;

        (k)    to hear and determine matters concerning state, local, and federal taxes in accordance with §§ 345, 505, and 1146 of the Bankruptcy Code;

        (l)    to enter a Final Decree closing the Chapter 11 Case;

(m)    to consider and act on the compromise and settlement of any litigation, Claim against or Cause of Action asserted in connection with the Chapter 11 Case, the Estate or the Reorganized Debtor's Estate; and

(n)    without limiting the generality of the foregoing and notwithstanding the Effective Date and to the fullest extent permitted by law, the Bankruptcy Court shall retain exclusive jurisdiction over the Reorganized Debtor's Estate after the Effective Date, including, without limitation, jurisdiction to resolve any and all controversies, suits and issues that may arise in connection herewith or therewith, including, without limitation, any Entities' obligations incurred in connection herewith or therewith, including without limitation, any action against the Debtor, the Reorganized Debtor, the Estate or the Reorganized Debtor's Estate, or any or all of the Debtor's or Reorganized Debtor's professionals, and any action seeking turnover or recovery of assets included in the Estate or Reorganized Debtor's Estate.

14.2.    Binding Effect of the Plan. Nothing contained in the Plan or the Disclosure Statement will limit the effect of confirmation as set forth in § 1141 of the Bankruptcy Code. The provisions of the Plan shall be binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, any Holder of a Claim or Interest, or their respective predecessors, successors, assigns, agents, officers, managers, members and directors and any other Entity affected by the Plan.

14.3.    Fractional Cents. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

14.4.    Successors and Assigns. The rights and obligations of any Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Entity.

14.5.    Blank Ballots. Any Ballot which is executed by the Holder of an Allowed Claim but which does not indicate an acceptance or rejection of the Plan, shall be deemed to be an acceptance of the Plan. Any Ballot not filed in accordance with the filing instructions on the Ballot pertaining to the Plan shall not be counted for voting purposes.

14.6.    Authorization of Corporate Action. Upon the entry of the Confirmation Order, all actions contemplated by the Plan will be deemed authorized and approved in all respects (subject to the provisions of the Plan), including, without limitation, the transfer and/or contribution of the Debtor's Assets to the Reorganized Debtor.  On the Confirmation Date, appropriate officers of the Debtor and the Reorganized Debtor are authorized and directed to execute and to deliver any and all agreements, documents and instruments contemplated by the Plan, or as necessary for the consummation of the Plan, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without the need for any additional authorizations, approvals or consents.

14.7.  Withdrawal of the Plan.  The Debtor reserves the right, at any time prior to the entry of the Confirmation Order, to revoke or withdraw the Plan.  If the Debtor revokes or withdraws the Plan, or if the Confirmation Date does not occur, or if the Effective Date does not Occur, then (a) the Plan will be deemed null and void and (b) the Plan shall be of no effect and shall be deemed vacated, and the Chapter 11 Case shall continue as if the Plan had never been filed and, in such event, the rights of any Holder of a Claim or Interest shall not be affected nor shall such Holder be bound by, for purposes of illustration only, and without limitation, (i) the Plan, (ii) any statement, admission, commitment, valuation or representation contained in the Plan, the Disclosure Statement, or the Related Documents or (iii) the classification and proposed treatment (including any allowance) of any Claim in the Plan.

14.8.  Captions.  Article and Section captions used in the Plan are for convenience only and will not affect the construction of the Plan.

14.9.  Method of Notice.  Any notice or other communication hereunder shall be in writing (including by facsimile transmission or by e-mail) and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the person for whom such notice is intended (or, in the case of notice by facsimile transmission or e-mail, when received and telephonically or electronically confirmed), addressed as follows (provided, however, that only one notice or other communication hereunder need be sent to Holders sharing the same address):

> If to the Debtor, to:
>
> CPJFK, LLC
> 151-20 Baisley  Boulevard
> Jamaica, New York 11434
> Attn:  Sunil Mir
>
> With a copy to:
>
>> Joseph Sarachek
>> Triax Capital Advisors
>> 10 Rockefeller Plaza, Suite 601
>> New York, New York 10020
>>
>> and
>>
>> Walter Drobenko, Esq.
>> Drobenko & Associates, P.C.
>> 25-84 Steinway Street
>> Astoria, N.Y. 11103
>
> If to the United States Trustee:
>
> United States Department of Justice

Office of the United States Trustee
271 Cadman Plaza East, Suite 4529
Brooklyn, New York 11201
Attn: William E. Curtin, Trial Attorney

Any of the above may, from time to time, change its address for future notices and other communications hereunder by filing a notice of the change of address with the Bankruptcy Court.

14.10. <u>Amendments and Modifications to Plan</u>. The Plan may be altered, amended or modified by the Debtor, before or after the Confirmation Date, as provided in § 1127 of the Bankruptcy Code. The Debtor may also seek to modify the Plan at any time after confirmation so long as (a) the Plan has not been substantially consummated and (b) the Bankruptcy Court authorizes the proposed modification after notice and a hearing. The Debtor further reserves the right to modify the treatment of any Allowed Claims at any time after the Effective Date upon the consent of the Creditor whose Allowed Claim treatment is being modified, so long as no other Creditors are materially adversely affected.

14.11. <u>Section 1125(e) of the Bankruptcy Code</u>. Confirmation of the Plan will constitute a finding that the Debtor (and each of its Affiliates, agents, directors, officers, employees, advisors, Professionals, and attorneys) have proposed and solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

14.12. <u>Entire Agreement</u>. The Plan, as described herein, and the Disclosure Statement and exhibits thereto set forth the entire agreement and understanding of the parties hereto relating to the subject matter hereof and supersede all prior discussions and documents. No party hereto shall be bound by any terms, conditions, definitions, warrants, understandings or representations with respect to the subject matter hereof, other than as is expressly provided for herein or as may hereafter be agreed to by the parties in writing.

14.13. <u>Substantial Consummation</u>. The Plan will be deemed substantially consummated, as such term is used in § 1101(2) of the Bankruptcy Code, upon the commencement of Distributions to the holders of a Class of Claims under this Plan. Following such substantial consummation, any appeal, rehearing or other post-confirmation motion of any nature with respect to this Plan or the Confirmation Order except as specifically provided herein or therein shall be rendered moot and no longer justiciable.

Dated:        March 7, 2011

<div style="margin-left: 40%;">

**CPJFK, LLC**
*Debtor*

By:        _S/_____
Charles Morais, Managing Member

**DROBENKO & ASSOCIATES, P.C**
*Counsel to the Debtor*

By:        _S/_____
Walter Drobenko, Esq. (WD3552)
Wdrobenko@cs.com
25-84 Steinway Street
Astoria, New York 11103
Tel. (718) 721-2000
Fax. (718) 721-8812

</div>

**EXHIBIT "B"**     To Be Submitted

**EXHIBIT "C"**



March 7, 2011

Messrs. Charles Morais and Sunil Mir
CPJFK, LLC
241 Ashford Circle
Atlanta, Georgia 30338

**Re:**     **First Mortgage Leasehold Financing for the 183 room hotel located at**
           **151-20 Baisley Boulevard, Jamaica, New York 11434  ("Hotel")**

Gentlemen:

SCS-Strategic Capital Solutions, LLC, a New York limited liability company ("SCS")  is pleased
to advise you on behalf of the Lender (defined below), that your request for financing in the form
of a first mortgage leasehold loan (the "Loan") to the Borrower (defined below) totaling
approximately the Principal Loan Amount (defined below) and to be used for the Purpose set
forth below has been approved.

In this regard, we are pleased to provide this conditional commitment (the "Conditional
Commitment"), subject to the following terms and conditions and such additional terms and
conditions as may be set forth in the Loan Documents (defined below) to be agreed prior to, and
executed at the Closing (defined below).

The terms and conditions of this Conditional Commitment and this conditional approval are as
follows:

**APPLICANT:**

Charles Morais and Sunil Mir, individuals, jointly and severally, currently the sole, direct and
indirect, owners of the Borrower (collectively, the "Applicant").

**BORROWER:**

CPJFK, LLC, a Georgia limited liability company (the "Borrower"). The Borrower  is currently a
debtor in Chapter 11  proceeding (the "Bankruptcy Proceedings"), commenced under Title 11 of
the United States Code (the "Bankruptcy Code"), *In Re CPJFK, LLC*, Case No. 10-50566
(CEC), U.S. Bankr. Ct., Eastern District of New York (such court presiding over the Bankruptcy
Proceedings, the "Bankruptcy Court").

---

The Closing of the Loan shall be subject to the final, non-appealable approval of the Bankruptcy Court as set forth in detail herein below, and in the time frames required hereby, including, without limitation, that the CPKFK, LLC confirms a plan of reorganization (the "Plan") pursuant to Sec. 1129 of the Bankruptcy Code to be proposed by the Applicant on behalf of the Borrower prior to the Commitment Termination Date (defined below) and such plan is otherwise in accordance with all terms all conditions set forth herein.

Borrower shall have no assets other than its interest in the Property and Ground Lease (defined below).   Borrower shall be controlled by the Applicant.

As a condition to the Closing, Borrower shall amend its operating documents to provide for customary and traditional special purpose entity provisions, as reasonably required by counsel to the Lender.

**GUARANTORS:**

Charles Morais and Sunil Mir, jointly and severally.

**RECOURSE:**

The Loan will be fully recourse to Borrower and each of the Guarantors, jointly and severally,

**LENDER:**

SCS and/or its affiliates, designees and/or assigns (the "Lender").

**PRINCIPAL LOAN AMOUNT:**

Total of approximately **Four Million Six Hundred Sixty Three Thousand Three Hundred Thirty ($4,663,330.00) Dollars** (the "Loan Amount" or the "Principal Loan Amount"). The Loan Amount will be finalized prior to the Closing, and will include all approved closing costs, including, without limitation, administrative fees, closing fees and expenses, attorneys fees of the Applicant, the Borrower and the Lender, title and title fees, and taxes, in case solely as and to the extent set forth in the Sources and Uses of Funds (defined below). Anything set forth herein to the contrary notwithstanding, the Loan Amount shall not exceed (1) 35% of the "as is" value of the Property (as defined below) or (2) 30% of the "as stabilized" value of the Property.

