UNITED STATES BANKRUPTCY COURT                **NOT FOR PUBLICATION**
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re

      CPJFK, LLC,

              Debtor.
---------------------------------------------------------x

Chapter 11

Case No. 10-50566-CEC

### <u>DECISION</u>

APPEARANCES:

Alan Nisselson, Esq.
Windels Marx Lane & Mittendorf LLP
156 West 56th Street
New York, NY 10019
Chapter 11 Trustee

Howard Simon, Esq.
Windels, Max, Lane & Mittendorf, LLP
156 West 56th Street
New York, NY 10019
Attorneys for Chapter 11 Trustee

Walter Drobenko, Esq.
Drobenko & Associates, LLC
25-84 Steinway Street
Astoria, NY 11103
Attorneys for Debtor

Fred B. Ringel, Esq.
Robinson Brog Lenwand Genovese
   & Gluck P.C.
875 Third Avenue, 9th Floor
New York, New York 10022
Attorneys for Neshgold, LP

Norman N. Kinel, Esq.
Lowenstein Sandler PC
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
Attorneys for The New York Hotel & Motel
Trades Council, AFL-CIO and the Hotel
Trades Council and Hotel Association of New
York City, Inc. Employee Benefit Funds

Barry N. Saltzman, Esq.
Pitta & Giblin, LLP
120 Broadway, 28th Floor
New York, New York 10271
Attorneys for The New York Hotel & Motel
Trades Council, AFL-CIO and the Hotel
Trades Council and Hotel Association of New
York City, Inc. Employee Benefit Funds

William E. Curtin, Esq.
Office of the U.S. Trustee
United States Bankruptcy Court
Eastern District of New York
271 Cadman Plaza East, Room 4529
Brooklyn, NY 11201

CARLA E. CRAIG
Chief United States Bankruptcy Judge

This matter comes before the Court on the Trustee's motion to approve the sale of substantially all of the property of CPJFK, LLC ("CPJFK" or "Debtor"), to Neshgold, LLP ("Neshgold"), a secured creditor holding an allowed claim secured by the assets which are the subject of the sale. The assets being sold consist primarily of an operating hotel known as the JFK Plaza Hotel (the "Hotel"), located at 151-20 Baisley Boulevard, Jamaica, New York, and the ground lease for the Hotel premises (collectively, the "Hotel Property").

This motion is the last stage in a sales process that began in January, 2011. The only party in interest objecting to the sale is the Debtor, which was displaced from management of the Hotel Property when the Trustee was appointed on November 19, 2010; the other parties in interest that have appeared in this case, i.e., Neshgold; the lessor under the ground lease; and the Hotel Trades Council and Hotel Association of NYC Inc. Employee Benefit Funds, The New York Hotel & Motel Trade Council, AFL/CIO (the "Union and Fund Creditors"), favor the sale.

For the following reasons, the Debtor's objections to the sale are overruled, and the Trustee's motion to approve the sale is granted.

Jurisdiction

This Court has jurisdiction of this core proceeding under 28 U.S.C. §§ 1334(b) and 157(b)(N), and the Eastern District of New York standing order of reference dated August 28, 1986. This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

<u>Factual and Procedural Background</u>

This case was commenced by the filing of a voluntary petition under Chapter 11 of Title 11, U.S.C. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Georgia on October 4, 2010.   On November 10, 2010, the case was transferred to the Eastern District of New York, where the Hotel Property is located.

On November 12, 2010, Neshgold made a motion by order to show cause seeking the appointment of a chapter 11 trustee, based on allegations of pre-petition and post-petition mismanagement of the Hotel Property by the Debtor's principals, including unauthorized use of Neshgold's cash collateral to pay pre-petition and post-petition expenses of the Debtor, its principals, Sunil Mir and Charles Morais, and non-debtors; failure to segregate hotel occupancy, sales and employment taxes; and failure to comply with orders of the United States Bankruptcy Court for the Northern District of Georgia which required the Debtor to provide proof of payment of post-petition payroll taxes, and to file a notice containing disclosure of post-petition income and expenses.  (ECF No. 58, 59.)[1]  After an evidentiary hearing held on November 19, 2010, an order was entered directing the appointment of a Chapter 11 trustee pursuant to 1104 of the Bankruptcy Code.[2]

On November 24, 2010, an order was entered approving the appointment of Alan Nisselson (the "Trustee") as chapter 11 trustee in this case.  (ECF No. 77.)  On December 3, 2010, the Debtor filed a motion to vacate the order appointing the Trustee under Rules 9023 and 9024 of the Federal Rules of Bankruptcy Procedure, and to remove the Trustee pursuant to Section 1105 of the Bankruptcy Code.  (ECF No. 88.)  The hearing on that motion has been repeatedly adjourned, at the Debtor's request or with the Debtor's consent, and is currently

---

[1] References to "ECF No." are to documents filed on the electronic docket in this case, by numerical designation.
[2] Unless otherwise indicated, all statutory references herein are to the Bankruptcy Code, Title11 U.S.C.

scheduled for May 2, 2011.  The Debtor has withdrawn the aspect of the motion that seeks to

reconsider or vacate the order appointing the Trustee under Rules 9023 and 9024.  (ECF No.