**PROPERTY:**

As used herein, the term the "Property" means the Hotel and any and all improvements, equipment, furniture, fixtures and personal property and business assets (tangible and intangible, current and future) located at the Hotel or used in connection with the operations of the Hotel.

**GROUND LEASE:**

The Hotel is built on real property subject to a ground lease (the "Ground Lease") with New Riviera Motel, LLC  (the "Ground Lessor") under and pursuant to the first restatement of lease between New Riviera Motel, LLC, as landlord, and the Debtor (as assignee from the Boulevard

---

Hotel Associates LLC), as tenant, for the non-residential real property located at 141-20 Baisley Boulevard, Jamaica, New York 11434, dated April 10, 1997, and all appendices, schedules and exhibits thereto, as amended from time to time. The Applicant represents, and the Applicant and the Borrower prior to the Closing will represent, that the rent payable under the Ground Lease (the "Ground Rent") equals $660,000 per annum, payable in equal monthly installments of $55,000 per month, in advance, on the first day of each calendar month. The Loan shall be subject to the execution and delivery to the Lender of an Estoppel and Consent to Ground Leasehold Mortgage from Ground Lessor (a "Ground Lease Estoppel") in form and substance acceptable to the Lender in its sole discretion. Among other things, the Ground Lease Estoppel shall provide for normal and customary cure rights, shall allow the Lender to foreclose and become the tenant under the Ground Lease, shall confirm that Lender is entitled to a new lease if Borrower ever rejects the Ground Lease in a subsequent proceeding under the Bankruptcy Code or if the Ground Lease is otherwise ever terminated, and shall provide that the Lender has standing in any proceeding (including any proceeding under Bankruptcy Code Section 363) that might be commenced by the Ground Lessor under the Bankruptcy Code.

**PURPOSE / USE OF PROCEEDS:**

The proceeds of the Loan shall be used solely to: (1) refinance a portion of the existing indebtedness secured by the Property and Ground Lease; (ii) fund certain Reserves (as defined below), including the Renovation Reserve (as defined below) approved by the Lender; (iii) pay for reasonable approved closing costs incurred in connection with the Loan, including loan fees, legal fees and administrative costs; (iv) provide funding for certain distributions in accordance with the Borrower's confirmed Plan (as reviewed and approved by the Lender); (v) provide working capital; and (vi) such other uses as may be approved by the Lender prior to the Closing (defined below). The Loan will be allocated in accordance with the Sources and Uses of Funds budget set forth on **SCHEDULE 1** attached hereto (the "Preliminary Sources and Uses of Funds"), which Preliminary Sources and Uses of Funds will be further detailed and finalized prior to the Closing and ultimately set forth in the Loan Documents (the final approved Sources and Uses of Funds for the contemplated Loan is hereinafter referred to as the "Sources and Uses of Funds"). Funds not used at Closing shall be allocated for the purpose delineated by the Lender, withheld and released as and when required.

**COLLATERAL:**

All obligations of the Borrower will be secured by the following (collectively, the "Collateral"):

a) A first priority lien on (i) Borrower's interest in the Ground Lease and all rights appurtenant thereto; (ii) Borrower's interest in the Hotel and all improvements, equipment, furniture, fixtures and personal property located at the Hotel or used in connection with the operations of the Hotel, and (iii) all other assets of Borrower;

b) A first priority pledge of (I) the Managed Account and Reserves (each as hereinafter defined), and (II) 100% of the ownership interests in Borrower and the Hotel, which ownership interests must be certificated,

c) An assignment of the Hotel Management Agreement and the Franchise Agreement (each as defined below),

---

d) An assignment of any tenant leases (which, in the context of any leases other than for transient occupants, room reservations or other ordinary course of the non-retail space at the Hotel, shall either be subordinate to the lien of the mortgage securing the Loan or subject to subordination agreements acceptable to the Lender); and an assignment of all other leases, profits, sales, contracts, income and rentals at or relating to the Property.

Anything set forth herein to the contrary notwithstanding, the collateral for the Loan shall not include such portion of accumulated cash flow from the operation of the Hotel as shall be used to pay administrative expenses as required by the Bankruptcy Court pursuant to the Order (as defined below); provided, however, that all such accumulated cash funds not required to be disbursed pursuant to the Order shall be collateral for the Loan upon satisfaction of any and all administrative expenses ordered paid pursuant to the Order.

The legal description of the Property, and the condition of title at and as of the Closing, must be approved by the Lender, in all respects, prior to the Closing. The Loan shall prime all existing liens on or with respect to the Property, including, without limitation, the Neshgold Loan (as defined below) and such is a condition to Closing

Borrower hereby authorizes the filing, where appropriate in advance of Closing, financing statements evidencing any security interests described above.

The Closing of the Loan is subject to evidence, reasonably satisfactory to the Lender and its counsel, that upon Closing (which Closing is subject to, among other things, Bankruptcy Court Approval) as set forth herein, the Lender shall have the priorities set forth herein and as required hereby, including, without limitation, the priming of all existing liens on or with respect to the Property (including, without limitation, the Neshgold Loan). Without limiting the foregoing, Borrower shall be required as part of the Closing to take whatever steps are required by any title company insuring the Lender's mortgage is a first priority mortgage (subject only to such exceptions—other than any existing financing secured by the Property—as are acceptable to Lender in its good faith discretion).

## LOAN TERM AND MATURITY:

The term of the Loan (the "Term") shall be thirty-six (36) months from Closing (the last day of the Term is hereinafter referred to as the "Maturity Date").

## INTEREST RATE:

Interest on the Loan shall be equal to Sixteen and One-Half of One percent (16.5%) per annum (the "Interest Rate"). Interest shall be payable Monthly in arrears and shall be based on the actual number of days elapsed and a 360-day year. Notwithstanding anything to the contrary contained herein, in no event shall the Interest Rate contracted for, charged, or received exceed the maximum rate allowed by law.

## REPAYMENT AND AMORTIZATION:

Interest shall be payable monthly at the Interest Rate noted on a fully funded basis. At Closing, an interest holdback (the "Interest Reserve") in the amount of at least twelve (12) months of

required interest payments (currently estimated at Seven Hundred Sixty Nine Thousand Four Hundred Forty Nine ($769,449) Dollars) will be established at the Closing to service the Loan as necessary. Payment of interest shall first be made from cash flow from Hotel operations, as and if available, and if cash flow shall not be sufficient, then from the Interest Reserve. In any event (1) the Interest Reserve shall be deemed fully funded at the Closing, shall be deemed part of the Principal Loan Amount and shall earn interest at the Interest Rate on a monthly basis; and (2) the Loan shall be interest only through the Term, but any and all principal, unpaid fees and accrued interest shall be due and payable in full on the Maturity Date.

**NOTICE TO BORROWER, APPLICANT AND GUARANTORS: IF YOU DO NOT HAVE THE FUNDS TO PAY THE BALLOON PAYMENT WHEN IT COMES DUE YOU MAY HAVE TO OBTAIN A NEW LOAN AGAINST THE PROPERTY OR OTHER COLLATERAL TO MAKE THE BALLON PAYMENT (WHICH LOAN MAY ALSO NEED TO BE REFINANCED AS WELL AS ANY JUNIOR INDEBTNESS THAT REMAINS SECURED BY THE HOTEL AS PART OF THE BORROWER'S PLAN OF REORGANIZATION). IN THAT CASE, YOU MAY AGAIN HAVE TO PAY COMMISSIONS, FEES AND EXPENSES FOR THE NEW LOAN. IN ADDITION, IF YOU ARE UNABLE TO MAKE THE MONTHLY PAYMENTS OR THE BALLON PAYMENT, YOU MAY LOSE THE PROPERTY COLLATERAL TO BE SECURED BY THE LOANS AND ALL OF YOUR EQUITY (AND, DEPENDING ON THE TERMS OF BORROWER'S PLAN, INCUR ADDITIONAL LIABILITY TO ANY HOLDERS OF JUNIOR INDEBTNESS THAT REMAINS SECURED BY THE HOTEL AS PART OF THE BORROWER'S PLAN).**

### PREPAYMENT / YIELD MAINTAINCE:

The Loan shall be pre-payable, in whole or in part, on thirty (30)-days' written notice, at any time, upon payment of a prepayment fee ("Prepayment Fee") equal to the interest on the principal prepaid for the period from the date of such prepayment to the 30-month anniversary of the Closing. Any prepayment shall include accrued interest and all other sums then due under the Loan. In no event shall there be any refund for the Commitment Fee, Origination Fee, third party fees, costs, Loan expenses and the like, except as specifically provided herein. Subject to the Prepayment Fee and the Repayment Fee (defined below), the unused portion of any monthly prepaid interest is refundable.

### REPAYMENT FEE:

The Borrower shall pay the Lender a fee (the "Repayment Fee") equal to (a) 1.5% of the principal amount of the Loan at maturity; provided, however, that the Repayment Fee shall equal 3.0% of any amount being repaid prior to the Maturity Date . The Repayment Fee shall be in addition to any Prepayment Fee, and not in lieu thereof. The Repayment Fee is expressly offered to Applicant in consideration of higher interest payments, waiver of principal payments and other economic considerations making the proposed Loan materially more economically advantageous to the Borrower, and therefore, the Applicant acknowledges that Borrower will receive measureable, just, fair and current consideration for the Repayment Fee. Notwithstanding the foregoing, in the event the any refinancing of the Loan shall occur with, through or arranged by SCS (an "SCS Exit Financing"), then there shall be no Repayment Fee for the Loan being repaid as a result of any such SCS Exit Financing.

---

## COMMITMENT FEE:

The Lender shall receive a non-refundable fee (the "Commitment Fee") equal to two (2%) percent of Loan Amount, of which fifty (50%) percent is payable by the Borrower (the "Borrower Portion") and the remaining fifty (50%) Percent is payable by each constituent of the Applicant from its own funds (the "Applicant Portion"). The Commitment Fee, subject to the provisions of the following sentence, will be fully earned upon the execution by the Applicant of this Conditional Commitment and the Applicant Portion will be due and payable by each constituent of the Applicant simultaneously with the execution hereof, time being of the essence, and the Borrower Portion will be subject to the confirmation of the Plan and payable upon the Closing, time being of the essence; provided, however, that in the event the Plan is not confirmed for any reason whatsoever, the Borrower Portion shall be immediately due and payable by each constituent Applicant, jointly and severally, without further notice. Any failure to pay the Commitment Fee to the Lender as required to be paid hereby when due shall permit the Lender, following written notice to the Applicant and two (2) business day opportunity to cure, to terminate this Conditional Commitment and the Lender shall have no obligations, if any, under this Conditional Commitment.