217.)

In early January, 2010, the Trustee filed motions pursuant to section 363 of the

Bankruptcy Code, seeking authorization to use Neshgold's cash collateral to operate the Hotel

Property, and seeking approval of sale procedures and terms of sale for substantially all of the

Debtor's assets.  (ECF Nos. 116, 119.)  The Trustee explained in these motions that a prompt

sale of the Hotel Property was necessary because no realistic possibility of reorganizing the

Debtor existed; even after efforts to reduce expenses and increase revenue, the operations of

the Hotel Property simply did not generate sufficient revenue to pay current administrative

obligations, including debt service to Neshgold, rent due on the ground lease, payments due to

the Union and Fund Creditors, and real estate taxes.  In order to operate the Hotel Property,

therefore, the Trustee needed Neshgold's permission to use its cash collateral, because

adequate protection could not be provided to Neshgold as required by § 363(c)(2)(B) and (e).

(Tr.[3] 1/12/11 at 41.)

Following the hearing on those motions, on January 26, 2011, an order was issued

approving the use of cash collateral through March 31, 2011, which included a timetable for

marketing the Hotel Property and selling it by that date (the "Cash Collateral Order").  (ECF

No. 152.)  The Cash Collateral Order also provided that the Trustee would have a period of 90

days from December 15, 2010 to assert any claim the estate may have against Neshgold, and

that unless a claim is timely asserted, Neshgold would be released from any such claims.  The

Cash Collateral Order also provided that "no other claim shall be granted or allowed with

priority superior to or *pari passu* with the priority of the claims of [Neshgold] granted by this

---

[3] "Tr." refers to the transcript of the hearing held on the date indicated.

Order in favor of [Neshgold] while any Lender Obligation [as defined in that order] remains outstanding." (ECF No. 152 at 12, 15.)

On January 26, 2010, this Court also issued an order approving sale procedures and terms of sale for the Debtor's assets (ECF No. 153) (the "Sale Procedures Order"), which provided for the marketing of the Hotel Property by Optimum Hotel Brokerage ("Optimum"), a broker retained with Court approval by the Trustee for this purpose. (ECF Nos. 149). The Sale Procedures Order also provided for the solicitation of offers, the evaluation of these offers by the Trustee, and closing of the sale by March 31, 2011.

On February 16, 2011, the Trustee filed a motion for approval of a settlement with Neshgold pursuant to Bankruptcy Rule 9019 (the "Settlement Motion"). (ECF No. 173.) Under the proposed settlement, Neshgold agreed that $410,000 of the sales proceeds to which it would otherwise be entitled (as holder of a security interest in the assets being sold) would be used to pay administrative expenses, and that an additional $100,000 would be used to pay unsecured claims and United States Trustee fees. Neshgold also agreed that the Debtor's lease of the parking lot adjacent to the Hotel, previously held by the Debtor and currently held by an affiliate of Neshgold, would be made available to be reinstated for use with the Hotel so that it could be offered for sale with the Hotel Property. Neshgold further agreed that the amount of the secured claim that it would be allowed to credit bid would be limited to $14,500,000 (its proof of claim asserted a claim of $15,732,162.61 ), and that it would exercise its rights as mortgagee under the ground lease to facilitate the transfer of the lease to any purchaser of the Hotel Property.

In exchange, the Trustee agreed to release all claims held by the estate against Neshgold, including claims relating to the termination of the parking lot lease and claims

concerning the alleged failure of the original holder of the loan, Fortress Credit Funding III L.P., Fortress Credit Funding IV L.P. and Fortress Credit Opportunities I L.P. (collectively, "Fortress"), to fund the Debtor (which the Debtor had asserted as a counterclaim in the action to foreclose the mortgage on the Hotel Property[4]).  The Settlement Motion was supported by, among other things, the Trustee's written analysis of the merits of the claims which were being compromised.

The day before the scheduled hearing on the Settlement Motion, the Debtor filed a plan and disclosure statement, as well as an application for an order to show cause seeking to stay the sale of the Hotel Property, and to stay the hearing on the Settlement Motion.  (ECF Nos. 195, 196, 197.)  The application for a stay was opposed by the Trustee, Neshgold and the Union and Fund Creditors, who pointed out numerous impediments to confirmation of the Debtor's proposed plan, including the fact that it was premised on the Debtor obtaining financing senior to Neshgold's lien, which was prohibited under the Cash Collateral Order; that it contemplated payment of a commitment fee of $93,000 from estate funds, which the Debtor had no authority to utilize; that it provided for the assumption of the ground lease on which the Hotel is located without providing any assurance that the cure amounts under the lease would be paid.  The objecting parties also pointed out that the plan has numerous feasibility issues, in that its effectiveness is conditioned on the fulfillment of numerous conditions, including the Debtor obtaining a franchise with a reputable hotel franchisor and the Debtor accumulating sufficient funds to pay all administrative and priority non-tax claims and to make the first distribution of 10% to unsecured creditors.  (ECF Nos. 200, 209, 210)

---

[4]  On January 27, 2009, while the foreclosure action was pending, the loan was assigned to Neshgold.  (ECF No. 152 at ¶ I.)