Unless earlier terminated pursuant to the terms of this Conditional Commitment, this Conditional Commitment shall expire (the "Commitment Termination Date"), at 4 p.m. EST on the date which is the earlier to occur of :

(x) the Bankruptcy Court Outside Approval Date (as defined below), if there is no Bankruptcy Court Approval (as defined below) prior to such time as set forth herein, and

(y) if there is Bankruptcy Court Approval prior to the Bankruptcy Court Outside Approval Date, then the earlier to occur of (i) the Closing, if the Closing shall occur; or (ii) the date which is ninety (90) days following the Bankruptcy Court Approval Date (as defined below), time being of the essence;

or such later date through which the Commitment may be extended in writing as SCS, on behalf of the Lender, may unilaterally determine from time to time.

In the event Borrower fails to close on or prior to the Commitment Termination Date other than as a result of a default by Lender under this Conditional Commitment, including if the Bankruptcy Court does not approve the Loan prior to the Bankruptcy Court Outside Approval Date, if any existing secured creditors obtain relief from the automatic stay, the Bankruptcy Proceedings are converted to a proceeding under Chapter 7 of the Bankruptcy Code, if the Property is sold, or the Borrower's Plan is not confirmed by the Commitment Termination Date, (a) 100% of the Commitment Fee shall be immediately due and payable, and each constituent of the Applicant, jointly and severally, hereby agrees that each constituent of the Applicant shall each be liable, jointly and severally, for any unpaid portion of such Commitment Fee, together with all costs of collection, including, but not limited to, attorneys' fees and disbursements, as herein provided, and (b) Lender's obligation under this Conditional Commitment shall be null and void. In the event Lender wrongfully refuses to close notwithstanding the full satisfaction of all conditions of this Conditional Commitment by Borrower, then any portion of the Commitment Fee then actually paid to Lender will be refunded to the Applicant as liquidated damages as Borrower's and Applicant's (and each of their respective affiliates, successors and assigns) sole

---



SCS Initials_____                              Applicant Initials_____

and exclusive remedy in connection therewith.

**ORIGINATION FEE:**

SCS shall receive an origination fee (the "Origination Fee") of three (3%) of the Loan Amount. The Origination Fee shall be deemed earned upon the execution of this Conditional Commitment by Applicant, but shall be paid at the Closing of the Loan from Loan Proceeds.

**ASSUMABILITY:**

The Loan shall not be assumable under any circumstances.

**MANAGEMENT:**

The Hotel shall at all times during which the Loan shall remaining outstanding, be managed by a hotel manager (the "Hotel Manager") engaged or retained by the Applicant, but subject to the reasonable approval of the Lender (using its good faith discretion) pursuant to a Hotel Management Agreement approved by the Lender (the "Hotel Management Agreement"), which Hotel Management Agreement shall contain a management fee (the "Management Fee") in an amount not to exceed 3.0% of the operating revenues of the Hotel (Lender and Borrower shall agree that the Management Fee shall be inclusive of any payments to be made to the Chief Restructuring Officer to be retained by the Borrower pursuant to the Plan as well as any other fees, directly or indirectly, to the Applicant). The Management Fee shall be under a structure that is consistent with management fees then customarily charged by third-party managers for hotels of similar size and services and located in the region. The Hotel Management Agreement shall be subordinate to the Loan, assigned to the Lender as collateral for the Loan and immediately terminable by the Lender upon a (1) default under the Loan or (2) if the debt service coverage ratio at any time following stabilization of the Hotel, becomes less than 1.25 to 1.00 (calculated based upon the Interest Rate and taking into account a pro rata allocation of rent due under the Ground Lease and the periodic funding of Reserves) The Borrower has represented that the Hotel Manager has agreed that following the two hundred seventy (270) day anniversary of the Closing of the Loan, to thereafter defer 100% of its management fee until the Hotel has achieved annualized net operating income of $1,300,000 (the "Minimum NOI Threshold"), which shall be calculated in a commercially reasonable manner and method approved by the Lender. Additionally, Lender shall receive a comfort letter or recognition agreement acceptable to Lender with respect to the Hotel Management Agreement to allow the Hotel to continue being managed under the Hotel Management Agreement and to abide by the Hotel Management Agreement, following the acquisition of the Hotel by the Lender or another entity pursuant to a foreclosure or deed-in-lieu of foreclosure or an order of the Bankruptcy Court. Anything set forth herein to the contrary notwithstanding, at all times while the Loan or any portion thereof is or remains outstanding, the Hotel Manager and the Hotel Management Agreement shall be subject to the Lender's prior written consent.

**FRANCHISE AGREEMENT:**

The Hotel Manager shall, and the Borrower shall cause the Hotel Manager to, enter into a hotel franchise agreement (the "Hotel Franchise Agreement") with either Starwood Hotel Group for a Sheraton Brand ("Sheraton") or Carlson Hotel Group for a Radisson Brand ("Radisson") or such

other franchise/hotel branding as shall be reasonably acceptable to the Lender (the actual franchisor finally selected is herein referred to as the "Franchisor") to provide reservation and other brand services to the Hotel. The Hotel Franchise Agreement shall be made effective no later than the date which is one hundred twenty (120) days from the Closing Date, and shall thereafter remain in full force and effect at all times thereafter so long as the Loan remains outstanding, time being of the essence. Any failure of the Hotel Manager to timely enter into the Hotel Franchise Agreement as set forth above shall constitute an event of default under the Loan Documents. The Franchise Agreement shall contain a franchise fee (the "Franchise Fee") in an amount not to exceed ten (10%) percent of operating revenues at the Hotel and shall be under a structure that is consistent with hotel franchise fees then customarily charged by third-party hotel franchisors for hotels of similar size and services and located in the region. The Hotel Franchise Agreement shall be subordinate to the Loan and assigned to the Lender as collateral for the Loan. The Borrower and the Applicant have represented that it is in discussions and negotiations with Sheraton and Radisson in this regard and will undertake their best efforts to complete the requirements of both Sheraton and Radisson, or such other approved hotel brand, in order to obtain either of them as the franchisor within the time periods required hereby.   Any default under the Hotel Franchise Agreement or the Hotel Management Agreement shall be a default under the Loan.

Lender shall receive a comfort letter or recognition agreement from the Franchisor reasonably acceptable to Lender with respect to the Hotel Franchise Agreement, without payment of any transfer fee, to allow the Hotel to continue being branded under the Hotel Franchise Agreement and to abide by the Hotel Franchise Agreement, following the acquisition of the Hotel by the Lender or another entity pursuant to a foreclosure or deed-in-lieu of foreclosure or an order of the Bankruptcy Court.

At Closing, the Lender shall holdback and retain an amount equal to One Hundred Twenty-Five Thousand ($125,000) Dollars (the "Franchise Reserve") to ensure the payment of the initial upfront required franchise fee to the Franchisor, which amount Borrower represents is sufficient to satisfy the Franchisor's requirement. Any amount required above the Franchise Reserve shall be contributed by the Borrower directly. In addition, the Lender shall holdback from the Loan an amount not to exceed One Hundred Twenty Thousand Nine Hundred Seven ($120,907) dollars or ten (10%) percent of the Applicant projected franchise fee that will be payable during the first two months of operations of the Hotel under the Franchise Agreement.

## MANAGED ACCOUNT:

All excess cash available at Closing from the pre-Closing operations of the Hotel and all cash flow generated by the operation of the Property and all excess accumulated cash shall be deposited into an interest bearing account (the "Managed Account") at a banking institution selected by Borrower and acceptable to Lender (an "Approved Bank").

The Managed Account shall be subject to a security interest in favor of the Lender, pursuant to a cash management agreement and cash control agreement to be executed at the Closing of the Loan. Funds in the Managed Account shall be disbursed according to provisions set forth in the Loan Documents. Such provisions shall include, among other things, "waterfall" provisions requiring application of funds monthly from the Managed Account as follows:

1) First, to the payment of current debt service on the Loan; and

2) Second, to pay any and all approved expenses of the Property and operation of the Hotel, including, but not limited to, ground rents, salaries and wages, payroll, sales and use and occupancy taxes, the periodic funding of the Reserves (as hereinafter discussed) and the Management Fee (but subject, in the case of management fees, to the satisfaction of Minimum NOI Threshold, the Franchise Fee (when applicable); and

3) Third, to the payment of all distributions authorized and required under the Plan, including, but not limited to, interest payments to Neshgold LP, ("Neshgold") under the two loans acquired by Neshgold from Fortress (Neshgold being in the successor in interest to Fortress) in the total original principal amount of $9,750,000 (collectively, the "Neshgold Loan"), distributions on account of priority and general unsecured creditors, and the fees of the Office of the United States Trustee.

All sums remaining in the Managed Account after the payment of the items set forth above shall remain in the Managed Account and serve as additional collateral for the Loan; provided, however, that Borrower may utilize sums remaining in the Managed Account to repay the Loan (subject to the applicable Prepayment Fee and Repayment Fee (if any)), further provided that if the Lender determines that the Hotel has achieved a debt service coverage ratio of not less than 1.25 to 1.00 (calculated based upon the Interest Rate and taking into account a pro rata allocation of rent due under the Ground Lease and the periodic funding of Reserves) based upon the annualized and seasonally adjusted six (6) month trailing net operating income (as determined by Lender in its sole discretion), funds remaining in the Managed Account may be disbursed to Neshgold or the Unsecured Creditors, as determined by the Bankruptcy Court and as may be required by the Plan. No distributions or payments by Borrower to its members shall be made during the term of the Loan.

Interest accrued on any amounts held in the Managed Accounts shall be for the benefit of the Borrower.