The Debtor's application for a stay of the sale was denied because it was sought by motion and not adversary proceeding, and therefore defective pursuant to Bankruptcy Rule 7001, and because the Debtor did not satisfy the requirements to stay, or enjoin, the Settlement Motion or the pending sale. See Time Warner Cable v. Bloomberg L.P., 118 F.3d 917, 923 (2d Cir. 1997) (To obtain a preliminary injunction, a party must show "a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party.").

To the extent that the Debtor's application could be viewed as a request for an adjournment of the hearing on the Settlement Motion and the sale, that request was denied as well, because of the numerous deficiencies and contingencies in the proposed plan, and because of the absence of any funding for the operations of the Hotel Property after the expiration of the right to use Neshgold's cash collateral under the Cash Collateral Order on March 31, 2011. After an evidentiary hearing, and by order dated March 18, 2011, the Settlement Motion was granted.

<u>The Motion to Approve the Sale</u>

On March 21, 2011, the Trustee filed his Report and Request for Confirmation of the Sale of Substantially All the Debtor's Assets. (ECF No. 221.) In it he described the marketing efforts undertaken by Optimum, the Trustee's retained broker. The Trustee reported his conclusion that the highest and best bid received was Neshgold's bid for $13,850,000, and that the second highest bid was $13,000,000. The Trustee sought approval of the sale to Neshgold pursuant to § 363(b) of the Bankruptcy Code.

The Debtor filed the only objection to the Trustee's motion to approve the sale to Neshgold.  (ECF No. 233.)  The Debtor's objections may be summarized as follows:

(1) Optimum "did not properly advertise the sale in order to obtain the best price for the bankrupt estate."  (ECF No. 233 at ¶ 3.)

(2) Optimum should have obtained an appraisal of the Hotel Property.  (ECF No. 233 at ¶ 3)

(3) The sale price of $13,850,000 "shocks the conscience" because it is below the value reflected in an appraisal obtained by the Debtor.  (ECF No. 233 at ¶ 3.)

(4) The sales brochure used by Optimum in its marketing efforts was inadequate because it did not state that the parking lot adjacent to the Hotel would also be available for lease by potential purchasers.  (ECF No. 233 at ¶ 4.)

(5) The brochure should not have mentioned that the Debtor is affiliated with Kronos Hotels LLC of Georgia ("Kronos"); that this statement is false and intended to mislead potential purchasers and discredit the Debtor.  (ECF No. 233 at ¶ 5.)

(6) The sales brochure should not have stated that the Property was being offered "at a substantial discount to replacement cost," which is estimated to be $36,000,000. (ECF No. 233 at ¶6.)

(7) Optimum had a conflict of interest because of prior dealings with Neshgold. (ECF No. 233 at ¶ 7.)

At the hearing, the Debtor raised two additional objections:  first, that this Court lacks jurisdiction to approve the sale because the Debtor filed notices of appeal from the order approving the Settlement Motion, and from the Court's decision to reopen the record to permit the testimony of Optimum and to permit the Debtor to introduce appraisal evidence; and

second, that the Hotel Property cannot be sold because the ground lease on which is situated

has been rejected by operation of law.

Discussion

I.  <u>This Court Has Jurisdiction to Consider the Sale Motion</u>

The Debtor's argument that the filing of the notices of appeal from the order approving

the Settlement Motion and the decision to reopen the record, divests this Court of Jurisdiction

to consider the Trustee's motion to approve the sale of the Hotel Property has no merit.

"[T]he docketing of a notice of appeal 'ousts the district court of jurisdiction except

insofar as it is reserved to it explicitly by statute or rule.'"  <u>Toliver v. County of Sullivan</u>, 957

F.2d 47, 49 (2d Cir. 1992) (<u>quoting</u> <u>Ryan v. United States Line Co.</u>, 303 F.2d 430, 434 (2d Cir.

1962).  For this reason, a bankruptcy court is without jurisdiction to modify any orders that are

under appeal.  <u>See</u> <u>In re Duratech Industries</u>, 241 B.R. 283, 290 (E.D.N.Y. 2009).

However, in the absence of a stay pending appeal pursuant to Bankruptcy Rule 8005,

"[i]t is equally established . . . that while an appeal of an order or judgment is pending, the

court retains jurisdiction to implement or enforce the order or judgment."  <u>DiCola v. Am. S.S.</u>

<u>Owners Mut. Prot. and Indem. Ass'n (In re Prudential Lines, Inc.)</u>, 170 B.R. 222, 243

(S.D.N.Y. 1994).  <u>See also</u> <u>C.H. Sanders Co. v. BHAP Hous. Dev. Fund Co.</u>, 750 F.Supp. 67,

69  (E.D.N.Y. 1990).  The distinction between enforcing an order and expanding an order "is

most germane in the context of a Chapter 11 bankruptcy case which involves the court's

issuance of innumerable orders involving a myriad of issues, one or more of which may be on

appeal at any given moment."  <u>Prudential Lines</u>, 170 B.R. at 244.

Here, the approval of the sale of the Hotel Property does not require the Court to

modify or expand upon the order approving the Settlement Motion or the decision to reopen

8

the record. Therefore, this Court has jurisdiction to approve the sale of the Hotel Property notwithstanding the Debtor's appeal of the order approving the Settlement Motion and the decision to reopen the record.