**RESERVES:**

During the Term of the Loan, on a monthly basis, Borrower shall be required to fund (i) a tax and insurance reserve in an amount sufficient to provide for the timely payment of real estate taxes and insurance premiums during the term of the Loan (the "Tax and Insurance Reserve"), and (ii) a furniture, fixtures and equipment replacement reserve (the "FF&E Reserve") in an amount equal to 2.0% of monthly gross revenues of the Property for the first 12 months of the Loan and 4.0% of monthly gross revenues of the Property thereafter. At Closing, the Lender shall holdback from Loan proceeds, amounts totaling Eight Hundred and Forty Thousand ($840,000) Dollars (collectively the " Tax Reserve") for the payment of projected real estate taxes as set forth in the Plan. The Tax Reserve, or portion thereof, shall be used by Lender to pay such taxes in the event of a shortfall in the Borrower's ability to timely make such payments when due from operating cash flow during the Term of the Loan.    In addition, the Borrower

---

SCS Initials_____                                          Applicant Initials_____

shall be required to fund into the Tax and Insurance Reserve in an amount sufficient to supplement the projected deposits in order to timely pay additional taxes and insurance premiums when due.

At Closing, a renovation reserve (the "Renovation Reserve") shall be established as a holdback from Loan Proceeds in an amount not to exceed Four Hundred Forty Two Thousand ($442,500) Dollars. The Renovation Reserve shall include (1) no more than $142,500 for the purchase of at least 190 Plasma Televisions for the Hotel (as required by the Franchisor) and (2) no more than $250,000 for hard and soft costs associated with the completion of required renovations of the Hotel and any surrounding grounds under the requirements of the Franchisor pursuant to the Franchise Agreement and (3) no more than 2% of operating revenue for deferred maintenance expenses.

At Closing, the Interest Reserve shall be established as a holdback from Loan Proceeds as set forth herein above.

At Closing, a Working Capital/Liquidity Reserve shall be established as a hold back from Loan Proceeds, for operating cash short falls at the Hotel during the initial 270 day term of the Loan.

At Closing, a reserve (the "Ground Lease Reserve") shall be established as a holdback from Loan Proceeds in the amount of $275,000 for six (6) months of Ground Rent due under the Ground Lease. The Ground Lease Reserve shall be made available to pay the Ground Rent to the extent not timely paid current by the Borrower from operating cash flow.

At Closing, a reserve (the "Parking Rent Reserve") in the amount of $60,000 for six (6) months of rent for parking facilities. The Parking Rent Reserve shall be made available to pay parking lease rent to the extent not timely paid current by the Borrower from operating cash flow.

At all times as the Loan shall remain outstanding, the Borrower shall maintain and fund all other reserves set forth on the Operating Budget of the Hotel as and when provided in the Plan.

All reserves and escrows described herein or set forth on the operating budget of the Hotel is herein referred to collectively as the "Reserves".

For the avoidance of doubt, unless otherwise expressly stated, all Reserves from Loan Proceeds (other than those that are in the Operating Budget), shall be a holdback from Loan Proceeds at the Closing, but shall be considered fully funded on and as of the Closing, and shall bear interest at the Interest Rate from and after the Closing Date until repaid as set forth herein.

## ENVIRONMENTAL INDEMNITY:

Borrower and Guarantors shall execute an environmental indemnification covering the Property.

## CLOSING:

The Loan shall close and be consummated (the "Closing") on, and all conditions required to be satisfied on and as of the Closing must be satisfied by, a mutually satisfactory date and time (the "Closing Date"), at or following execution of definitive approved and satisfactory Loan Documents, but no earlier than forty-five (45) days, and no later than ninety (90) days, following

the date (the "Bankruptcy Court Approval Date") of Bankruptcy Court Approval (as defined below), if any. The Bankruptcy Court Approval Date must be no later one hundred and twenty (120) days from the date of this Conditional Commitment (the "Outside Required Court Approval Date"), which time is of the essence; unless otherwise extended in a writing duly signed by the Lender, and if not so extended, then any obligations of Lender under this Conditional Commitment shall be null and void without further notice.

A condition precedent to this Conditional Commitment is receipt of Bankruptcy Court Approval prior to the Outside Required Court Approval Date, Unless and until there is Bankruptcy Court Approval within the time periods required hereby, neither SCS nor the Lender shall have any obligations under this Conditional Commitment whatsoever. In addition, if for any reason whatsoever either (1) the Closing does not occur on or before the Commitment Termination Date or (2) the Bankruptcy Court Approval Date does not occur within the Outside Required Court Approval Date, unless otherwise agreed by the Lender in writing (which agreement may be withheld for any reason or no reason whatsoever in the Lender's sole and absolute discretion), the Lender shall not have any further obligations with respect to the contemplated Loan.

## BANKRUPTCY COURT APPROVAL AND ORDER:

The Closing shall also be subject to the entry of a final, non-appealable Order of the Bankruptcy Court confirming the Plan, which Plan shall incorporate approval of the Loan in accordance with the provisions of Section 364 of the Bankruptcy Code (the "Bankruptcy Court Approval"), and which Plan modified, supplemented or amended by the Applicant, the Borrower or the Bankruptcy Court from the Borrower's Proposed Plan (as defined below) shall be subject to the Lender's review and approval. The parties shall use their commercially reasonable efforts to facilitate the Closing to occur within 90 days of the entry of the Order by the Bankruptcy Court approving the Plan and the Loan (the "Order").

The Order shall be final and non-appealable. The Order shall include the approval of a deed-in-lieu of foreclosure for the Hotel and Borrower's interest in the Ground Lease to be deposited in escrow with the Lender with the right of the Lender to effect such instrument(s), (x) upon the failure of Borrower to achieve effectiveness of the Plan within two hundred seventy (270) days following the Order, provided, however, (1) that the Loan actually Closes within the time periods specified herby and required herein, and (2) that Borrower may extend this period by ninety (90) days for good cause, or (y) upon any other event of default under the Loan.

Borrower shall agree and the Bankruptcy Court shall find that: (i) the Loan is a valid and enforceable obligation of Borrower; (ii) the Lender's mortgage on the Hotel and the Ground Lease are valid and enforceable obligations of Borrower and are secured by an unavoidable first mortgage lien on the Hotel and Ground Lease in the aggregate amount of the Loan, priming all other liens or encumbrances that may remain on the Property at or following the Closing of the Loan, including, without limitation, the Neshgold Loan; (iii) the terms and conditions of the Order shall be binding on Borrower, its estate, its creditors and any subsequently appointed trustee in the Borrower's chapter 11 proceeding, or any subsequent chapter 7 proceeding; (iv) no plan of reorganization or liquidation that impairs Lender's interests may be confirmed without Lender's prior written consent or over Lender's objection, unless Lender is paid in full pursuant to the Order; (v) upon the occurrence of a payment default or other material default, or upon the maturity of the Loan (by acceleration or otherwise), whichever occurs first, upon five (5) court days' notice to Borrower and pursuant to the terms of the Order, title to the Property and

Borrower's interest in the Ground Lease shall be conveyed to the Lender (or its designee), free and clear of liens, claims, interests and encumbrances (except those of Lender) without the need of a further order of the Court, unless, unless, during said five (5)-day notice period, Borrower files a motion, supported by admissible evidence, contesting whether a default has occurred, and within ten (10) days thereafter, the Court enters an order finding that no payment default or other material default or maturity in fact has occurred; (vi) under no circumstances may the Hotel or Borrower's interest in the Ground Lease be sold, conveyed, transferred, assigned, abandoned or further encumbered without Lender's prior written consent, unless Lender is paid in full, subject to the terms of the Order; and (vii) in order to effectuate the terms of the Order or upon the occurrence of an event of payment default or other material default under the Loan Documents, upon five (5) court days' notice to Borrower, Lender  is granted relief from the automatic stay, pursuant to 11 U.S.C. Section 362(d), if applicable, subject to the terms of the Order, unless during said five-day notice period, Borrower files a motion, supported by admissible evidence, contesting whether a default has occurred, and within ten days thereafter, the Court enters an order finding that no payment default or other material default in fact has occurred.

**CLOSING COSTS:**

All reasonable costs and expenses incurred in connection with the Closing of the Loan, including, without limitation, the Borrower Portion of the Commitment Fee, the Origination Fee, the Administrative Fees, third-party fees and expenses, other approved Closing costs, title and title insurance, Lender's attorneys fees, and taxes, shall be paid by Borrower at the Closing, certain portions of which may be paid from Loan Proceeds as and to the extent provided for herein and in the Sources and Uses of Funds for the contemplated Loan.

**REPRESENTATIONS AND WARRANTIES:**

Borrower hereby represents and warrants that: (i) other than the Bankruptcy Proceeding and except as set forth in the Borrower's Proposed Plan of Reorganization, dated March 7, 2011 (the "Borrower's Proposed Plan"), there is no litigation or similar proceeding threatened or pending against Borrower, or any Guarantor, or the Collateral which may materially affect the value of the Collateral or the ability of Borrower or any Guarantor to perform any of  its obligation hereunder; (ii) there exists no event or circumstance which, with notice or lapse of time, or both, would constitute grounds for termination of this Conditional Commitment; (iii) Borrower has, or prior to Closing will have, a valid leasehold fee interest in and to the Property, free and clear of all liens, charges, claims, options and other encumbrances, subject only to such liens, charges, claims, options and encumbrances as may be accepted in writing by Lender pursuant to the Order; (iv) except as set forth in the Borrower's Proposed Plan, there are no outstanding or unpaid judgments against Borrower, Applicant or any Guarantor, and all federal and state tax assessments of fees imposed upon the Property either have been paid or will be paid at the Closing as part of the Loan Proceeds and such amounts are adequately reflected in the Sources and Uses of Funds and will be accurately set forth in any closing statement for this transaction; (v) other than that of the Bankruptcy Court, no consent, approval or other authorization is required with respect to this transaction from any person or under any document by which Applicant, Borrower or any Guarantor is obligated or bound; and (vi) Borrower has all permits, licenses and approvals required in connection with the Hotel and the proposed renovations and the operations of the Hotel (including without limitation, valid liquor and food and beverage licenses).  Borrower shall update the above representations and warranties and furnish at Closing such additional

information, representations and warranties for it or any other relevant party as Lender may reasonably request in connection with the Loan.