    II.    The Testimony in Support of the Sale

On March 25, 2011, a hearing was held on the motion to approve the sale. The Trustee proffered his testimony in support of the sale, explaining why, in his judgment, the sale should be approved, and was cross-examined by the Debtor. The Debtor put on the testimony of its principal, Charles Morais. On March 28, 2011, the Court reopened the record pursuant to § 105(a) to permit Optimum's testimony and to permit the Debtor to present evidence relating to the Hotel's appraisal. On March 29, 2011, the Trustee presented the testimony of Joseph McCann, the principal of Optimum.

Based upon the record made at the hearing, the Debtor's objections to approval of the sale are overruled. The Trustee's testimony, and Optimum's testimony showed that the Hotel Property was marketed widely in accordance with the Sales Procedures Order, and that Neshgold's offer was the highest and best received.

Joseph R. McCann, the president and principal of Optimum, testified with respect to the efforts taken with respect to the sales process. Mr. McCann testified that he is a licensed real estate broker in five states: New York, New Jersey, Pennsylvania, Massachusetts, and Connecticut. (Tr. 3/29/11 at 8, 45). He also testified that, among other affiliations and activities, he is president of Hotel Brokers International ("HBI"), which is a national organization that accounts for more than 30% of all the hotels sold in the United States. (Tr. 3/29/11 at 7-8.) He explained that the 50 hotel brokers involved in HBI "leverage each other's

relationships for co-brokerage, marketing, [and] advertising." (Tr. 3/29/11 at 19.) He testified that Optimum "only sell[s] hotels and hospitality entities." (Tr. 3/29/11 at 9.)

Mr. McCann testified regarding his efforts to market the Hotel Property. He "visited the [H]otel, spoke with the woman who's managing the [H]otel, took pictures, toured the [H]otel, inspected the [H]otel, and concurrently gathered all [the] market data and information . . . needed to write a substantial marketing package to sell the [H]otel." (Tr. 3/29/11 at 12-13.) Mr. McCann explained that the marketing package included pictures, market data, competitive research, a general description of the market, demand generators, and economic development in the Hotel's area. (Tr. 3/29/11 at 13, 17.) It also included information on construction specifics, an executive summary, and a summary of pertinent information to assist buyers in evaluating the property, such as the Debtor's agreement with the union. (Tr. 3/29/11 at 13.) Because he did not have access to the Hotel's financials, Mr. McCann obtained a report analyzing "the five-year trend of the market in terms of the revenue" of hotels. (Tr. 3/29/11 at 17.) He explained that this report assists potential buyers in determining how a typical hotel perform in that market. (Tr. 3/29/11 at 18.) The marketing package was received into evidence as Exhibit C.

Mr. McCann testified that he printed 7,500 hard copies of the marketing package, and also delivered copies via electronic format. (Tr. 3/29/11 at 15.) He also published two 1/8[th] page advertisements in major hotel magazines, Management and Hotel Business. (Tr. 3/19/11 at 18.) He upgraded his website to allow prospective purchasers to electronically execute a confidentiality agreement, and upon doing so, the prospective purchasers would be given access to another website containing the entire marketing package and other due diligence material. (Tr. 3/29/11 at 18-19.)

The Hotel was also advertised on HBI's website. (Tr. 3/29/11 at 19.) Mr. McCann disseminated press releases to 152 different media outlets, including the <u>Wall Street Journal</u>, <u>Real Estate</u> magazine, and <u>Real Estate Forum</u>. (Tr. 3/29/11 at 24.) He testified that the press release was included in the daily email sent out by <u>Hotel Business</u> to its email subscribers, and that he also purchased the "top line" on an email announcement by Hotel Online. (Tr. 3/29/11 at 24.) The advertisement included on Hotel Online's daily email generated "973 clicks." (Tr. 3/29/11 at 24.) Another press release was prominently displayed in Hotel News Resource, and was the fourth most read article in national trade journals. (Tr. 3/29/11 at 25.)

Mr. McCann testified that he sent an "e-mail blast" to 4,826 email addresses maintained in Optimum's database of qualified buyers to inform them that the Hotel Property was being offered for sale. (Tr. 3/29/11 at 19-20, Exhibit A, Email Blasts.) He further testified that an email blast was sent to 9,004 email addresses through HBI's database of qualified buyers. (Tr. 3/29/11 at 20.) Mr. McCann also sent and received 990 e-mails from parties relating to the sale. (Tr. 3/29/11 at 28.) He also attended two hotel investment conferences, the Americas Lodging Investment Summit and the Hotel Brokers International Convention, and disseminated brochures to market the Hotel Property. (Tr. 3/29/11 at 21.) Copies of those brochures were received into evidence as Exhibit B, under the tab entitled "Print Advertising."