**CLOSING CONDITIONS:**

In addition to the other closing conditions and conditions precedent set forth in this Conditional Commitment, prior to Closing of the Loan, Lender shall receive at Borrower's expense, such items as Lender may reasonably require in order to provide security for the Loans as required hereby, including without limitation, the following items, all satisfactory in form and content to the Lender and its counsel in all aspects and their sole discretion:

1.  Loan Proceeds. Final Sources and Uses of Funds statement for the Loan proceeds, satisfactory to the Lender in all respects;

2.  Closing Certificate. Borrower shall deliver at the Closing a certificate acceptable to the Lender in all respects indicating (i) all financial statements and all projections and all financial information relating to each constituent Applicant, the Borrower and each Guarantor and other information delivered to the Lender are complete and correct, (ii) there has been no adverse change in the business, prospects or financial condition of the Applicant, the Borrower or the Guarantor or the Property (including, without limitation, the Hotel and its condition and operations), from that of the date hereof or as set forth in such financial statements, (iii) all of Applicant's, Borrowers' and Guarantor's representations and warranties set forth in this Conditional Commitment remain true and correct; and (iv) to the best of each of Applicant's Borrower's and the Guarantors' knowledge, information and belief, all conditions to Close have been satisfied and no fact, condition or circumstances exists that would entitle the Lender to terminate the proposed transactions.

3.  Priming Loan. Full subordination, satisfactory to the Lender in all respects, of any and all existing debt or liens (including, without limitation, the Neshgold Loan), and evidence satisfactory to the Lender in that regard. An intercreditor and subordination agreement (an "Intercreditor Agreement") between the Lender and Neshgold with respect to the Neshgold Loan shall be executed at the Closing, in form, enforceability and content satisfactory to the Lender and its counsel, in its sole and absolute discretion.

4.  Utilities, Environmental Permits, and Zoning; Parking. Borrower shall deliver at the Closing a written certificate confirming each of the following: (i) that the Hotel is finally and properly zoned for its contemplated use; (ii) that all required approvals of governmental authorities for the Hotel and the intended use of the Hotel have been unconditionally and validly issued and obtained, are in full force and effect, and are not being challenged; (iii) the unconditional availability of sewer, water, and other required utilities and municipal services in sufficient capacity to serve the Hotel; and (iv) that all governmental laws, regulations, and requirements applicable to the Hotel and proposed improvements on the Property have been complied with and that the plans have been prepared in accordance with such laws, regulations and requirements;    In addition, Borrower shall demonstrate to Lender's reasonable satisfaction, access to parking facilities for the use of patrons and employees of the Hotel that are reasonably satisfactory to the Lender to cover the projected parking requirements of patrons and employees of the Hotel.



5. Authorizations. Certificates and other evidences as Lender may reasonably require demonstrating the due organization, existence, authority, power and capacity of each Borrower and the Guarantors.

6. Insurance. Borrower shall obtain and maintain such insurance as the Lender may reasonably require, including:

    i.   Flood insurance;
    ii.  Hurricane insurance;
    iii. General Liability insurance;
    iv.  Workers' Compensation Insurance, as applicable; and
    v.   Hazard insurance on the Property and all other tangible assets of Borrower;

    All insurance policies shall name Lender as mortgagee, lender's loss payee and additional insured, as applicable. For purposes of insurance, Lender shall be named as shall be directed by SCS to the Borrower in writing prior to, at or following the Closing. All insurance shall be in such amounts and form and shall be issued by such insurers as shall be approved by the Lender and shall require written notice to Lender at least thirty (30) days prior to cancellation, nonrenewable, modification or expiration. Proof of such insurance coverage and payment of premiums shall be delivered at the Closing of the Loans.

7. Documentation. A loan agreement, containing such representations, warranties, covenants, conditions and requirements as Lender may in its sole and absolute discretion require, together with a promissory note, mortgage, guaranty of payment and performance as provided herein, assignment of leases, contracts and rentals, security agreement, financing statements, the Ground Lease Estoppel, the Intercreditor Agreement and such other agreements, instruments, certificates and documents as is customary for priming loans of this nature or that Lender or its counsel may require to evidence and secure the Loans (collectively, the "Loan Documents"), all in form, enforceability and content satisfactory to the Lender and its counsel, in its sole and absolute discretion. Without limiting the foregoing, the Loan documents shall: (i) prohibit any sale, assignment, pledge, transfer, mortgage or other encumbrance, or any contract to do any of the foregoing, of all or any portion of the Property without the prior written consent of the Lender, and (ii) prohibit any change in the ownership or management of any Borrower or in the management of the Property or the from the Hotel Manager, or any change in the Franchisor, in each case without prior written consent of the Lender. The Loan is subject to the negotiation, execution and delivery of all such definitive Loan Documents, in each case in form, substance and enforceability satisfactory to the Lender in its sole and absolute discretion and shall be reasonable and customary for transactions of this type. The Borrower must be satisfactory to the Lender and must be owned or controlled by the constituents of the Applicant.

8. Survey. Current accurate prints of survey certified to the Lender and the title insurer, made by a registered land surveyor in the State of New York, acceptable to Lender containing a detailed legal description of the Property which coincides with that contained in the title policy, clearly setting forth bearings and dimensions and location of boundary lines as well as the dimensions and location of all lots at the Property, improvements, streets, accesses, easements, encroachments and setbacks and containing such certifications as the Lender may require.

---

61 Broadway, Suite 1060, New York, New York 10006 (T) 212.379.1250 (F) 212.379.1251
www.strategiccapitalsolutions.com

SCS Initials _____    Applicant Initials _____

9.  Title Insurance. An ALTA mortgagee title insurance policy covering the Property constituting the Collateral issued by a title insurance company acceptable to the Lender in the amount of the Loan containing only such exceptions as are approved by the Lender (in its sole discretion and in all respects) and containing such endorsements as the Lender may require. The title policy shall (i) show Borrower to be vested with valid marketable leasehold interest in and to the Hotel, free and clear of all defects, liens, encumbrances, or exceptions, except for maters as may be acceptable to the Lender; (ii) insure the mortgage, deed of trust or deed to secure debt to be a valid first lien on the fee simple title to the Property in the full amount of the Loan, with priority to all existing liens, (iii) contain no exceptions as to mechanic's and materialmaens' liens survey matters or any other matters not acceptable to the Lender; and (iv) insure all access and other easements necessary for the use of the Property. Standard exceptions relating to persons in possession, and survey matters shall be deleted. Legible copies of all easements, rights of way, and other matters affecting title to or use of the Property shall be submitted to the Lender prior to the Closing for its review, and all such matters must be acceptable to the Lender. A commitment shall be delivered to the Lender prior to Closing and the final policy shall be delivered to Lender within ten (10) days of Closing. Borrowers shall pay all costs related to the issuance of the title insurance commitment, policy, and endorsements.

10. Lien search. There shall be performed (i) a UCC search on the chattels and other personal property covered by the Lender security agreement, and such search shall have revealed no prior financing statements thereon; and (ii) a search of all judgment liens and lis pendens records with respect to each Borrower, the Guarantor and the Property.

11. Taxes. Payment of all Property taxes and assessments applicable to the Property shall be made at Closing and shall be appropriately prorated. Such amounts shall be provided from Loan Proceeds as set forth herein.

12. Opinions of Counsel. Opinions of counsel for Borrower and Guarantors addressing such legal issues concerning the Loan as the Lender or its counsel may require, in their sole discretion, including, without limitation, that the organizational documents of Borrower are valid and that the Borrower is in good standing in the State of New York and any other states in which such standing is required, due authorization for the execution and delivery of the Loan Documents, and the enforceability thereof, and compliance with zoning, land use and environmental laws, and the matters set forth above.

13. No Adverse Change. Prior to the Closing, the Lender shall not have discovered any information which it, in its sole discretion, believes is negative information with respect to the condition (financial, physical or otherwise), business, operation, financials, assets, liabilities or prospects of the Borrower or the Guarantor, or relating to or in respect of the Property, the Ground Lease or the Collateral, the Borrower's Plan, the proposed use of funds, the economic value, business assets, liabilities, or results of operations of the Borrower or any constituent of the Applicant or any Guarantor or any property securing the Loan, or any other matter relating to any of the foregoing. In addition, the Ground Lease shall be and remain in full force and effect, and there shall exist no breaches, violations or defaults thereunder (and no breaches, violations or defaults that with notice or the application of time, or both, will exist). Applicant shall provide SCS with copies of any and all motions, filings, documents or



61Broadway, Suite 1060, New York, New York 10006  (T) 212.379.1250  (F) 212.379.1251
www.strategiccapitalsolutions.com

SCS Initials_____                                    Applicant Initials_____

briefs filed by any person or party in connection with the Bankruptcy Proceeding, from time to time and immediately upon its receipt of notice of, or Applicant'/s filing of, any such motions, filings, documents or briefs, including, without limitation, a copy of the motions and filings that are made in connection with the Plan and this Conditional Commitment. The Closing of the Loan is subject to satisfactory site inspection by representative of the Lender within 15 days prior to the date of the Closing.

14. Financials.  The Lender shall receive monthly financial statements (or changes thereto) for the Hotel, including, without limitation, balance sheets, income statements and statements of cash flow, for each calendar month period commencing October 2010 through the date of the Closing, and such financial statements shall be reasonably satisfactory to the Lender and be in accordance with representations made to the Lender in respect of the financial condition of the Hotel during all such periods.   In addition, Lender shall receive, within fifteen (15) days following the date of this Conditional Commitment, monthly projections for the 12 month period from the Closing Date, and quarterly projections thereafter, through the period ending December 31, 2015, as well as a pro forma balance sheet dated on and as of the Closing (and assuming the Closing of the Loan and the effectiveness of the Plan), in each cash satisfactory to the Lender in all respects in its sole and absolute discretion, and any modifications, supplements or changes to such financial projections and pro forma balance sheet shall be provided to the Lender no later than the date which is the earlier of (1) any date in which such information is either filed with the Bankruptcy Court or otherwise provided in connection with the Bankruptcy Proceeding to any third party (under or pursuant to a court order or otherwise) and (2) within five (5) business days following the end of each calendar month. All such projections and statements shall provide for the Loan, the payments to be made thereunder, any payments to be made under the Plan or the Order from the Loan, from operating income or any other sources. The projections shall show, to the Lender's reasonable satisfaction that all payments required under the Plan or the Order, the Loan, and to operate the Hotel, can be paid, timely and when due, from Loan proceeds, operating income or any other source or as may otherwise be required or set forth in the Plan or the Order, and that the Company will be reasonably expected to have at all times from the date hereof through the Closing Date and at all times in which the Loan may be outstanding, the requisite cash flow necessary to cover the operating expenses needed to be made and fund the Reserves required to be funded, in each cash when due to prudently operate the Hotel. The Lender shall receive personal financial statements of each Guarantor, in form reasonably acceptable to the Lender, dated on and as of no more than 30 days of the Bankruptcy Court Approval Date and the Closing Date.