Mr. McCann testified that, as soon as he was contacted by an interested party, he would email a letter to that party containing the access code to Optimum's web site that contained the full marketing package, pictures, and other due diligence materials. (Tr. 3/29/11 at 26.) Approximately 104 of these letters were sent, and the recipients' information is shown in Exhibit B, under the tab entitled "Due Diligence Web Code Sent." (Tr. 3/29/11 at 26.) Approximately 70 recipients of those letters executed the confidentiality agreement and entered

the website containing the marketing package and due diligence materials, and 50 parties engaged in additional discussions with Mr. McCann about the Hotel Property. (Tr. 3/29/11 at 26.) Those discussions typically involved the potential purchasers' request for additional information about the Hotel Property and the sales process, including "a feel for the asset's location, the market, . . . clarification on the rules of the bidding, . . . what brand [the Hotel] could . . . be converted to." (Tr. 3/29/11 at 26.) Mr. McCann further testified that some of the interested parties visited the Hotel through a formal tour, and that between 25 and 30 indicated they would visit the Hotel Property on their own. (Tr. 3/19/11 at 27.)

Mr. McCann testified that he emailed a "call for offers" on February 14, 2011 to the 104 parties that expressed interest through Optimum's website, indicating that any offers must be received by February 28, 2011 and providing the rules for the sale. (Tr. 3/29/11 at 28.) Mr. McCann sent a second email informing the parties that the deadline for submitting offers was extended. (Tr. 3/29/11 at 29.)

Mr. McCann testified that, based upon his efforts in the marketing process, he received two offers for the Hotel Property: one for $3 million and one for $13 million. (Tr. 3/29/11 at 29.) After Neshgold's credit bid was made, Mr. McCann approached the $13 million bidder to encourage it to increase its bid, but the attempt was unsuccessful. (Tr. 3/29/11 at 30.)

Mr. McCann testified that the fact that the Hotel does not have a franchise agreement negatively impacted the bids received for the Hotel Property because of the "uncertainly with the buying public of what renovations are needed, what standard are met or not met." (Tr. 3/29/11 at 30.) Mr. McCann explained that, while a non-branded hotel provides a purchaser with "a little bit of opportunity," it is generally difficult to sell such hotels because of the effect that being non-branded has on revenue performance. (Tr. at 3/29/11 at 30.) Additionally, Mr.

McCann testified that the lack of a franchise is a greater concern with respect to airport hotels, such as the Hotel, because of the "high transient activity," which generally requires "global connectivity and [a] reservation system." (Tr. 3/29/11 at 29.)

Mr. McCann testified that the union contract for the Hotel's employees was a second factor that negatively impacted the interest in the Hotel because "the buying public" does not "want to buy union hotels, because they perceive their operating costs, and labor, and [costs of] benefits [for workers] to be higher." (Tr. 3/29/11 at 32.)

Mr. McCann testified that, on the other hand, the sale was not negatively impacted by the fact that the lease for the adjacent parking lot was not initially included. (Tr. 3/29/11 at 32.) He acknowledged that "an extra parking lot does have some value with an airport hotel," because of "extra parking for weekend business, banquets, parties, [and] meetings," or because it can be a revenue generator, for example, a park-and-fly promotion with the hotel. (Tr. 3/29/11 at 32-33.) However, he explained that "[i]n general, airport hotels run a very high transient occupancy with almost zero drive-in business." (Tr. 3/29/11 at 33.)

III.  The Debtor's Objections to the Sale

The Debtor's principal objection to the approval of the sale is that the Trustee did not obtain an appraisal of the Hotel Property in connection with the marketing process, and that Neshgold's bid, though clearly the highest obtained, is so low in relation to the value of the asset as to "shock the conscience." As to the first argument, there is no requirement that an appraisal be obtained in connection with the sale of real property under § 363 of the Bankruptcy Code. Here, the Trustee properly concluded that there would be little point in the context of this case to obtain an appraisal, where the lack of funding to operate the Hotel Property made a prompt sale necessary.

Moreover, as Mr. McCann testified, the best offer received in a competitive bidding process reflects market value:

> Q:   And how do you make that determination what is the best price of the property?
> A:   Is what the market will offer –
> Q:   Uh-huh.
> A:    -- and purchase it for. That's the market value.
> Q:    And if the offers that you received don't reflect market, what do you do as the broker?
> A:   The process determines the value. Not –
> Q:   Process meaning what?
> A:   The competitive process of the bidding process determines market value.
> Q:   Okay. So if we have two bidders, that's going to be determining the market     value, is that what you're saying?
> A:   If you expose it to 10,000 and another 500 look at it, another 100 look at information, another 70 go back and forth with you, another 20 some visit the hotel, and then when the offers are due, you get two offers, I would think that is a pretty good indicator of market value.

(Tr. 3/29/11 at 38: 4-21.)

As to the second argument, there is no evidence that the $13,850,000 bid is so low in relation to the value of the Property as to "shock the conscience."  As evidence of the value of the Property, the Debtor offered the testimony of Mr. Morais, a principal of the Debtor, who testified that in his opinion it was worth $30 million, based upon the fact that it had 182 rooms.  (Tr. 3/25/11 at 130: 3-5.)  This testimony is entitled to little weight.  Mr. Morais is not an expert in the field of appraisal, and did not conduct an appraisal of the Hotel Property.  His conclusion was not based upon any analysis of comparable sales, the condition of the Hotel Property, or the income it generates.  Moreover, his testimony is anything but disinterested.