15. Borrower Cash Equity. Borrower shall pay the Borrower Portion of the Commitment Fee as required herein.

16. Reserves.  All reserves required to be established and/or funded as required hereby having been so established.

17. Renovation Funds. Funds allocated for renovations will be disbursed, as necessary for approved costs, against appropriate documentation therefor, following inspections and monitoring, all to be detailed in the Loan Documents.

18. Bankruptcy Court Approval.  Bankruptcy Court Approval shall have been received, with due

---

61 Broadway, Suite 1060, New York, New York 10006  (T) 212.379.1250  (F) 212.379.1251
www.strategiccapitalsolutions.com

SCS Initials _____                          Applicant Initials_____

evidence thereof reasonably satisfactory to the Lender and its counsel, as required herein, within the time periods stated and required herein. In addition, any motion, notice, action or Plan filed or to be filed from time to time by the Borrower in connection with the Bankruptcy Proceeding, shall be consistent with and not in any way in contradiction of the requirements, terms and conditions set forth in this Conditional Commitment, and the Lender's obligations hereunder shall be subject to its review and approval of all such Filings and the Plan (including as the same may be modified, supplemented or amended from time to time). The Plan and the Order shall be in accordance with, and shall not in any way contravene the terms, conditions, or requirements of this Conditional Commitment,. The Order required hereby shall be entered and shall remain in full force and effect, without any modifications not expressly agreed to by the Lender in writing.

19. Hotel Management shall be vested in the Hotel Managers, or an entity owned or controlled by or otherwise affiliated with the Guarantors.

20. Food and Beverage. The Food and Beverage shall have been re-established and re-opened and be made fully operational by the Closing Date with twenty-four (24) hour room service, established dinning services, and catering services such as, and to the extent which was in place prior to September 30, 2010.

21. IHG and Union Litigation. All litigation and claims between IHG and the Borrowers, Applicants or the Guarantors, with respect to the Property, shall have been fully and finally settled in all respects and upon terms and conditions reasonably acceptable to the Lender and its counsel. All litigation and claims between the Borrower, the Applicants or the Guarantors and the various unions shall have been settled in all respects and upon terms and conditions reasonably acceptable to the Lender and its counsel in all respects. The Lender confirms that at the request of the Applicant, the amount of $150,000 is being budgeted from Loan Proceeds to pay for all or a portion of any such settlements with the Unions.

22. Other Matters. Such other matters or items as Lender or its counsel may reasonably require including, without limitation, any conditions set forth in this Conditional Commitment, or which are customary in connection with transactions of the nature contemplated hereby. Lender will have the option of withholding Loan disbursements until all such conditions or special conditions which Lender's counsel deems necessary have been complied with to the Lender's satisfaction. Borrower shall furnish Lender any and all other information, documentation, opinions and assurances with respect to the proposed transactions contemplated hereby as the Lender or its counsel shall request.

**FINANCIAL COVENANTS:**

Financial Reporting Requirements.

i.    Borrower shall furnish to the Lender, within ninety (90) days of its fiscal year end, audited financial statements prepared in accordance with generally accepted accounting principles by a firm of certified public accountants acceptable to Lender. Guarantors shall each submit Personal Financial Statements, prepared on form reasonably acceptable to the Lender, within 90 days of each calendar year end.

---

ii.   Financial statements and federal income tax returns for the Borrower and the Guarantor for the tax period ended 2010, 2011, 2012 and for any periods thereafter in which the Loan remains outstanding shall be furnished to Lender within thirty (30) days of filing such return.

iii.  Internally-generated statements of the Borrower, to include monthly income statements and balance sheets (historical and projected), comparisons to budget, receivables and payables aging schedules, and inventory schedules, to be provided monthly within 15 days of month end.

iv.   Lender or its agents to have right to conduct field audits and inspections at Borrower's expense.

v.    Lender may also require such other financial statements, as Lender deems appropriate.

Other Covenants.   Borrower shall comply with the following additional requirements during the Term of the Loan:

- Borrower shall not pay any dividends or make any distributions, nor shall it make any payments to any subordinated creditor including, without limitation, any of the existing liens (except to the extent expressly permitted by Lender).

- Borrower will not, during the term of the Loan, create, incur, assume or suffer to exist, any mortgage, deed of trust, pledge, lien, security interest, charge or encumbrance on any of its property or assets, nor will it file, or permit to be filed, any financing statement naming it as a debtor.

- Borrower shall provide, at the Lender's request, and from time to time, such reports and information relating to the Property securing the Loan as the Lender may require, including, without limitation, STR reports, competitive and market information, any information relating to the condition of the Property or the operations of the Hotel, and copies of all filings made by any party in the Bankruptcy Proceeding.

- Lender shall have the right, at Borrowers' sole cost and expense, at any time and from time to time, to inspect the Collateral and or the Property, to be detailed in the Loan Documents.

- No plan of reorganization or liquidation that impairs Lender's interests may be confirmed without Lender's prior written consent or over Lender's objection, unless Lender is paid in full.

- Except as may be set forth in the Order, Borrower shall be in compliance with all contracts and leases.



## ENVIRONMENTAL ISSUES:

Borrower shall be required to certify, prior to Closing, compliance with all environmental regulations and/or requirements of local, state, or federal government. Evidence of said compliance in such form as Lender may request shall be submitted to Lender as soon as practicable prior to the Closing, including any certifications, orders and/or letters of the State of New York Department of Environmental Protection or any other applicable regulatory authority. Lender reserves the right to disapprove the Loan if Lender is not satisfied with evidence of compliance with environmental laws.

Borrower expressly represents to Lender that neither the Property nor any portion thereof has in the past been used, is presently being used, and will not in the future be used for the handling, storage, transportation, or disposal of hazardous or toxic materials other than incidental use of small quantities of such materials commonly used in commercial operations, all of which use has been in full compliance with all applicable laws and regulations. Borrower and Guarantors each, jointly and severally, agree to indemnify, defend, and hold Lender harmless from and against any loss to Lender as a result of past, present or future transportation, or disposal of hazardous or toxic materials and/or noncompliance with environmental laws or orders of any environmental regulatory authority.

## NONASSIGNABILITY; NO THIRD PARTY BENEFICIARY:

This Conditional Commitment is issued solely for the benefit of Applicant and only for the purposes described herein, and may not be assigned by the Applicant under any circumstances whatsoever, and no other person(s) or party(ies), including, without limitation, any Guarantor or existing creditor of any constituent of the Applicant, Borrower (except following Bankruptcy Court Approval) or any Guarantor, shall be a beneficiary hereof or have any rights hereunder, and no rights are conferred upon any other person(s) or party(ies), whether or not their name may be used or otherwise identified herein.

## LENDER NOT A JOINT VENTURER:

Lender shall not be deemed to be a partner or joint venturer with any constituent of the Applicant, the Guarantors or the Borrower or any other parties. Each constituent Applicant and the Borrower, jointly and severally, will indemnify and hold Lender harmless from and against any and all liabilities, damages, claims, demands, costs, expenses and attorneys' fees resulting from such a construction of the relationship of the parties.

## COSTS AND EXPENSES:

Each constituent of the Applicant shall reimburse SCS for all expenses incurred in connection with the transactions contemplated in this Conditional Commitment regardless of whether or not the transaction contemplated herein actually closes. Without limiting the generality of the foregoing, other than as may otherwise be expressly set forth herein, all legal fees and attendant expenses incurred by Lender (including, without limitation, SCS) relating to the Loan, including, without limitation, fees relating to preparation of Loan Documents, Loan Closing fees and Closing Costs and fees for post-closing services shall be paid by and be the sole responsibility of

each constituent of the Applicant, regardless of whether the Loan is Closed or funded. Notwithstanding anything to the contrary contained herein, each constituent of the Applicant's obligation to reimburse SCS for all costs and expenses as provided herein shall survive the expiration or termination of this Conditional Commitment. Additionally, Applicant shall seek (or shall cause Borrower to seek) Bankruptcy Court approval for the allowance and immediate payment of all out-of-pocket costs and expenses (including, without limitation, all fees and expenses of counsel) associated with the Loan as administrative expenses; provided, however, that if Applicant fails to file satisfactory pleadings in the Bankruptcy Court within five (5) days of SCS's request for such Bankruptcy Court approval, SCS may do so (but is not obligated to do so), all in it sole and absolute discretion.

## GOVERNING LAW; INTERPRETATION:

This letter shall be governed by and construed in accordance with the laws of the State of New York, without reference to the conflict of laws provisions thereof. The parties hereby irrevocably and unconditionally consent to: (i) the irrevocable designation of the Secretary of State of the State of New York upon whom process may be served in connection with any dispute arising out of, or in connection with, this Agreement or the performance of the transactions contemplated hereby; (ii) personal jurisdiction in any action brought in any court, federal or state, within the State of New York having subject matter jurisdiction arising under this Agreement, and (iii) venue in any court, federal or state, located in the City of New York, New York. The headings of sections and paragraphs hereof are for convenience only and shall not be construed in any way to limit or define the content, scope, or intent of the provisions hereof. As used herein, the singular shall include the plural and masculine, feminine, and neuter pronouns shall be fully interchangeable, where the context so requires. As used herein, "hereof", "hereby", "hereunder", "herein" and words of like import shall be deemed to refer to this Conditional Commitment in its entirety and not just a particular paragraph or section of this Conditional Commitment. If any provision hereof, or any paragraph, sentence, clause, phrase or word, or the application thereof, in any circumstances, is adjudicated to be invalid, the validity of the remainder of this letter shall be construed as if such invalid part were never included herein. Time is of the essence for any and all dates and times set forth in this Conditional Commitment.

## MODIFICATION:

This letter embodies the entire agreement among the parties. No modification or amendment shall be made by the Borrower in any manner set forth herein except by a written instrument executed by the parties.