Additional evidence of the value of the Hotel Property was presented; the Debtor submitted an appraisal prepared by PKF Associates, which valued the Hotel at $20,000,000. This appraisal, however, was based upon the assumption that the Property had received a product improvement plan for re-conversion to a Crowne Plaza hotel, and that conversion took place by November 1, 2010 – which is not the case. No appraisal evidence was presented reflecting the value of the Hotel Property in its current condition, without a Crowne Plaza franchise.

The Debtor also argued that the Hotel Property was not adequately marketed because the availability of the adjacent parking lot was not publicized. As the Trustee pointed out, when the marketing process began, the lease for the parking lot was not available in connection with the sale. (Tr. 3/25/11 at 49.) When, after the approval of the settlement with Neshgold on March 18, the lot became available to potential purchasers, the deadline for bids had passed, but the Trustee informed the second highest bidder, who had offered $13,000,000, that the parking lot was also available, and the bidder declined to increase the offer. (Tr. 3/25/11 at 54.) The Trustee also testified that he believed, based upon Optimum's advice, that the availability of parking was irrelevant in marketing the Property given that it is an airport hotel.[5]

---

[5] When asked about the likely impact of the inclusion of the parking lot in the marketing package, Mr. McCann testified as follows:

> Q:      Now let me ask you a question. If you knew that the parking lot was part of this package so to speak, you as a broker, would you -- I guess you would have to send notices to the people. Would that be accurate?
>
> A:       I don't think that would be necessary, no.
>
> Q:      Well, why do you say that?
>
> A:      Well, it's just an extra asset with an expense attached to it. Okay. So it isn't what we presented and sold to them. And if – I'll give you an example. If someone wanted that parking lot, they would have to in essence value the lease on that parking lot as an expense of $125,000 a year which could erode their valuation of how much money they could make on the hotel.
>
> Q:      Well, however, the parking lot is revenue generating. That would also go into the evaluation, is that correct?

(Tr. 3/25/11 at 49:18 – 51:8.) The Trustee's actions with regard to the marketing of the parking lot with the Hotel Property provide no reason to deny approval of the sale.

The Debtor argued that two statements in the sales brochure, that the Debtor is affiliated with Kronos, and that the Hotel Property was being offered at a substantial discount to replacement cost, both undermined the sales process. The statement concerning the Debtor's affiliation with Kronos was explained by the Trustee as background information, and no cogent explanation was provided by the Debtor why this fact would undermine the marketing of the Property. The fact that the Hotel Property was being offered at a substantial discount to a replacement cost of $36,000,000 is self-evident, and Mr. McCann testified that such a statement would not negatively affect the purchase price.[6] Neither statement provides a basis to deny approval of the sale.

The Debtor also argues that Optimum was not a disinterested broker and alleged that Optimum had a loyalty to Neshgold or its affiliate, Rosedev, based upon prior business dealings. Mr. McCann testified to the contrary, explaining his prior interactions with Rosedev. He testified that he met the principal of Rosedev in 2004 when he introduced Rosedev to a hotel that was for sale. (Tr. 3/19/11 at 10.) Rosedev's offer was not accepted for that sale, but Mr. McCann later introduced Rosedev to two other properties. (Tr. 3/29/11 at 10.) Mr.

---

       A:      If they believe that the balance of expense to what extra revenue they could take in, I think it would be a situation they would have to make a capital budgeting decision on.
(Tr. 3/29/11 at 64:6-23.)

[6]       Q:      Okay. All right. Now when you use the terminology "substantial discount," do you think that term -- the use of that term has any effect on the price that you can achieve?
       A:      No.
       Q:      And why is that?
       A:      Because buyers are comparing it to construction cost only. So if they assume that a construction cost is [$]275,000 a room, and they're getting it for 250,000 a room, that's a discount.

(Tr. 3/29/11 at 88:19-89:1)

McCann testified that he has not had any transaction since then, and that he is not employed by Rosedev. (Tr. 3/29/11 at 10.) He further testified that he did not have any conversations with Neshgold or Rosedev to cause any reduction of the sales price of the Hotel Property, and was unaware of any efforts to negatively affect the sales price. (Tr. 3/29/11 at 34.) The Debtor has not produced any evidence to establish, or even raise a legitimate suspicion, that Mr. McCann or Optimum has a conflict of interest in this matter.

The Debtor also argues that the Hotel Property cannot be sold because the ground lease was rejected by operation of law pursuant to § 365(d)(4) because the Trustee did not obtain an extension of time to assume or reject the ground lease within 120 days after the date of the order for relief. This argument must be rejected.

Section 365(d)(4) provides that "an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of (i) the date that is 120 days after the date of the order for relief; or (ii) the date of the entry of an order confirming a plan." However, § 365(d)(4)(B), provides that, upon motion of the trustee for cause, the court may extend the deadline "prior to the expiration of the 120-day period," by an additional 90 days.

The Trustee's deadline to assume or reject the unexpired lease for the hotel property was February 1, 2011. On January 31, 2011, the Trustee filed a motion to extend the deadline. New Riviera Motel, LLC (the "Landlord") argued that, any extension must have been granted before expiration of the initial 120 days.