Neither the Borrower nor any constituent of the Applicant nor any constituent of the Guarantors may maintain any action against Lender (including, without limitation, SCS) on this Conditional Commitment, or any agreement to lend money, extend credit, or forebear from collection of a debt, or make any other accommodation for repayment of a debt for more than the actually paid amount of the Commitment Fee from such person under any circumstances, whatsoever, including, without limitation, any failure to fund or Close the contemplated Loan as set forth herein and subject to the terms and conditions hereof. **THE LENDER (INCLUDING, WITHOUT LIMITATION, SCS) SHALL HAVE NO LIABILITY TO APPLICANT, BORROWER OR GUARANTORS, OR ANY OTHER PERSON OR ENTITY, UNDER ANY THEORY OF LAW OR EQUITY FOR ANY AMOUNT IN EXCESS OF THE**

SCS Initials _____

Applicant Initials _____

ACTUALLY PAID PORTION OF THE COMMITMENT FEE, LESS COMPENSATION FOR ACTUAL AND REASONABLE EXPENSES. APPLICANT, BORROWER AND GUARANTOR EACH HEREBY, JOITNLY AND SEVERALLY, ACKNOWLEDGES THAT THIS LIMITATION OF DAMAGES CLAUSE IS REAONSBALE. APPLICANT, BORROWER AND GUARANTOR EACH AGREE, JOINTLY AND SEVERALLY, NOT TO PURSUE ANY CLIAM IN EXECESS OF THE ABOVE SUM. If the Lender (including, without limitation, SCS) does not perform its obligations under the terms of this Conditional Commitment that it is required to perform hereunder for any reason or otherwise breaches the terms of this Conditional Commitment for whatever reason, the Lenders' (including, without limitation, SCS) sole obligation shall be to refund the actually paid portion of the Commitment Fee, less actual expenses. **SAID REFUND SHALL BE THE TOTAL EXTENT OF ANY LIABILITY OR OBLIGATION ON THE PART OF THE LENDER (INCLUDING, WITHOUT LIMITATION, SCS) UNDER ANY AND ALL CIRCUMSTANCES WHATSOEVER. THERE WILL BE NO REFUND IF THE BORROWER OR THE APPLICANT OR THE GUARANTOR FAILS TO COMPLY WITH ALL OF THE CONDITIONS SET FORTH HEREIN.**

JURY TRIAL; VENUE:

Applicant, Borrower and each Guarantor hereby expressly and unconditionally and irrevocably waives any claim or right to trial by jury in any suit, action, proceeding, cross-claim or counterclaim brought based upon, arising out of, or connected herewith or hereunder or any other document executed in connection with the Loan, including, without limitation, the Loan Documents and the obligation, the collateral or any related transaction.

**BORROWER, APPLICANT AND GUARANTOR EACH UNDERSTAND THAT SCS CAN NOT AND WOULD NOT ENTER INTO THIS LETTER WITHOUT APPLICANT'S, BORROWERS', APPLICANT'S AND THE GUARANTOR'S AGREEMENT TO THE LIMITATION OF DAMAGES, CHOICE OF LAW, CHOICE OF FORUM AND WAIVER OF TRIAL BY JURY CLAUSES CONTAINDED HEREIN.**

EXCLUSIVITY:

Upon Applicant's acceptance of this Conditional Commitment through and including the Commitment Termination Date, or for so long as SCS is proceeding in good faith towards Closing, Applicant and Guarantors each (on their own behalf and on behalf of each of their respective affiliates) agrees to work in good faith, exclusively with SCS with respect to the transactions contemplated herein (such period being herein referred to as the "Exclusive Period"). During the Exclusive Period, Applicant and Guarantors each (on their own behalf and on the behalf of each of their respective affiliates) agrees to cease, and not to initiate or entertain any and all discussions, negotiations, due diligence or other efforts with all other parties concerning any type of financing or transaction which may be an alternative to the one contemplated herein (including, but not limited to, any alternative debt or equity financing with another party).



**BREAK-UP FEE:**

If at any time during the Exclusive Period, (a) Applicant or any of the Guarantors, or any of their respective affiliates causes (or continues), or Applicant or any of the Guarantors or any of their affiliates causes the Borrower to commence, negotiation of a transaction which may be an alternative to the one contemplated herein (including, but not limited to, an alternative debt or equity financing with another party); (ii) Applicant or any of the Guarantors, or any of their respective affiliates accepts, or Applicant or any of the Guarantors or any of their affiliates causes the Borrower to accept, an alternative debt or equity financing proposal, agreement, proposal letter or commitment from another party; (iii) Applicant or any of the Guarantors, or any of their respective affiliates, or Borrower notifies SCS that Borrower intends to proceed with alternative debt or equity financing in lieu of the Loan contemplated herein; (iv) Applicant or any of the Guarantors, or any of their respective affiliates, or Borrower makes a material misrepresentation to SCS; (v) the Property is sold; or (vi) Applicant or any of the Guarantors, or any of their respective affiliates, or Borrower otherwise breaches the provisions of the paragraph entitled "Exclusivity" above, then each constituent of the Applicant and, subject to the next succeeding sentence, the Borrower, jointly and severally, agree they will pay SCS a fee (the "Break-up Fee") equal three and one-half of one (3.5%) percent of the maximum Loan Amount, plus reimbursable costs and expenses. The Break-up Fee shall survive termination of this Conditional Commitment. Anything set forth above to the contrary notwithstanding, SCS (on behalf of itself and the Lender) hereby confirms that it understands and agrees that the Borrower shall not be responsible to pay the Break-Up Fee, and the Break-Up Fee shall not otherwise be applicable, if the Plan is not confirmed.

**TERMINATION:**

This letter and transactions contemplated hereby, including, without limitation, the contemplated Loan, and any and all of the obligations of the Lender (including, without limitation, SCS) set forth herein may be immediately terminated SCS on behalf of the Lender at any time and without notice upon the occurrence of any of the following events:

A.  Any change in the condition (financial or otherwise) of Borrower, the Guarantor, their respective business or operations, assets, liabilities, the Property, or the prospects thereof or relating thereto, or the Ground Lease, any other negative information discovered by the Lender, in each case on or subsequent to the date hereof, which is, in the sole discretion of Lender, adverse;

B.  If any statement or representation made by either Applicant, Borrower or the Guarantor herein or in support of the Loans shall prove untrue or if either Applicant, Borrower or the Guarantor shall be unable to fulfill any conditions to closing set forth herein;

C.  Any failure to pay the Commitment Fee set forth herein as, when and to the extent required herein, which time is of the essence;

D.  Any failure to obtain Bankruptcy Court Approval and the entry of the Order prior to the Outside Required Court Approval Date; or the filing by the Borrower of any Filings or Plan of Reorganization in the Bankruptcy Proceeding that is not in

---

61Broadway, Suite 1060, New York, New York 10006  (T) 212.379.1250  (F) 212.379.1251
www.strategiccapitalsolutions.com

**SCS Initials** _____                    **Applicant Initials** _____

accordance with or that contradicts the terms, conditions or requirements set forth in this Conditional Commitment.

E. Any breach by the Applicant or the Borrower of its representations, warranties, covenants or agreements set forth herein, including, without limitation, the Exclusivity Provisions hereof;

F. Any conversion of the Bankruptcy Proceedings to a Chapter 7 proceeding, or any sale of the Property (including, without limitation, the Hotel), or all or any of the assets of thereof or relating thereto.

G. Any order granting relief from the provisions of the Automatic Stay under the Bankruptcy Code.

H. If the Ground Lease is rejected by the Borrower, or is otherwise terminated, or in violation, breach or default, or is no longer, or after notice or the passage of time or both will no longer be or remain, in full force and effect.

I. If the Property is sold prior to the Commitment Termination Date.

**ANY TERMINATION OF THIS CONDITIONAL COMMITMENT SHALL NOT AFFECT LENDER'S RIGHTS TO ENFORCE THE PROVISIONS HEREOF RELATING TO PAYMENT OF THE COMMITMENT FEE, THE BREAK-UP FEE (UNLESS, WITH RESPECT TO THE BORROWER, THE PLAN IS NOT CONFIRMED) AND/OR PAYMENT OR REIMBURSEMENT OF ITS COSTS AND EXPENSES, INCLUDING ATTORNEYS' FEES AND EXPENSES, WHICH RIGHTS SHALL SURVIVE ANY SUCH TERMINATION. THE LENDER SHALL HAVE NO OBLIGATIONS UNDER THIS CONDITIONAL COMMITMENT WHATSOEVER, UNDER ANY THEORY OF LAW OR EQUITY, UNLESS AND UNTIL THERE EXITS AN ORDER AND BANKRUPTCY COURT APPROVAL AS SET FORTH HEREIN AND AS REQUIRED HEREBY AND THE TERMS AND CONDITIONS HEREOF ARE APPROVED BY THE BANKRUPTCY COURT.**

**MISCHELLANEOUS:**

The Applicant, the Borrower and the Guarantors, each hereby, jointly and severally, acknowledge, understand and agree that the preceding terms and conditions are not exhaustive, and this letter is subject to other terms and closing conditions customarily required by the Lender for similar loans (including, without limitation, late charges, due on sale and due on encumbrance clauses, default interest, financial covenants, restriction on transfer of all or part of the Collateral, any interest in the Collateral or Borrower, and restriction on further liens or encumbrances on the Collateral, and any and all other items which Lender or its counsel may, in their sole discretion, deem necessary or required in connection with the contemplated Loan). SCS intends to obtain participants for all or part of this contemplated Loan, or assign, transfer, syndicate, pledge or arrange all or part of the contemplated Loan, at any time, prior to or at the Closing of the contemplated Loan, to, with or through third parties, all in its sole and absolute discretion, and funding and closing of the Loan is expressly conditioned upon SCS's success and/or ability in

that regard. The Lender's obligations are conditioned upon the fulfillment, to the Lender's sole satisfaction, of each term and condition referenced herein or in the Loan Documents. This letter is not intended to set forth all of the terms and conditions of the Loan Documents.