At the hearing held on March 16, 2011, the Trustee informed the Court that an agreement was reached with the Landlord, and that the Landlord's objection to his motion was

withdrawn so long as there will be no change of use of the Hotel Property by any successful bidder. The resolution also provided that the terms of the lease will remain the same.

It is well established that a landlord may waive, or be estopped from asserting, that an unexpired lease is rejected as a matter of law. See In re Esmizadeh, 272 B.R. 377, 387 (Bankr. E.D.N.Y. 2002); In re THW Enterprises, Inc., 89 B.R. 351, 355-56 (Bankr. S.D.N.Y. 1988) (citing cases). Therefore, given the resolution between the Trustee and the landlord, the provisions of § 364(d)(4) have been waived.

Assuming the Debtor has standing to argue that the ground lease was rejected, the doctrine of quasi-estoppel bars the Debtor from asserting that the ground lease was rejected by operation of law. "Quasi estoppel operates to bar a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by that party." HSBC Bank USA v. Adelphia Commc'ns Corp., Nos. 07-CV-553A, 07-CV-555A, 07-CV-554A, 2009 WL 385474, at *18 (W.D.N.Y. Feb.12, 2009). The Debtor's proposed plan of reorganization provides for, and indeed depends upon, the assumption of the ground lease. (ECF. No. 195 ¶8.3.) Therefore, the Debtor cannot argue that the lease was rejected for purposes of the Trustee's motion to sell the Hotel Property, but at the same time seek to assume it for the purposes of reorganizing the Debtor pursuant to its proposed plan.

Therefore, the nonresidential lease for the hotel property has not been rejected, and may be assumed and assigned to the purchaser of the Hotel Property. The Debtor's argument to the contrary provides no reason to deny approval of the sale.

IV. The Proposed Sale Satisfies the Applicable Legal Standard

    a. The Standard for Approval of a Sale of Assets under § 363 in Chapter 11.

Section 363(b) authorizes a trustee, after notice and a hearing, to sell property of the estate outside the ordinary course of business. 11 U.S.C. § 363.

The Second Circuit's landmark decision in Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983) set forth the balancing test which is applied to determine when assets may be disposed of in chapter 11 prior to confirmation of a plan of reorganization: "[t]here must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)." Id. at 1070. As the Court noted in In re General Motors Corp., 407 B.R. 463, 489-90 (Bankr. S.D.N.Y. 2009), "in the Second Circuit, as elsewhere, even the entirety of a debtor's business may be sold without waiting for confirmation where there is good business reason to do so."

In Lionel, the Second Circuit "set forth a nonexclusive list to guide the court in consideration of the issue.

> (a) the proportionate value of the asset to the estate as a whole;
> (b) the amount of elapsed time since the filing;
> (c) the likelihood that a plan of reorganization will be proposed and confirmed in the near future;
> (d) the effect of the proposed disposition on future plans of reorganization;
> (e) the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property;
> (f) which of the alternatives of use, sale or lease the proposal envisions; and 'most importantly perhaps,'
> (g) whether the asset is increasing or decreasing in value."

General Motors, 407 B.R. at 490 (quoting Lionel, 722 F.2d at 1071).

General Motors supplemented the Lionel factors to include the following:

- Does the estate have the liquidity to survive until confirmation of a plan?
- Will the sale opportunity still exist as of the time of plan confirmation?
- If not, how likely is it that there will be a satisfactory alternative sale opportunity, or a stand-alone plan alternative that is equally desirable (or better) for creditors?
- Is there a material risk that by deferring the sale, the patient will die on the operating table?

General Motors, 407 B.R. at 490.

While the party seeking approval of the sale bears the burden to satisfy the standard under § 363(b), a party objecting to the sale "is required to produce some evidence respecting its objections." Lionel, 722 F.2d at 1071.

    b.  Application of the Standard to the Facts.

The exigencies of this case demonstrate the need for a prompt sale of the Hotel Property. The income generated by the Hotel Property is cash collateral of Neshgold. Under the Cash Collateral Order, the right to use Neshgold's cash collateral terminates on March 31, 2011. Absent use of cash collateral, there is no funding to operate the Hotel Property. When asked at the March 25 hearing what will happen if the sale is not approved, the Trustee responded:

> Mr. Nisselson:     Well, I think I could answer it that way. If the sale is not approved, cash collateral will be over. I will be forced to close the hotel so we'll have no operating means by which to continue operations because we would not be generating any cash collateral because I can't utilize any of the cash collateral. We would close the hotel, and I imagine at that point we would have to make a motion to convert the case to Chapter 7. There are other aspects of the case that would need to be pursued, although Your Honor could

consider dismissal, but I would probably
counsel against that.

(Tr. 3/25/11 at 141:19 - 142:3.)

Cash collateral may be used without the consent of a secured creditor holding an
interest in the collateral only when adequate protection can be provided for the use of the cash
collateral. Here, the Hotel Property is operating at a deficit. In seeking approval of the Sales
Procedure and Cash Collateral Orders, the Trustee stated that the Hotel does not generate
sufficient revenue to pay its administrative expenses. This was reiterated by the Trustee at the
hearing on this motion:

> The Court:      Mr. Nisselson, does your, is the hotel operating
> on the basis that it's paying administrative costs
> at this point?
>
> Mr. Nisselson:      Absolutely not, Your Honor. And it's not
> paying debt service. And it's not paying real
> estate taxes of almost a $1 million. And it's, we
> have not paid ground rent for February and
> March. I paid January rent. And we're just
> basically meeting the expenses as they're
> coming due. And we haven't been able to pay
> the vast amount of expenses that were run up by
> the Debtors after bankruptcy but before I was
> appointed.