**THE INTERESTS OF THE APPLICANT, THE BORROWER, THE GURANTORS AND THE LENDER ARE OR MAY BE DIFFERENT AND MAY CONFLICT, AND THE LENDER'S ATTORNEY REPRESENTS ONLY THE LENDER AND NOT APPLICANT, THE BORROWER OR ANY GUARANTOR AND THE APPLICANT, THE BORROWER AND THE GUARANTORS ARE EACH, THEREFORE, ADVISED TO EMPLOY AN ATTORNEY OF THEIR CHOICE LICENSED TO PRACTICE LAW IN THE STATE OF NEW YORK TO REPRESENT THE INTERESTS OF THE APPLICANT, THE BORROWER AND THE GUARANTORS.**

ACCEPTANCE:

**If the terms and conditions contained herein meet with your approval, please indicate your acceptance by signing and returning an original hereof by 5 p.m. Eastern Standard Time on March 7, 2011, at which point this Conditional Commitment shall expire.** Any failure to do so shall be deemed as a voluntary refusal by you to enter into the proposed transaction and the terms hereof shall therefore be null and void in any and all respects.

By acceptance of this letter, Applicant, Borrower and Guarantors each acknowledge, understand and agree that this letter is an outline of the principal understandings, which are anticipated to b the basis for the terms of the final Loan. As a result of further investigation, information may come to Lender's attention of which it is not now aware which could preclude a Closing or as a result of which Lender may require that the Loan and the terms contemplated hereby be restructured or otherwise modified or decline to provide, Close or fund the contemplated Loan or any financing.

<div align="center">[THE REST OF THIS PAGE IS INTENTIONALLY LEFT BLANK]</div>

This letter is for the benefit of Applicant only and may not be relied upon by any third party, under any circumstances whatsoever.

Very truly yours,

SCS-STRATEGIC CAPITAL SOLUTIONS, LLC,
a New York limited liability company

By: Strategic Capital Holdings, LLC,
a Florida limited liability company

By: Strategic Capital Solutions, LLC,
a New York limited liability company

By: _____
Name: Edward O. Mehrfar
Title: Managing Member

ACKNOWLEDGED AND AGREED TO
as of this ___ day of March, 2011:

APPLICANT:

_____
Charles Morais

_____
Sunil Mir

GUARANTORS:

_____
Charles Morais

_____
Sunil Mir

**Schedule I**
**PRELIMINARY SOURCES AND USES OF FUNDS**

| Uses of Funds | Sponsor Plan | Paid At Closing From Loan Proceeds | Holdback From Loan Proceeds | Applicant/Borrower |
|---|---|---|---|---|
| Plasma TVs for the Rooms: 190 X $750 ea. | $142,500 | | $142,500 | |
| Renovation Reserve | $300,000 | | $300,000 | |
| Real Estate Taxes Owing Jun- Oct 2010 | $210,000 | $210,000 | | |
| Real Estates Tax from Oct 2010 - Dec 2010 | $210,000 | $210,000 | | |
| Real Estate Tax Reserve Jan 2011 -June 2011 | $420,000 | | $420,000 | |
| Real Estate Tax Reserve Jul 2011 - Dec 2011 | $420,000 | | $420,000 | |
| Land Lease Owed Jun-Dec 2010 | $385,000 | $385,000 | | |
| Sheraton/Radisson Upfront Franchise fee Reserve | $125,000 | | $125,000 | |
| Franchise Fee Reserve, 2 mo X 10% of Rm Rev. | $120,907 | | $120,907 | |
| Ground Rent Reserve, 6 mo X $55,000 per Month | $330,000 | | $330,000 | |
| Parking Rent Reserve, 6 mo X $10,000 | $60,000 | | $60,000 | |
| Mortgage Recording Tax (2.7% of the Loan Amount) | $125,910 | $125,910 | | |
| Title Insurance Cost | $4,663 | $4,663 | | |
| Borrower Legal Fees/Administrative Fees | $150,000 | $150,000 | | |
| Mechanic's Liens | $0 | | | |
| Tax Liens (NY State) | $300,000 | $300,000 | | |
| Union Settlement Payment | $150,000 | $150,000 | | |
| City of New York Fire Depart. (Fee) (Sponsor Equity) | $0 | | | |
| NYC Department of Environ. Protection (Fee) | $0 | | | |
| Elevator Inspection Fee | $0 | | | |
| Utility Payments Due | $0 | | | |
| Lender Misc Closing Costs (i.e. Legal, Third Party, etc.) | $100,000 | $100,000 | | |
| Working Capital/Liquidity Reserve | $200,000 | | $200,000 | |
| SCS Origination Fee, % of Loan Amount | $139,900 | $139,900 | | |
| Commitment Fee, % of Loan Amount | $93,267 | $0 | | $93,267 |
| Interest Reserve (12 Months) | $769,449 | | $769,449 | |
| **Total Uses of Funds** | **$4,756,596** | **$1,775,473** | **$2,887,857** | **$93,267** |
| **Sources of Funds** | | | | |
| **Debt:** | | | | |
| SCS Financing Funded At Closing | $1,775,473 | | | |
| SCS Financing (Holdbacks/Reserves) excl. Int. Reserve | $2,118,407 | | | |
| SCS Financing (Interest Reserve) | $769,449 | | | |
| **Total SCS Financing** | **$4,663,330** | | | |
| **Equity:** | | | | |
| Commitment Fee | $93,267 | | | |
| **Total Equity** | **$93,267** | | | |
| **Total Sources of Funds** | **$4,756,596** | | | |

61Broadway, Suite 1060, New York, New York 10006  (T) 212.379.1250  (F) 212.379.1251
www.strategiccapitalsolutions.com

SCS Initials 

Applicant Initials_____

**EXHIBIT "D"**     To Be Submitted

**EXHIBIT "E"**



Smart·*by*·Design®

February 24, 2011

Sunil Mir
JFK Plaza Hotel
151-20 Baisley Blvd
Jamaica, NY 11435

RE:    JFK Plaza Hotel Conversion to Red Roof Inn

Dear Mr. Mir:

Thank you for your interest in the Red Roof Inn. We are very interested in discussing the steps
necessary to convert the JFK Plaza Hotel located at 151-20 Baisley Blvd, Jamaica, NY into a Red
Roof Inn.

I will be visiting the hotel on Tuesday, March 1 to take pictures for our franchise approval
committee to review. At that time I will provide you with our Franchise Disclosure Document
which you must hold for 14 days before you can submit an application.

Should you have any questions, please do not hesitate to contact me at 215-859-1633.

Sincerely,


Mark Sutton
Director of Franchise Development

**From:** Sunil Mir <smir@cpjfk.com>
**To:** wdrobenko <wdrobenko@cs.com>
**Cc:** cmorais <cmorais@cpjfk.com>
**Subject:** Fwd: RE: JFK
**Date:** Mon, Mar 7, 2011 3:42 pm
**Attachments:** image001.png (19K)

----- Forwarded message from John.Salvatore@starwoodhotels.com -----
    Date: Fri, 18 Feb 2011 09:59:53 -0500
    From: "Salvatore, John" <John.Salvatore@starwoodhotels.com>
  Subject: RE: JFK
      To: smir@cpjfk.com

Sunil,

Thanks for meeting us yesterday.  As we discussed, please send me the
information requested so we can continue to evaluate the opportunity
for Four Points.


best, John


From: smir@cpjfk.com [mailto:smir@cpjfk.com]
Sent: Wednesday, February 16, 2011 5:37 PM
To: Salvatore, John
Cc: Ohlsson, Chip
Subject: Re: JFK


No problem sir.

Sent on the Now Network from my Sprint® BlackBerry


From: "Salvatore, John" <John.Salvatore@starwoodhotels.com>

Date: Wed, 16 Feb 2011 17:35:30 -0500

To: <smir@cpjfk.com>

Cc: Ohlsson, Chip<Chip.Ohlsson@starwoodhotels.com>

Subject: Re: JFK


Sunil... We will be a little tomorrow... Probably around 12.

Thanks...
best regards,

john w salvatore
senior director | development
starwood hotels and resorts
914.640.8160 | 973.903.7795 cell

-------------------------
Sent using my BlackBerry

3/7/2011 4:06 PM

From: Salvatore, John
To: 'smir@cpjfk.com' <smir@cpjfk.com>
Cc: Ohlsson, Chip
Sent: Mon Feb 14 16:14:53 2011
Subject: Re: JFK

Yes...Ill be in the market this thursday around 11 and will stop by
the hotel to look around.


best regards,

john w salvatore
senior director | development
starwood hotels and resorts
914.640.8160 | 973.903.7795 cell

--------------------------
Sent using my BlackBerry



From: smir@cpjfk.com <smir@cpjfk.com>
To: Salvatore, John
Sent: Sat Feb 12 23:10:01 2011
Subject: Re: JFK

John, thank you for the star report. Could we meet anytime this week
at the hotel to tour the property. Thanks.

Sent on the Now Network from my Sprint® BlackBerry


From: "Salvatore, John" <John.Salvatore@starwoodhotels.com>

Date: Mon, 31 Jan 2011 11:05:30 -0500

To: <smir@cpjfk.com>

Subject: FW: JFK


Sunil,

Attached is the STAR report?


Best regards,

John


---------------------------------------------

John W Salvatore

SENIOR DIRECTOR, DEVELOPMENT

GLOBAL DEVELOPMENT GROUP


T 914 640 8160   M 973 903 7795   F 914 640 8485


1111 WESTCHESTER AVENUE
WHITE PLAINS, NY 10604
UNITED STATES

----------------------------------------------


This electronic message transmission contains information from the
Company that may be proprietary, confidential and/or privileged. The
information is intended only for the use of the individual(s) or
entity named above. If you are not the intended recipient, be aware
that any disclosure, copying or distribution or use of the contents of
this information is prohibited. If you have received this electronic
transmission in error, please notify the sender immediately by
replying to the address listed in the "From:" field.
This electronic message transmission contains information from the
Company that may be proprietary, confidential and/or privileged. The
information is intended only for the use of the individual(s) or
entity named above. If you are not the intended recipient, be aware
that any disclosure, copying or distribution or use of the contents of
this information is prohibited. If you have received this electronic
transmission in error, please notify the sender immediately by
replying to the address listed in the "From:" field.


This electronic message transmission contains information from the
Company that may be proprietary, confidential and/or privileged.
The information is intended only for the use of the individual(s) or
entity named above.  If you are not the intended recipient, be
aware that any disclosure, copying or distribution or use of the
contents of this information is prohibited.  If you have received
this electronic transmission in error, please notify the sender
immediately by replying to the address listed in the "From:" field.


----- End forwarded message -----

**EXHIBIT "F"**         To Be Submitted

**EXHIBIT "G"**    To Be Submitted