(Tr. 3/25/11 at 151: 8-17.)

Under these circumstances, it is clear that the Hotel's operations do not generate
sufficient revenues to provide adequate protection for use of cash collateral on an operating
basis. Nor is there evidence from which to conclude that there is an equity cushion sufficient
to provide adequate protection. While the Debtor introduced in evidence an appraisal valuing
the Hotel Property at $20,000,000, that valuation was based on the assumption that the Hotel
had received a product improvement plan for conversion to a Crowne Plaza Hotel, and that the

conversion had taken place on November 1, 2010 – a significant assumption which is contrary

to the facts.   Even if there were an equity cushion, it would be eroded on an ongoing basis by

the accumulation of unpaid ground rent, real estate taxes, and debt service.  All of these

circumstances support the Trustee's conclusion that the Hotel does not have the necessary

funding to continue operations after March 31.

Thus, on this record, it appears that the estate does not have the liquidity to survive

until confirmation of a plan – which is the first of the additional factors outlined in General

Motors.  Nor is there any assurance that the sale would be available at the time of Plan

confirmation.  Neshgold's offer is contingent on a March 31 closing.  The highest other bid

received fell more than $850,000 below the amount of Neshgold's bid, and there is no reason

to believe that either offer would be received for the Hotel after it ceased operations.

With respect to the third General Motors factor, whether there will be a stand-alone

plan alternative that is equally desirable or better for creditors, the Debtor's plan is fraught with

problems, which have been outlined by the parties supporting this proposal sale in briefing

submitted in support of this motion.  This proposed Plan, which has not been moved by the

Debtor toward confirmation since it was filed on March 8, cannot be considered a viable

alternative to the proposed sale.  The sale will provide value to numerous constituencies in this

case: it will resolve Neshgold's secured claim; it will result in the Landlord receiving payment

of arrears under the ground lease; it will benefit the Union, which reached an agreement with

Neshgold to resolve labor disputes at the Hotel; it will provide for $510,000 to be paid to

administrative and unsecured creditors.  If the sale is not approved, the Hotel will likely cease

operating, and substantial value will likely be lost.

Against this backdrop, an analysis of the <u>Lionel</u> factors leads to the conclusion that there is a "good business reason" to approve the sale. As to the first factor, while the assets being sold consist of substantially all of the estate's property, the sale is appropriate given the inability of the Trustee to fund continued operations. As to the second factor, this case has been pending since October 4, 2010, almost six months. The Debtor (or any other party) had ample opportunity to obtain confirmation of a plan, which has not occurred. With respect to the third factor, the Debtor's current proposed plan has no reasonable likelihood of confirmation, and there has been no other plan proposed. With respect to the fourth factor, it is not clear that there will be a future plan of reorganization in any event. With respect to the fifth factor, although the Debtor's appraisal is in evidence, it is not a basis to conclude that the price is inadequate, given that the appraisal is based on the assumption that the Hotel is operating as a Crowne Plaza, which it is not, and given the evidence presented of the marketing campaign conducted by Optimum. Finally, with respect to the final <u>Lionel</u> factor, if the sale is not approved, and the Hotel ceases operations, value will likely be lost for many creditor constituencies, including the Landlord, the Union and Fund Creditors, administrative claimants and unsecured creditors.

In sum, the evidence presented establishes that the Hotel property was extensively and appropriately marketed. The offer that the Trustee seeks to accept is the highest and best of the offers presented. There is ample business justification for the sale.

V.     Finding Under § 363(m)

The order presented by the Trustee contains a proposed finding that Neshgold has purchased the Hotel Property in good faith, within the meaning of § 363(m) of the Bankruptcy Code. As the Second Circuit has noted, "[b]ankruptcy courts routinely make a finding of good

faith at the time of the § 363 sale approval." <u>Licensing By Paolo, Inc. v. Sinatra (In re Gucci)</u>, 126 F.3d 380, 389 (2d Cir. 1997). The <u>Guicci</u> court held that "the good-faith analysis is focused on the purchaser's conduct in the course of the bankruptcy proceedings. This includes the purchaser's actions in preparation for and during the sale itself. That is, the good-faith requirement prohibits fraudulent, collusive actions specifically intended to affect the sales price or control the outcome of the sale." <u>Id.</u> at 390.

Here, the marketing for the sale was conducted by Optimum, and the testimony established that there was no interference or involvement by Neshgold or any other party in the marketing process, nor any evidence of any "fraudulent, collusive actions specifically intended to affect the sale price or control the outcome of the sale." <u>Id.</u> Accordingly, a good-faith finding pursuant to § 363(m) is appropriate in this case.

Conclusion

For the foregoing reasons, the Trustee's motion to approve the sale of the Hotel Property is approved.



**Dated: Brooklyn, New York**
**March 30, 2011**

_____
**Carla E. Craig**
**United States Bankruptcy Judge**